UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

_____

UNITED STATES OF AMERICA,

                Plaintiff,

                                    Case No.  18-20495

      v.

                                    HON. DAVID M. LAWSON

IBRAHEEM IZZY MUSAIBLI,
   aka Abu Shifa Musaibli,
   aka Abu 'Abd Al-Rahman Al-Yemeni,
   aka Abu Abdallah Al Yemeni,
   aka Abdallah Umar Al-Salih,
   aka Ibraheem 'Izd 'Umar Salih Musaibad,

                Defendant.

_____

## UNITED STATES' MOTION TO ADMIT ISIS DOCUMENTS RELATED TO DEFENDANT AND HIS CO-CONSPIRATORS
_____

Ibraheem Musaibli joined the terrorist organization ISIS (also known as the Islamic State) in late 2015. During his time with the group, Musaibli attended a military training camp, engaged in combat, conducted armed guard duty, and conspired with other ISIS members to assist foreigners to travel to the Islamic State. In the spring of 2018, ISIS lost much of its former territory to a coalition of troops led by the United States military (hereinafter the "Coalition Forces"). As Coalition Forces took back territory from ISIS, they recovered documents, electronic storage

media, and electronic devices belonging to ISIS. Coalition Forces then exploited and analyzed the recovered media to assist in the efforts against ISIS.

The United States seeks to admit several documents recovered from the collected media. These documents relate to Musaibli personally, his brigade of foreign fighters collectively, and ISIS's military apparatus generally. The United States requests that the Court hold an evidentiary hearing, pursuant to Federal Rule of Evidence 104(a), to determine the admissibility of the ISIS documents. Counsel for Musaibli does not concur in the admissibility of the documents.

MATTHEW SCHNEIDER
United States Attorney

s/*Kevin M. Mulcahy*
Kevin M. Mulcahy
Hank Moon
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Kevin.Mulcahy@usdoj.gov
(313) 226-9713

Date:  December 31, 2020

## BRIEF IN SUPPORT OF MOTION TO ADMIT DOCUMENTS

## I
## THE ISLAMIC STATE

### A. The History and Evolution of ISIS

In 1999, the country of Jordan released Abu Musab al-Zarqawi after he served 5 years of a 15-year sentence for unlawful possession of firearms and membership in a militant organization. Zarqawi then moved to Afghanistan, where he made contact with al-Qaeda's leadership and established his own jihadi group known as Jama'at al-Tawhid wal-Jihad ("JTWJ"). Zarqawi's group plotted attacks against Western tourist spots in Jordan and elsewhere before eventually moving to Iraq. By the beginning of the Iraq war in 2003, JTWJ moved on to targeting the government of Jordan, the international community, and the Shia, which Zarqawi viewed as the chief threat to Sunni power in Iraq and the wider region. In September 2004, Zarqawi pledged allegiance to al-Qaeda and Osama Bin Laden. From that point onward, JTWJ was known as al-Qaeda in Iraq ("AQI").[1] Over the next few years, other jihadi groups in Iraq joined AQI to form a coalition under Zarqawi's leadership.

On June 7, 2006, Zarqawi was killed. In the years following his death, AQI changed its name to the Islamic State in Iraq ("ISI"). By 2011, the group had moved

---

[1]      On October 15, 2004, the U.S. Secretary of State designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

its headquarters to Mosul, Iraq, and named a new leader: Abu Bakr al-Baghdadi. Prison breaks and bombings followed, leading to an increase in ISI members and increased influence in the region. ISI exploited the Arab Spring in 2011 and the Syrian civil war to gain recruits, weapons, and land.  Perhaps most importantly, on April 9, 2013, Baghdadi confirmed in an audio statement that Jabhat al-Nusra (another large jihadi group) was joining ISI: the combined group ultimately became the now-familiar Islamic State in Iraq and al-Sham ("ISIS").[2]

On June 29, 2014, ISIS released an audio recording announcing a formal change of its name to the Islamic State and declaring the formation of a Caliphate or Islamic State. On July 4, 2014, Baghdadi made a rare public appearance during Friday evening prayers at the Grand Mosque of al-Nuri in Mosul to declare himself the Caliph (or leader of the Caliphate) and—importantly to this case—calling on Muslims around the world to join the group, which he renamed the Islamic State or IS.

Acquiring land and establishing a government structure over that territory was vital to the Caliphate. "By 2014, ISIL had taken Mosul from a defeated Iraqi army,

---

[2]      On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (i.e., "ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.

as well as Raqqa and oil-rich Deir Az Zor in Syria. The group used tools and bulldozers to begin systematically dismantling the Syria-Iraq border, turning its caliphate aspirations into reality." *The Rise and Fall of ISIL Explained,* June 20, 2017, www.aljazeera.com/features/2017/6/20/the-rise-and-fall-of-isil-explained (last visited Dec. 16, 2020). At its peak, the Islamic State ruled over parts of Syria and Iraq equivalent to the size of the United Kingdom. *See* Ian Johnson, *The rise of ISIS: Terror group now controls an area the size of Britain, expert claims*, Sept. 4, 2014, www.independent.co.uk (last visited Dec. 7, 2020).

### B. ISIS as a Bureaucracy

Almost immediately, the Caliphate ran its territory with a bureaucracy that rivaled large, formal, state governments. "The group takes a bureaucratic, systematized approach to maintaining power that makes it look in some ways more like a settled government than a fly-by-night band of extremists. Whether under the flag of the Islamic State, or ISIS before that, the group organizes the territory it administers into well-defined geographic units, levies taxes in areas it controls, and manages large numbers of fighters across a sparsely populated territory roughly the size of the United Kingdom." Jacob N. Shapiro and Danielle F. Jung, *The Terrorist Bureaucracy: Inside the Files of the Islamic State*, BOSTON GLOBE (Dec. 14, 2014) www.scholar.princeton.edu/sites/default/files/jns/files/the_terrorist_bureaucracy_inside_ _the_files_of_the_islamic_state_in_iraq_-_ideas_-_the_boston_ _globe_0.pdf.

"The group [] meted out services . . . which in certain categories outperformed the one it had usurped. The Islamic State collected taxes and saw to it that the garbage was picked up. Couples who got married could expect to receive a marriage license printed on Islamic State stationery. Once children of those unions were born, their birth weight was duly recorded on an ISIS-issued birth certificate. The group even ran its own D.M.V." *See* Rukmini Callimachi and Falih Hassan, *Abu Bakr al-Baghdadi, ISIS Leader Known for His Brutality, Is Dead at 48,* THE NEW YORK TIMES (Oct. 27, 2019), https://www.nytimes.com/2019/10/27/ world/middleeast/al-baghdadi-dead.html.

Numerous media outlets obtained copies of ISIS documents and reported on the terrorist group's detailed record keeping. *See* Rukmini Callimachi, *The ISIS Files: When Terrorists Run City Hall*, THE NEW YORK TIMES (Apr. 4, 2018), https://www.nytimes.com/interactive/2018/04/04world/middleeast/isis-documents-mosul-iraq.html ("The world knows the Islamic State for its brutality, but the militants did not rule by the sword alone. They wielded power through two complementary tools: brutality and bureaucracy."); Ghaith Abdul-Ahad, *The Bureaucracy of Evil: How Islamic State Ran a City,* THE GUARDIAN (Jan. 29, 2018), https://www.theguardian.com/cities/2018/jan/29/bureaucracy-evil-isis-run-city-mosul ("Totalitarian regimes can't survive on millennial ideology and mass terror alone. They need a functioning bureaucracy and competent administrators.");

*Documents Reveal ISIS Bureaucracy*, CBC NEWS: THE NATIONAL (Nov. 14, 2014), www.youtube.com/watch?v=OvhftJHHtel ("ISIS clearly has an obsession with paperwork.").

## II
## IBRAHEEM MUSAIBLI

### A. Background

Ibraheem Musaibli was born in Dearborn, Michigan in May 1990.  Musaibli dropped out of high school to work at his parents' perfume shop.  Musaibli spent considerable time in Yemen—the country of his parents' birth and to which he feels a particular connection—throughout his youth. Musaibli married his first wife in Yemen at age 19. That marriage resulted in the birth of two children, whose names would later serve as part of Musaibli's kunya, or nom de guerre, while fighting for the Islamic State.

From October 2013 to March 2014, Musaibli attended a religious school in Dammaj, Yemen. This attendance coincided with the second of two sieges of the school by Shiite rebels known as Huthis. Huthis and students at the school (as well as local tribesmen) battled for several months. Eventually, the sides reached a ceasefire.  Musaibli returned to the United States a few months after the fighting stopped.

When Musaibli came back from Dammaj, he brought his wife and two children with him. The marriage did not last long thereafter. Musaibli's wife took

the children back to Yemen by the end of 2014. From 2013 through early 2015, Musaibli began consuming internet jihadi material on his path to radicalization. For example, Musaibli digested Anwar Al Awlaki[3] propaganda videos, and sent them to friends and family members. In February 2015, Musaibli married a woman from Pennsylvania and fathered another child. Before the child's birth, however, Musaibli left the United States.

### B. Musaibli Joins ISIS

In April 2015, Musaibli returned to Yemen where he married a third woman, fathered another child, and left again prior to the birth. By early October 2015, Musaibli began his journey from Yemen to Syria to join ISIS. The defendant traveled through Saudi Arabia and Turkey prior to crossing into Syria. By late October or early November 2015, the defendant had joined ISIS in Raqqa, Syria: ISIS's self-proclaimed capital. There, the defendant attended a ten-day ISIS religious training camp. He then traveled with other ISIS members to Mosul, Iraq, where he attended an ISIS military training camp. The military camp included training on crossing terrain with a machine gun, shooting a machine gun, and conducting ambush techniques. Upon graduation from the ISIS military training camp, the defendant swore allegiance to ISIS and its leader, Abu Bakr Al-Baghdadi.

---

3      Anwar al-Awlaki was a prominent leader and recruiter for al Qaeda in the Arabian Peninsula ("AQAP"), a designated foreign terrorist organization, who was killed in 2011.  Al-Awlaki was a prolific producer of English-language jihadist propaganda, which, even after his death, continues to inspire individuals to participate in violent jihad.

At the end of the training camp, ISIS assigned the defendant to a military brigade and issued him a Kalashnikov assault rifle, a vest, magazines, and grenades. The defendant went with other ISIS members of his military brigade, armed with Kalashnikov assault rifles, grenades, and RPGs, to Hit, Iraq. There, Musaibli fought alongside other ISIS members as they tried to protect Hit from the advancing Coalition Forces. Musaibli engaged in combat and conducted ribat on behalf of ISIS. Ribat is a form of armed guard duty where ISIS fighters protect the front line of the battle against enemy advancement.

The defendant remained with ISIS for over two and one-half years. By November 2016, the defendant was with ISIS in Dayr Az Zawr, Syria, one of ISIS's remaining strongholds at that time. The defendant admitted to law enforcement that he conducted armed guard duty and fought on behalf of ISIS against the Syrian Army while in Dayr Az Zawr. He claimed to recall only firing his weapon twice at Syrian military positions.

As ISIS lost territory, the defendant retreated with the terrorist group. Eventually, Syrian Democratic Forces captured the defendant and he remained in SDF custody until he was turned over to the FBI. In July 2018, he was flown back to the United States to face terrorism-related charges.

## C. The ISIS Documents

Given ISIS's record-keeping prowess and Musaibli's lengthy tenure with the terrorist organization, it is not surprising that records related to Musaibli have been recovered. As detailed below, several identify Musaibli himself, while other recovered documents are about ISIS generally, Musaibli's brigade/battalion (Tariq bin Ziyad),[4] or some of Musaibli's coconspirators. These documents are directly relevant to establishing (1) the conspiracy and agreement by Musaibli and others to provide material support to ISIS; (2) that Musaibli specifically provided material support to ISIS in the form of his own personal service, specifically, serving under the direction and control of ISIS as a solider; and (3) that he attended a training camp (as charged in Count Three of the First Superseding Indictment) because soldiers for ISIS received military training from the group.

What follows are brief descriptions of the documents recovered thus far. A copy of these documents will be provided to the Court, under separate cover, prior to the hearing on this motion. Should additional relevant documents become available, the United States will update both the defense and the Court.

---

4       ISIS battalions are named after historic Generals; e.g., Tariq Bin Ziyad, who is known for his conquest to cross Gibraltar from Morocco to conquer Spain in 700 AD.  The Tariq Bin Ziyad Battalion was created by Abu Souleymane al-Faransi a/k/a Abdelilah Himich, a Moroccan-born French citizen and alleged co-planner of 2015 and 2016 terrorist attacks in France and Belgium. The Tariq Bin Ziyad Battalion was made up largely of foreign terrorist fighters.

### 1.  The Tariq bin Ziyad Roster

In February 2017, Iraqi military forces recovered numerous ISIS documents in Mosul, one of which was an ISIS roster listing members of the Tariq bin Ziyad foreign fighter brigade. Iraqi military forces provided the documents to the United States Department of Defense that same day. The next day, the original documents were transported to a DoD military facility in Iraq and scanned into the DoD network for exploitation, placed in evidence bags, and returned to Iraqi military forces. Michael Frost, a DoD staff operations specialist, then sent the scanned documents to the FBI's Counterterrorism Division for further analysis.

The Tariq bin Ziyad roster contained information on 341 brigade members. A stamp on the first page notes that it is from the Islamic State, Diwan al-Jund, which means the Office of the Soldiers. The 18-page roster provides information on various soldiers broken into categories, including lists of soldiers who were martyred, injured, ready, on leave, and wanted, among other categories. The second page of the document lists Tariq bin Ziyad fighters who are "resting after a raid." Musaibli is on this list. Specifically, the translated entry provides several pieces of information about him:

| | |
|---|---|
| Kunya: | Abu 'Abd-al-Rahman Al-Yemeni |
| Date of birth: | 27/5/1990 |
| Census Number: | 1200015723 |
| Nationality: | Yemen |
| Position: | Fighter |
| Remarks: | He left the frontline twice without permission |

The information in this document is corroborated by other sources. For example, Musaibli told family members that he used the kunya Abu 'Abd-Al-Rahman. In English, the kunya translates to the father of 'Abd-Al-Rahman. Musaibli's eldest son is named Abd Al Rahman. The ISIS census number is akin to social security numbers in the United States, and it was used by ISIS in identifying its soldiers and members. Additionally, Musaibli's parents are naturalized U.S. citizens from Yemen and Musaibli spent significant time in Yemen (hence the last portion of his kunya being "al Yemeni" or from Yemen and the indication in the roster that his nationality is "Yemen"). Finally, Musaibli's date of birth is correctly listed in the roster as May 27, 1990.

## 2. The Payroll Records

In June 2017, Coalition Forces recovered electronic media in Mosul, Iraq.[5] Included in the electronic media were payroll sheets that contained information about each ISIS member receiving pay, including name, kunya, census number, family information, date of birth, amount paid, brigade, and the month(s) of payment. For Musaibli, the entries—which are broken up into two parts here for ease of review—read as follows:

---

5       The government provided the exact coordinates of the media's recovery location to the defense.

| Full Name and Tribe [Arabic] | Full Name and Tribe [HT] | Full Name and Tribe [Variant] | Kunyah [Arabic] | Kunyah [HT] | Census Number | DOB |
|---|---|---|---|---|---|---|
| ابراهيم عزد عمر صالح مسيبد | Ibrahim 'Azd 'Umar Salih Masaybad | | ابو عبد الرحمن اليمني | Abu-'Abd-al-Rahman al-Yemeni | 1200015723 | 27-May-1990 |
| ابراهيم عزد عمر صالح مسيبد | Ibrahim 'Azd 'Umar Salih Masaybad | | ابو عبد الرحمن اليمني | Abu-'Abd-al-Rahman al-Yemeni | 1200015723 | 27-May-1990 |
| ابراهيم عزد عمر صالح مسيبد | Ibrahim 'Azd 'Umar Salih Masaybad | | ابو عبد الرحمن اليمني | Abu-'Abd-al-Rahman al-Yemeni | 1200015723 | 27-May-1990 |
| ابراهيم عزد عمر صالح مسيبد | Ibrahim 'Azd 'Umar Salih Masaybad | | ابو عبد الرحمن اليمني | Abu-'Abd-al-Rahman al-Yemeni | 1200015723 | 27-May-1990 |
| ابراهيم عزد عمر صالح مسيبد | Ibrahim 'Azd 'Umar Salih Masaybad | | ابو عبد الرحمن اليمني | Abu-'Abd-al-Rahman al-Yemeni | 1200015723 | 27-May-1990 |
| ابراهيم عزد عمر صالح مسيبد | Ibrahim 'Azd 'Umar Salih Masaybad | | ابو عبد الرحمن اليمني | Abu-'Abd-al-Rahman al-Yemeni | 1200015723 | 27-May-1990 |
| ابراهيم عزد عمر صالح مسيبد | Ibrahim 'Azd 'Umar Salih Masaybad | | ابو عبد الرحمن اليمني | Abu-'Abd-al-Rahman al-Yemeni | 1200015723 | 27-May-1990 |
| ابراهيم عزد عمر صالح مسيبد | Ibrahim 'Azd 'Umar Salih Masaybad | | ابو عبد الرحمن اليمني | Abu-'Abd-al-Rahman al-Yemeni | 1200015723 | 27-May-1990 |
| ابراهيم عزد عمر صالح مسيبد | Ibrahim 'Azad 'Umar Salih Musaybad | | ابو عبد الرحمن اليمني | Abu-'Abd-al-Rahman al-Yemani | 1200015723 | |

| Wives | Children | Parents | Dependents | Rent [IQD] | Sustenance | al Stipe | Diwan / Sector / Department | Assignment | Money Disposition | Remarks | Months [Time Period] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 40 | 90 | Abu-Mu'tazz al-Qarashi Division | Tariq Bin-Ziyad | | | Jumada t-Tania [1437, 11 MAR - 08 APR 2016] |
| 0 | 0 | 0 | 0 | 0 | 30 | 80 | Abu-Mu'tazz al-Qarashi Division | Tariq Bin-Ziyad | | | Dhu l-Qa'da [1437, 05 AUG - 03 SEP 2016] |
| 0 | 0 | 0 | 0 | 0 | 40 | 90 | Abu-Mu'tazz al-Qarashi Division | Tariq Bin-Ziyad | | | Rajab [1437, 09 APR - 08 MAY 2016] |
| 0 | 0 | 0 | 0 | 0 | 40 | 90 | Abu-Mu'tazz al-Qarashi Division | Tariq Bin-Ziyad | | | Sha'ban [1437, 09 MAY - 07 JUN 2016] |
| 0 | 0 | 0 | 0 | 0 | 30 | 80 | Abu-Mu'tazz al-Qarashi Division | Tariq Bin-Ziyad | | | Ramadan [1437, 07 JUN - 06 JUL 2016] |
| 0 | 0 | 0 | 0 | 0 | 30 | 80 | Abu-Mu'tazz al-Qarashi Division | Tariq Bin-Ziyad | | | Shawwal [1437, 07 JUL - 04 AUG 2016] |
| 0 | 0 | 0 | 0 | 0 | 20 | 63 | Abu-Mu'tazz al-Qarashi Division | Tariq Bin-Ziyad | | | Dhu l-Hijja [1437, 04 SEP - 02 OCT 2016] |
| 0 | 0 | 0 | 0 | 0 | 20 | 56 | Abu-Mu'tazz al-Qarashi Division | Tariq Bin-Ziyad | | | Muharram 1438 [03 OCT - 01 NOV 2016] |
| 0 | 0 | 0 | 0 | 0 | 20 | 70 | Abu-Mu'tazz al-Qarashi Division | Tariq Bin-Ziyad | | | Safar 1438 [02 - 30 NOV 2016] |
| | | | | | | | Al-Mu'tazz Billah Division | Tariq Bin-Ziyad | | | Jumada l-Ula [1437, 10 FEB - 10 MAR 2016] |
| | | | | | | | Al-Mu'tazz Billah Division | Tariq Bin-Ziyad | | | Jumada l-Ula [1437, 10 FEB - 10 MAR 2016] |

Like the Tariq bin Ziyad roster, several components of the payroll record correspond to Musaibli. Those include his kunya, his name (with a slight misspelling), his date of birth, his brigade, and his ISIS census number. The chart shows Musaibli receiving monthly payments for most of 2016, which aligns with Musaibli having joined ISIS sometime in late 2015.

Given the extensive nature of the ISIS bureaucracy and its recordkeeping and transfer of data methods, multiple different copies and versions of this payroll sheet exist. For example, in addition to the version found by Coalition Forces shown above, a UN investigative team assigned to hold ISIS members accountable for crimes against humanity (called UNITAD) recovered similar payroll records with the same information about Musaibli on them. UNITAD recovered its documents from Northern Iraq as well, independent of Coalition Forces. The United States intends to call a witness from the United Nations investigative team during the proposed evidentiary hearing.

### 3.  Office of the Treasury, Soldier's Administration Report

On December 27, 2017, ISIS electronic media was recovered in Hasaka Province, Syria.  Among the records was a link chart for the Islamic State's "Office of the Treasury" displaying several boxes under the heading "Estimated Budget," as shown below.



The first box was called "Work Force." Clicking on that link leads to an Excel Spreadsheet entitled "Soldier's Administration Ledger." Line 20901 of the Solder's Administration ledger lists and identifies defendant Musaibli. That line provides his name, kunya (Abu 'Abd-al-Rahman al-Yemeni), census number (matching the other documents), date of birth (May 27, 1990), brigade (Tariq bin Ziyad), and total payment received.

14

### 4. Syrian Roster

In December 2017, in Hasaka Province, Syria, Coalition Forces recovered a roster of ISIS fighters that included stipends paid to listed soldiers, unit assignments, and other information. The spreadsheet had a few different tabs regarding ISIS dependents as well as personal information about the fighters. A line item on that list identifies Musaibli, including his ISIS census number (matching the other documents), kunya (Abu 'Abd-al-Rahman al-Yemeni), brigade (Tariq bin Ziyad), date of birth (May 27, 1990), and reflects that he received payment. The document lists his occupation as "soldier."

### 5. Hospital Records

The United States also intends to offer hospital records related to Musaibli's various stays in an ISIS hospital in Raqqa. Issued by ISIS's Office of Health, the Raqqa General Clinic records reveal that Musaibli received lab tests, X-rays, and examinations from September to November 2016. It lists Musaibli as being a member of the Office of the Soldiers. Below is a translated portion of two such records:



| | | | | | Total | Total |
|---|---|---|---|---|---|---|
| **Date** | **Personnel number** | **Assigned to** | **Type of Treatment** | **Name/ Alias** | $0 | 4,086,579 لىس. |
| Corresponding to 11th Sept., 2016 | Leave | Allepo | Lab test | Abu 'Abd-al-Rahman al-Yemeni | | 1,700 |
| Corresponding to 8th Nov., 2016 | | Office of Soldiers | X-ray with examination | Abu 'Abd-al-Rahman al-Yemeni | | 900 |
| Corresponding to 17th Nov., 2016 | | Office of Soldiers | X-ray with examination | Abu 'Abd-al-Rahman al-Yemeni | | 2,100 |
| Corresponding to 20th Nov., 2016 | | Office of Soldiers | Examination with lab test | Abu 'Abd-al-Rahman al-Yemeni | | 1,900 |
| Corresponding to 25th of Nov., 2016 | | Office of Soldiers | Examination | Abu 'Abd-al-Rahman al-Yemeni | | 500 |

Header of chart:

| Month of Dhu I Hijja, 1437 Hijri | Treatment of the Brothers 2 | Office Of Heath al-Raqqah's General Clinic |
|---|---|---|
| -USD 8,173 | **Surplus of Deficit** | **Allocated Amount** |
| USD 8,173 | The amount spent is in Syrian Liras at the exchange rate indicated in the budget () equals to | |

### 6.  ISIS and Tariq bin Ziyad Documents

In addition to documents specifically identifying Musaibli, the United States intends to offer documents related to his brigade, Tariq bin Ziyad, and ISIS generally. One such document is a flow chart that lays out the Office of Soldiers' structure, including the various infantry brigades and battalions. Tariq bin Ziyad is

among those battalions. Inserted below is a translated copy of the brigade structure chart:



Another ISIS document that the government intends to use at trial sets forth how ISIS assigned census numbers. As indicated throughout this motion, Musaibli had a consistent census number—similar to a social security number in the United States—that ISIS used to identify him (to pay him, for example). This document shows that census numbers correspond with different Wilayats (similar to provinces), but that census numbers beginning with "120001" are reserved for the Military Administration. Musaibli's census number begins with "120001." One portion of this chart, shown here in Arabic and English, looks like this:

| 1150010000 | ولاية صلاح الدين | 15 | 15 | Wilayat Salah Al-Din | 1150010000 |
| 1160010000 | ولاية كركوك | 16 | 16 | Wilayat Kirkuk | 1160010000 |
| 1170010000 | ولاية نينوى | 17 | 17 | Wilayat Nineveh | 1170010000 |
| 1180010000 | ولاية الجزيرة | 18 | 18 | Wilayat Al-Jazeera | 1180010000 |
| 1190010000 | ولاية دجلة | 19 | 19 | Wilayat Dijlah (Tigris) | 1190010000 |
| 1200010000 | الادارة العسكرية | 20 | 20 | The Military Administration | 1200010000 |

There are other documents related to ISIS and Musaibli's co-conspirators, including:

- A proclamation from ISIS that every member must be assigned a census number;

- An after-action report explaining why ISIS lost the battle of Hit, Iraq (a battle Musaibli was involved in);

- A wanted poster of a British ISIS member with whom Musaibli conspired to recruit two British teenage brothers to travel to join ISIS; and

- An example of weekly activity reports related to the Tariq bin Ziyad brigade.

## III
## THE LAW

Federal Rule of Evidence 104(a) allows for pretrial hearings to determine the admissibility of evidence before trial. *See* Fed. R. Evid. 104(a). Admissibility of the ISIS documents requires the government to clear two hurdles: authentication and hearsay.

## A. Authentication

Under Federal Rule 901(a), a proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The authenticity inquiry "turns on whether the document is what it purports to be, not its veracity." *United States v. Mandycz*, 447 F.3d 951, 966 (6th Cir. 2006). The authentication threshold is a "relatively low hurdle." *United States v. Mallory*, 902 F.3d 584, 595 (6th Cir. 2018) (quotation omitted). "Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997); *see also United States v. Thomas*, No. 90-3289, 1990 U.S. App. LEXIS 22476, 1990 WL 212541, *4 (6th Cir. Dec. 21, 1990) (quoting *United States v. Jardina*, 747 F.2d 945, 951 (5th Cir. 1984)) ("Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court."). Stated another way, Rule 901(a) requires only "some competent evidence in the record to support authentication." *United States v. Koziy*, 728 F.2d 1314, 1321 (11th Cir. 1984).

Rule 901(b) sets forth examples of the ways or types of evidence that proponents can use to meet authenticity's low standard. Two of these examples are relevant here. First, under subsection (b)(1), authentication can be established through "testimony of a witness with knowledge." During the proposed evidentiary

hearing, the United States intends to call several witnesses with knowledge of the hallmarks of ISIS documents and with several of these documents in particular. While subject to change, the United States plans to call the following witnesses:

- *UNITAD Witness*. In September 2017, the United Nations Security Council unanimously adopted resolution 2379 (2017), by which it requested the Secretary-General to establish an investigative team, headed by a Special Adviser, to support domestic efforts to hold ISIL accountable by collecting, preserving, and storing evidence in Iraq of acts that might amount to war crimes, crimes against humanity, and genocide committed in Iraq. Pursuant to this resolution, the Secretary-General established the United Nations Investigative Team to Promote Accountability for Crimes Committed by Da'esh/ISIL (known as UNITAD). The United States intends to call a member of the UNITAD investigative team who has reviewed thousands of ISIS documents as part of its mission. The UNITAD witness will also testify about ISIS documents the investigative team found that identify Musaibli in particular. The witness will testify about the proposed exhibits in this case, and provide opinion testimony that they are ISIS documents. The exact identity of the UNITAD witness is being finalized and will be provided to the defense as soon as it is available.

- *Cooperating Witness #1.* Cooperating Witness #1 is a criminal defendant in a case in another district. Like Musaibli, in 2015, Cooperating Witness #1 left his American family to join ISIS. Like Musaibli, Cooperating Witness #1 was a member of the Tariq bin Ziyad brigade. Like Musaibli, Cooperating Witness #1 was injured while fighting on behalf of ISIS. After his injury, Cooperating Witness #1 worked in the administration department within the Tariq bin Ziyad brigade. In that capacity, Cooperating Witness #1 regularly updated and maintained some of the documents at issue here, including the Tariq bin Ziyad roster and the payroll records.

- *George White.* Mr. White works at the National Media Exploitation Center (NMEC) in Bethesda, Maryland. NMEC was established in late 2001 to coordinate FBI, CIA, Defense Intelligence Agency (DIA), and National Security Agency (NSA) efforts to analyze and disseminate information gleaned from millions of pages of paper documents, electronic media, videotapes, audiotapes, and electronic equipment seized by the U.S. military and intelligence community in Afghanistan, Iraq, and other foreign lands. Mr. White has spent the last several years reviewing and analyzing captured enemy material from around the world, with much of his time focusing on ISIS documents. Mr. White has reviewed thousands

of documents recovered in formerly controlled ISIS territories. Mr. White will testify about the typical trademarks of ISIS documents and how the documents the United States offers here are consistent with the ISIS documents he has reviewed.

- *FBI Special Agent Mike Frost.* As Coalition Forces advanced on ISIS to recapture land in Iraq and Syria, they frequently collected or received documents, computers, cell phones, electronic storage media, and other materials left behind by, or collected from, retreating ISIS fighters and administrative personnel. That material was transported to a Regional Exploitation Center (REC) where various analysts mined the data for information. Some of the documents identifying Musaibli as an ISIS fighter described above were collected in Iraq and/or Syria and taken to the REC. Special Agent Frost was assigned to a REC when Coalition Forces collected some of the documents at issue in this case. Special Agent Frost will testify about how documents are handled at the REC and his recollection about the circumstances of collection of some of the documents related to Musaibli.

Rule 901(b)(4) provides another means of authenticating these documents. That rule indicates that authentication can be met by documents' distinctive characteristics such as "appearance, contents, substance, or internal patterns . . .

taken in conjunction with circumstances." *See* Fed. R. Evid. 901(b)(1) and (b)(4).

The "circumstances" referred to in subsection (b)(4) include circumstances surrounding discovery of the documents. *See United States v. Crosgrove*, 637 F.3d 646, 658 (6th Cir. 2011) (relying in part on evidence of where a document originated in deeming the document properly authenticated); *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997) (approving introduction of written materials as sufficiently authenticated because they were found in an isolated campsite occupied only by the defendant); *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) (finding the fact that drug ledgers were discovered in known drug trafficker's home to be evidence of authenticity); *United States v. Helmel*, 769 F.2d 1306 (8th Cir. 1985) (finding gambling ledger sufficiently authenticated even though author of the ledger was unknown because the contents of the ledger were such that only those persons acquainted with the particular transactions and persons involved could have written them, the ledger was found in one of the defendant's homes, and the names in the ledger corresponded to members of the gambling enterprise).

Here, the ISIS documents contain several indicators of their veracity as genuine ISIS documents. Most or all of the documents are written on ISIS letterhead or contain ISIS stamps. The various payroll spreadsheets contain internal patterns reflecting how ISIS determined how much its fighters are paid, such as the name, date of birth, number of wives, number of children, ISIS census number, kunya,

brigade, and other identifying information and, notably, the information is largely consistent across the various documents with respect to Musaibli. Virtually all of the documents (payroll sheets, rosters, etc.) contained these categories of information, showing that ISIS consistently tracked this data regarding its soldiers. Moreover, documents are dated during the time Musaibli was a member of ISIS and were recovered in territory formerly controlled by ISIS. Finally, the specific nature of the contents of the documents are corroborated by the defendant's own statements about his ISIS activities, along with his known birthdate, claimed nationality, and parental lineage. Taken together, with the expected testimony, the appearance, contents, internal patterns and the circumstances of the documents' discovery establish that the documents are what the Government claims them to be—authentic ISIS records.

## B. Hearsay

The rules on hearsay favor admissibility of the documents. Most obviously, the documents are not hearsay as they are co-conspirator statements. Even if considered hearsay, however, the documents are admissible under the business records and residual hearsay exceptions to the rule against hearsay.

### 1. Co-Conspirator Statements

Count 2 of the First Superseding Indictment charges Musaibli with conspiracy to provide material support to ISIS. A statement is not hearsay if it is offered against an opposing party and "was made by the party's coconspirator during and in

24

furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).[6] To introduce such statements as evidence, the government must show three things by a preponderance of the evidence: (1) a conspiracy existed, (2) the defendant was a member of the conspiracy, and (3) the statement was made in the course and furtherance of the conspiracy. *See United States v. Martinez*, 430 F.3d 317, 325 (6th Cir. 2005). The statements themselves may be considered in determining admissibility under Rule 801(d)(2)(E). *See United States v. Clark*, 18 F.3d 1337, 1341 (6th Cir. 1992) (en banc). Even a cursory analysis of these documents show that they are co-conspirator statements admissible under Rule 801.

First, a conspiracy existed. The United States formally designated ISIS as a foreign terrorist organization in May 2014. "The existence of an agreement between two or more persons" to provide material support to ISIS constitutes a criminal conspiracy. *See United States v. Alebbini*, 979 F.3d 537, 544 (6th Cir. 2020) (citations omitted). In June 2014, when Abu Bakr al-Baghdadi publicly declared the Islamic State a Caliphate, he invited Muslims from around the world to join. *See Timeline: the Rise, Spread, and Fall of the Islamic State,* The Wilson Center, Oct. 28, 2019, www.wilsoncenter.org/article/timeline (last visited on Dec. 7, 2020). And

---

6      In this case, Musaibli has been charged with conspiring to provide material support to ISIS. It is well established, however, that the coconspirator exception to the rule against hearsay, is applicable even in cases where no conspiracy is charged or when the conspiracy charged is different from the conspiracy during which the statement offered was made. *See*, *e.g.*, *United States v. Swidan*, 888 F.2d 1076, 1080-81 (6th Cir. 1989); *United States v. Talley*, 164 F.3d 989, 999 n.4.

tens of thousands of people, including Musaibli, answered Baghdadi's call and pledged allegiance to the organization. When they joined ISIS, these foreign fighters entered into a criminal conspiracy.

Second, Musaibli was a member of this conspiracy. Evidence from a variety of sources supports this conclusion. Musaibli electronically communicated with family and friends during his time with ISIS. In May 2016, he told a relative, "I am conducting jihad with the Islamic State against America and the Shi'ah country of Iran." He later tells that same relative that his Emir was Abu Bakr Al-Baghdadi, and that the relative should "sign up with us." In July 2016, Musaibli explained to his cousin that "jihad against the Shiites and Americans in Iraq," was his legal obligation.  To others, Musaibli confessed, "I came here and saw the truth.  Jihad for the sake of God is the utmost sign of Islam"; "I am only fighting the army with a Kalashnikov and the 20,000 brothers here are doing the same"; and "The enemy entered the land of Muslims in Iraq, so we must fight." Musaibli even encouraged his brother to come to the Islamic State.

Besides his own statements, the very documents at issue here support a finding that Musaibli was a member of the conspiracy. The documents consistently list Musaibli by his ISIS census number, his kunya, date of birth, and claimed country of origin. The documents contain dozens of other foreign fighters listed alongside Musaibli. Moreover, the government anticipates that at least one cooperating witness

will testify that the witness was with Musaibli in the Tariq bin Ziyad brigade. Tariq bin Ziyad was a well-known group consisting mainly of foreign fighters. Thus, through his own admission and other evidence, the United States will show that Musaibli was a member of the conspiracy.

Third, and finally, the government must show that the statements were made in the course and furtherance of the conspiracy. *Martinez*, 430 F.3d at 325. "A statement is made in furtherance of a conspiracy if it was intended to promote conspiratorial objectives; it need not actually further the conspiracy." *United States v. Carter*, 14 F.3d 1150, 1155 (6th Cir.1994). "[S]tatements which identify the participants and their roles in the conspiracy are made 'in furtherance' of a conspiracy." *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994) (collecting cases) (finding statement that identified an individual as a participant of the conspiracy and commented on that individual's inadequate performance in his role were admissible under Rule 801(d)(2)(E)). Moreover, a statement is admissible under Rule 801(d)(2)(E) even when the declarant's identity is unknown, provided that the government shows that the unknown declarant was more likely than not a conspirator.  *Martinez*, 430 F.3d at 326.

From payroll records to rosters to structural documents, the records all relate to the Islamic State running its territories as a government. Running the Caliphate as a legitimate government was one of the objectives of the ISIS conspiracy.

Importantly, too, throughout the course of its existence as a Caliphate, ISIS engaged in repeated battles with Coalition Forces. Therefore, documents setting forth payments made to fighters, listing available fighters through rosters, documenting medical care provided to soldiers, and having a well-organized state all relate to important conspiratorial objectives. Accordingly, documents reflecting those functions were made in the course of and in furtherance of the conspiracy.

The Sixth Circuit has repeatedly affirmed the admission of documents in criminal cases where the documents involve information about a large conspiracy, even when only one or two of its members are on trial. The most common examples involve drug ledgers. *See United States v. Goshen,* 14 F.3d 602 (6th Cir. 1993) (affirming admissibility of drug ledgers as co-conspirator statements, noting that the statements were made in furtherance of the conspiracy because they allowed members to better manage the conspiracy's business); *United States v. Breitkreutz,* 977 F.2d 214, 218–19 (6th Cir. 1992) (affirming admissibility of a drug ledger, even where the author of the ledger was unknown). Beyond drug ledgers, the Sixth Circuit has applied the co-conspirator hearsay exception to a day planner where the entries reflected loans made in a vote-buying scheme. *See United States v. Shrout,* 298 Fed. Appx 479, 482 (6th Cir. 2008).

An espionage case, *United States v. Squillacote*, 221 F.3d 542, 564 (4th Cir. 2000), is instructive. There, the defendants were charged with various offenses

related to their espionage activities on behalf of East Germany and other countries. At trial, the government introduced documents "that the government purchased . . . from unidentified sources." *Id.* at 564. The documents were created by East Germany's intelligence service and contained information about the defendants' addresses, their code names, and the operations to which the defendants were assigned. *Id.* at 552. The district court admitted the documents as coconspirator statements. *Id.* at 563. On appeal, the Fourth Circuit affirmed the admission of the documents. The court of appeals found that the documents were created during the course of the conspiracy and that "there can be no real dispute that, by compiling the information contained in the disputed documents—the Appellants' real and code names, their addresses, the object of their assignments, how they could be contacted—the GDR was acting in furtherance of the conspiracy." *Id.*

Likewise, in *United States v. Hamama,* 2010 WL 2649877 (E.D. Mich. June 30, 2010) (Edmunds, J.), the defendant was charged with conspiracy to act as an agent of a foreign government (in violation of 18 U.S.C. §§ 371 and 951) and the government sought to admit documents from the Iraqi Intelligence Service ("IIS"). Prior to trial, the court held an evidentiary hearing regarding IIS documents, which had been acquired following the United States' invasion of Iraq in 2003. Like the documents at issue here, some of the IIS documents were found by United States military forces operating in Iraq while others were obtained from an Iraqi opposition

group operating in Iraq. *Id.* at *2. In admitting the documents, the court heard and credited the testimony of experts and former IIS officials to authenticate the documents. Relying on *Squillacote*, Judge Edmunds found that the documents were co-conspirator statements and therefore not barred by the rule against hearsay. *See id.* at *15-*18. In admitting the documents, the court highlighted that the conspiracy was shown not just by the documents themselves, but also by statements of the defendant and the testimony of the former IIS officials. *See id.* at *16-*18.

Here, just like *Squillacote* and *Hamama*, the documents consist of a government-like organization compiling information about its assets—in this case foreign fighters—to track these assets' contribution to the conspiracy. Information about members of the Islamic State, including their kunyas, number of family members, amount of payment, notes about their activities in battle, and unique identifying information, all serve to assist this highly-organized organization in determining how best to use its resources. The documents, therefore, were made in furtherance of the conspiracy.

## 2.  The Exception for Records of Regularly Conducted Activity

Even if the documents are hearsay, Federal Rule of Evidence 803(6)'s exception to the hearsay rule for records of regularly conducted activity allows for their admission. That rule provides an exception for:

A record of an act, event, condition, opinion, or diagnosis if:

(A)     the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B)     the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C)     making the record was a regular practice of that activity;

(D)     all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E)     the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). To qualify for the business record exception, the government must lay a foundation "through the testimony of the custodian or other qualified witness." *United States v. Baker*, 458 F.3d 513, 518 (6th Cir. 2006). The Sixth Circuit has explained that "[t]he phrase 'other qualified witness' is given a very broad interpretation. To be an 'other qualified witness,' it is not necessary that the person laying the foundation for the introduction of the business record have personal knowledge of their preparation. All that is required of the witness is that he or she be familiar with the record-keeping procedures of the organization." *Id.* at 519; *see also United States v. Collins,* 799 F.3d 554, 584 (6th Cir. 2015) (explaining that the meaning of "another qualified witness should be given the broadest interpretation"); *United States v. Sachs*, 801 F.2d 839, 843 (6th Cir. 1986) (noting

that the witness's lack of personal knowledge goes to the credibility that should be accorded that witness's testimony, not the admissibility of the statements). As this Circuit has held, the foundation for admitting business records under Rule 803(d), "may be laid, in whole or in part, by the testimony of a government agent or other person outside the organization whose records are sought to be admitted. The only requirement is that the witness be familiar with the record keeping system." *United States v. Collins*, 799 F.3d 554, 584 (6th Cir. 2015).

Here, the various ISIS documents reflect an important goal of the organization: to create and run a separate nation living under Sharia law. *See What is "Islamic State?"*, Dec. 2, 2015, www.bbc.com/news/world-middle-east-29052144 (last visited Dec. 14, 2020). To achieve that goal, ISIS focused as much on its bureaucracy as it did on its fight against Coalition Forces. Thus, the steady keeping of records of its regularly conducted activity—like paying its members—served an important role in the criminal enterprise.

As set forth in the authentication section of this motion, the United States will call a variety of witnesses who are familiar with ISIS's record keeping procedures and documents. The government expects these witnesses will confirm that the records outlined in this motion meet the requirements of Rule 803(6).

### 3.  Residual Hearsay Exception

Finally, the residual hearsay exception also applies to these documents. Federal Rule of Evidence 807 permits evidence to be admitted if it has sufficient "circumstantial guarantees of trustworthiness," and "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807. Here, the evidence of the trustworthiness of the ISIS documents is significant. The documents were discovered in ISIS-controlled territory, during the conflict between Coalition Forces and ISIS, typically on ISIS letterhead or with ISIS stamps. Moreover, most of the documents contain similar information—such as kunyas, number of wives, number of children, payment amount, census number, etc.—providing an internal consistency that further supports their trustworthiness. *See, e.g., Hamama*, 2010 WL 2649877 at *19 (applying the residual hearsay exception after finding the documents trustworthy based on the testimony of former Iraqi Intelligence Service officials and experts); *United States v. Dumeisi*, 424 F.3d 566 (7th Cir. 2005) (affirming the district court's finding of the residual exception to IIS files).

**IV**
**CONCLUSION**

For these reasons, the government respectfully requests that the Court hold an

evidentiary hearing before trial regarding the admissibility of the ISIS documents.

MATTHEW SCHNEIDER
United States Attorney

s/*Kevin M. Mulcahy*
Kevin M. Mulcahy
Hank Moon
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Kevin.Mulcahy@usdoj.gov
(313) 226-9713

Date:  December 31, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on December 31, 2020, I electronically filed the
foregoing document using the ECF system, which will send notification of filing to
the counsel of record.

s/Kevin M. Mulcahy
Assistant U.S. Attorney