UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

                Plaintiff,          Case No. 18-20495

    v.

                                Hon. David M. Lawson

Ibraheem Izzy Musaibli,

                Defendant.

_____/

### Defendant's Motion to Suppress Statements Made During His Interrogation Over Remote Messaging Applications and Custodial Statements Tainted by the Involuntary Statements Made During This Interrogation

Defendant, Ibraheem Izzy Musaibli, through his attorneys, moves this Court to enter an order excluding from evidence his: (1) instant messaging communications with Federal Bureau of Investigation Special Agent Wendy Kerner, which occurred from on or about April 23, 2018, to on or about June 7, 2018; and (2) his custodial statements made on or about June 23, 2018, and June 24, 2018.  Defendant files a supporting brief and states that:

1.    Mr. Musaibli is currently charged by superseding indictment with: Providing and Attempting to Provide Material Support to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B; Conspiracy to Provide Material Support to a Foreign

1

Terrorist Organization, in violation of 18 U.S.C. § 2339B; and Receipt of Military Type Training from a Foreign Terrorist Organization (ISIS), in violation of 18 U.S.C. § 2339D(a).

2.  The Government disclosed to the defense communications between Mr. Musaibli and SA Wendy Kerner made over instant messaging platforms Telegram and Facebook Messenger from April 23, 2018, to June 7, 2018.

3.  Mr. Musaibli's statements in these communications were made in an attempt to secure the United States government's help in escaping from ISIS territory in Syria.

4.  During these conversations, SA Kerner told Mr. Musaibli that his answers must conform with the FBI's view of his reasons for traveling to Syria and his support of ISIS before she could offer him assistance in escaping.

5.  This coercive pressure forced Mr. Musaibli to give statements in violation of his Fifth Amendment right against self-incrimination.

6.  Subsequent to this remote interrogation, Mr. Musaibli turned himself over to the U.S.-allied Syrian Democratic Forces.

7.  After being held for almost two months, he was taken into FBI custody and flown to the United States.

8. During his flight to the United States and immediately upon his arrival, he was again interrogated multiple times by SA Kerner.

9. The interrogations were tainted by his prior involuntary statements and his decision to participate cannot be found to be voluntary within the meaning of the Fifth Amendment.

10. Counsel requests an evidentiary hearing where it will present to this Court information and evidence on the conditions in Syria and other information relevant to this Motion.

11. Per Local Rule 7.1(a), Defense counsel communicated with the Government regarding this Motion and it does not concur with the requested relief.

  //

  //

  //

  //

  //

  //

  //

  //

  //

3

For the reasons indicated above, the Defendant requests that this Court hold an evidentiary hearing and after such hearing, enter an order excluding from evidence statements made by Mr. Musaibli to SA Kerner over instant messaging applications, as well as custodial statements made overseas and in the U.S. after the instant messaging interrogation.

Submitted,

s/James R. Gerometta

James R. Gerometta
Fabián Rentería Franco
Counsel for Ibraheem I. Musaibli
FEDERAL COMMUNITY DEFENDER
613 Abbott Street, Suite 500
Detroit, Michigan 48226
Email: james_gerometta@fd.org
Phone: 313.967.5542
Facsimile: 313.962.0685

John A. Shea (P37634)
Counsel for Ibraheem I. Musaibli
120 N. Fourth Avenue
Ann Arbor, Michigan 48104
Telephone: 734.995.4646
Dated: December 31, 2020          Email: jashea@earthlink.net

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

                    Plaintiff,              Case No. 18-20495

        v.
                                            Hon. David M. Lawson

Ibraheem Izzy Musaibli,

                    Defendant.
_____/

## Brief in Support of Defendant's Motion to Suppress Statements Made During His Interrogation Over Remote Messaging Applications and Custodial Statements Tainted by the Involuntary Statements Made During This Interrogation

Ibraheem Musaibli was charged on April 9, 2019, in a four-count superseding indictment with Providing and Attempting to Provide Material Support to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B; Conspiracy to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B; Possessing and Discharging a Firearm (Machine Gun) in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c); and Receipt of Military Type Training from a Foreign Terrorist Organization (ISIS), in violation of 18 U.S.C. § 2339D(a). On July 29, 2019, Count 3, the § 924(c) charge, was dismissed. The other three counts remain pending and trial is set for the fall of 2021.

1

As part of discovery, the Government disclosed statements made by Mr. Musaibli to Federal Bureau of Investigation Special Agent Wendy Kerner over Telegram and Facebook Messenger, instant messenger applications. These statements, from April 23, 2018, to June 7, 2018, occurred while Mr. Musaibli was in southern Syria attempting to flee ISIS territory. He initiated communications with the FBI at the request of his parents in an attempt to enlist their help in fleeing ISIS.  SA Kerner sometimes used the alias Rafiqa Rashid in those communications.

SA Kerner was aware of Mr. Musaibli's desperate situation and used his desire to escape the deteriorating stability in southern Syria to coerce Mr. Musaibli into making incriminating statements.  Before she would agree to assist him in fleeing the area, SA Kerner repeatedly, and over numerous conversations, told Mr. Musaibli that he needed to confirm her contention that he had joined ISIS and/or provided support to ISIS as a condition of her providing assistance.  This coercive tactic violated the Fifth Amendment's clause against self-incrimination.   Mr. Musaibli's decision to make statements to SA Kerner was not volitional and of his own free will because it was impermissibly influenced by his desperation to escape ISIS territory, which SA Kerner was fully aware of, and the United States government's threat that it would not assist him, a U.S. citizen, unless he made

incriminating statements to SA Kerner.  The statements made by Mr. Musaibli to SA Kerner over messaging applications must be excluded from evidence.

Further, Mr. Musaibli's decision to make statements directly to SA Kerner and other FBI agents during his flight to the United States on July 23-24, 2018, and in Gary, Indiana on July 24, 2018, was not voluntary within the meaning of the Fifth Amendment because his decision to speak was tainted by the existence of prior statements made over the messaging applications.  These July 23-24, 2018 statements are connected to and the direct product of those prior statements. They must be excluded from evidence.

## Facts

After approximately two and one-half years of living in Syria and Iraq, spending much of his time imprisoned or living on the streets and sleeping in mosques, Mr. Musaibli was desperate to escape ISIS territory.  In the spring of 2018, the U.S.-backed Syrian Democratic Forces, along with elements of the Iraqi army, launched Operation Roundup to clear one of the last remaining areas in Syria under ISIS control, a strip of land along the

Euphrates river north of the border with Iraq.[1]  The area was not only one of the last ISIS strongholds, it also marked the border between territory controlled by the Russian-backed Syrian government and U.S.-backed rebels.  Operation Roundup was a component of a larger joint operation between the SDF and Syrian government to destroy ISIS.  The area was under constant bombardment not only by forces supporting the SDF offensive, but also by Russian warplanes supporting the Syrian government.  *See* Ex. A - Map of Operation Al-Jazeera Storm.

During his last two years in ISIS territory, Mr. Musaibli repeatedly asked his family for money to hire a smuggler to take him to Turkey or a portion of Iraq outside of ISIS control.  Every request was met with the same answer or variation of it: We cannot send you money unless the federal agents investigating your circumstances and monitoring our communications approve such step to help you escape violence.  While Mr. Musaibli's parents did send him $800 near the end of his time in ISIS territory, those federal agents never approved the overseas transfer of approximately $2,000 that would have allowed Mr. Musaibli to escape.

---

[1]     *U.S.-backed Syrian forces resume battle against Islamic State*, Reuters, May 1, 2018, *available at* https://www.reuters.com/article/us-mideast-crisis-syria-sdf/u-s-backed-syrian-forces-resume-battle-against-islamic-state-idUSKBN1I2390 (last visited Dec. 11, 2020).

The FBI would not help Mr. Musaibli escape ISIS until they were able to communicate with him.  Mr. Musaibli had many reasons he wanted to avoid speaking to American agents.  Foremost, he feared he would be discovered by ISIS and beheaded as a spy.  Also, at times he feared the United States would target him with a drone strike if he revealed his location.  Constant bombings occurred in Mr. Musaibli's environment.  Finally, he feared facing a criminal justice system that was biased against him and would not understand his actions if he was brought back to the United States.

Despite these fears, in late April 2018, Mr. Musaibli was so desperate to leave ISIS territory that he agreed to communicate with FBI Special Agent Wendy Kerner and ask for help leaving ISIS territory.  Because of limitations in phone and internet service in ISIS territory, Mr. Musaibli and SA Kerner communicated using instant messaging applications Telegram and Facebook Messenger.[2]  The conversation was arranged by Mr. Musaibli's parents and both SA Kerner and Mr. Musaibli knew that the purpose of the conversation was to try to arrange Mr. Musaibli's escape from ISIS.  Additionally, Mr. Musaibli knew that SA Kerner was demanding information about him and his time in ISIS territory.

---

[2]     Telegram is a cloud based messaging application for smart phones and computer devices.  Although there are technical differences, it is similar to WhatsApp and Facebook Messenger.

5

SA Kerner and Mr. Musaibli's first communication occurred on April 23, 2018. Having been advised that Kerner wanted an introductory statement from him about his history and circumstances, Mr. Musaibli began their conversation with a long summary detailing his time in ISIS territory. SA Kerner was not satisfied with this information. During her April 23 exchanges with Mr. Musaibli, SA Kerner repeatedly challenged Mr. Musaibli to confirm his membership in ISIS and his activities in support of ISIS, informing him that she would not help Mr. Musaibli escape from ISIS otherwise. SA Kerner was aware of the danger Mr. Musaibli faced in Syria, either from the Russian-backed Syrian regime or from the constant bombings by coalition forces, as well as his desperation to leave the war zone.

> I don't know if you would get prison time or how much you would get. However, if you stay there, you could be picked up by regime and it would be much worse. Or bombed and killed. Or bombed and hurt terribly[.][3]
>
> . . .
>
> Any day a bomb could drop and blow your legs off or worse.

Ex. B – Telegram Communications at 126, 134.

---

[3] Defense counsel is transcribing the communications to reflect as appearing in instant messaging applications, thus there will be incomplete phrases or sentences, incorrect spellings, and other typographical errors.

SA Kerner specifically reinforced Mr. Musaibli's awareness of these dangers as she prepared him for questioning.

> And bombs are happening now[.]
>
> . . .
>
> And what kind of life is it if you get your legs blown off[.]

Ex. B at 127.

SA Kerner demanded to know Mr. Musaibli's exact location before she would assist him.  Ex. B at 131.  She also demanded that he provide follow up information before she would help him travel out of ISIS territory.

> Back to your essay.  I need to address several things if you want me to speak to the state department[.]

Ex. B at 11.

SA Kerner made it clear that she did not believe parts of his summary and that he must change it before she would help him escape.

> If you are not honest with me I can't help[.]
>
> . . .
>
> And I know things about you so I know you are not being totally honest with me[.]

Ex. B at 11.

Mr. Musaibli made additional statements in an attempt to get help escaping but, when he could not answer a specific question, such as if he had

been assigned an ISIS identification number and what that number was, SA

Kerner would repeat her threat to leave him in ISIS territory.

> Ibraheem, please be honest with me.  I know you
> have an Isis number and I know you know that
> number.  If we can't establish trust there is nothing I
> can do[.]

Ex. B at 15.

After more back and forth about his relationship with ISIS, SA Kerner

eventually threatened to terminate the conversation because she was not

satisfied with his response.

> Are you now ready to leave ISIS?
>
> . . .
>
> You have to understand that I already know the
> truth[.]  I'm trying to establish trust with you[.] So we
> can take the next steps[.]
>
> . . .
>
> If I don't believe you are being honest with me than I
> can't continue[.]
>
> . . .
>
> I need to end this conversation.  I want you to think
> about what we have talked about if you are ready to
> have honest discussion we can talk.  I can be your
> advocate but we need to get past the deception.  So
> think about what you want and we will talk again.  I
> will try you Wednesday at 11:00 am my time[.]
>
> . . .
>
> Just admit the truth. There are many like you, and
> the reasons you went[.]
>
> . . .

8

> Well I guess that is your call.  Admitting the truth to me isn't bad as I think you have it played out to yourself.  But I cannot continue until you are at least honest with me about joining Isis.

Ex. B at 18-20.

Mr. Musaibli and SA Kerner finished their conversation that day, but resumed two days later, on April 25, 2018.  Again, early in that conversation, SA Kerner was unsatisfied with his answers.  When Mr. Musaibli made statements about traveling to Syria to join U.S.-backed rebels, SA Kerner responded by again threatening to end the conversation, a conversation that needed to happen in order for Mr. Musaibli to escape ISIS territory and within an immediate time frame.

> Again until we establish basic truths.  We can't speak.
> . . .
> You are in a great position to provide us great information but you only have a small window to do it because of the area you are in.

Ex. B at 23.

After this threat, Mr. Musaibli spent several hours answering SA Kerner's questions.  However, on the crucial question of whether Mr. Musaibli intended to join ISIS, SA Kerner again resorted to threatening to abandon Mr. Musaibli unless he answered in the way she wanted.

> In order for me to better assess what I figure out for your situation I need to go to my boss and tell them that you are being truthful with me.  And that starts

9

> with admitting that you went, you joined and they screwed you over and now you want to come home.
>
> . . .
>
> But I cannot go further and go to my boss without telling him you are being truthful about why you went to Raqqa[.]

Ex. B at 50.

Again, Mr. Musaibli begged that his parents be allowed to send him money so he could escape.  SA Kerner responded by making it clear that she was his only lifeline out of ISIS territory.

> I don't have to bargain with you Ibraheem.  Your children want their dad alive.  Your mom misses you desperately[.]
> . . .
> How in the world do you think you can do this without getting killed or arrested by people that will kill or harm you?

Ex. B at 51.

> I feel like there is one person trying to keep Ibraheem alive and that is me.  It's not you, clearly and not your parents.

Ex. C at 7.

> [I] want to get the information to you so you can decide you want to do it on your own.  So when bombs come flying down and you see terrible things happening you have all the information you need to get the heck out of there.

Ex. C at 24.

10

Mr. Musaibli also asked for help in bringing his wife from Yemen to the United States and while the government would not pay for the plane flight, SA Kerner confusingly stated that it could help in other ways within the same communication.

> I can fix the papers, and she can get on a plane.  We cant pay for it.  So that is step one in her coming.  I will do my best to bring her ASAP but things need to be in order.
> . . .
>
> Listen, I tried to have arrangements to have your wife brought here.  That was shot down.

Ex. C at 8, 30.

Mr. Musaibli and SA Kerner continued to communicate with each other until around June 7, 2018.  Over approximately ten conversations, Mr. Musaibli would occasionally raise the issue of allowing his parents to send him money to escape,[4] however, he became more and more resigned to SA Kerner and the FBI as his only means of escaping ISIS territory and that he

---

[4]    For example, at one point SA Kerner tells Mr. Musaibli that she "can't authorize your family to send money so what do you suggest?" in connection to her earlier response that he could not escape ISIS territory "without getting killed or arrested."  Ex. B at 51.

must satisfy their expectations to receive help.[5]   Primarily, he needed to satisfy *her* views of him.

Around June 9, 2018, Mr. Musaibli turned himself over to the Syrian Democratic Forces (SDF) a majority Kurdish U.S.-backed militia force.  After roughly a month of being held in their custody, the FBI was made aware that a possible United States citizen was being held in Hasakah Prison in northeast Syria.  The FBI investigated and found Mr. Musaibli in SDF custody.  On July 23, 2018, the FBI took custody of Mr. Musaibli and flew him to the United States on a military flight.  During that flight and after he arrived in Gary, Indiana, Mr. Musaibli was subjected to multiple interrogations by SA Kerner, following up on the information provided by Mr. Musaibli over messaging applications.

## Argument

### A. Mr. Musaibli's statements were involuntary and the product of the Government's threat to abandon him in ISIS territory.

Mr. Musaibli, a United States citizen, was trapped in life-threatening ISIS territory when he agreed to speak with an agent of the FBI about receiving help to escape the area.  Before the FBI would agree to provide any

---

[5]     Defendant filed with the Court a motion for leave to file Telegram and Facebook Messenger communications between Mr. Musaibli and SA Kerner as sealed exhibits.

assistance, they demanded that he give lengthy incriminating statements regarding his travel to Syria and his involvement with ISIS.  He was explicitly and repeatedly told that no help would be forthcoming unless he gave statements that satisfied the FBI.  The FBI would not contact the State Department or help him in any way if Mr. Musaibli's statements did not conform to their preset view of Mr. Musaibli and his time overseas.  This threat to leave him in a war-torn area under constant threat of death from one of the three sides involved in the Syrian civil war rendered his resulting statements involuntary under the Fifth Amendment.

While Mr. Musaibli was not in FBI custody while communicating with SA Kerner, the Supreme Court recognizes that special circumstances allow for coercive conduct in non-custodial settings.  *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976).  The burden is on the prosecution to prove by a preponderance of the evidence that a defendant's statement is voluntary. *Lego v. Twomey,* 404 U.S. 477, 487-89 (1972).

It long has been held that admission of an involuntary statement violates a defendant's right against self-incrimination as well as the defendant's due process right to a fundamentally fair trial, both of which rights are guaranteed by the Fifth Amendment to the United States Constitution. U.S. Const. amend. V.  *See Bram v. United States*, 168 U.S. 532,

18 S.Ct. 183, 42 L.Ed. 568 (1897); *United States v. Powe,* 591 F.2d 833, 838 (citations at fn5) (D.C. Cir. 1978). "Voluntariness" has been described as "an essentially free and unconstrained choice" as opposed to a statement made by someone whose "will has been overborne and his capacity for self-determination critically impaired." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

When deciding whether a statement is involuntary, courts must consider the totality of circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). No one factor is dispositive; courts must evaluate all facts together to determine if "a defendant's will was overborne." *Id.* In the Sixth Circuit, courts should examine the record to see (1) if "the police activity was objectively coercive"; (2) if "the coercion . . . was sufficient to overbear the defendant's will"; and (3) if the police misconduct was "the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)).

Threats, including credible threats of violence, can render a statement involuntary. *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991). The threatened violence need not come from the law enforcement agency. In *Payne v. Arkansas*, 356 U.S. 560 (1958), the Supreme Court found that the

14

threat of mob violence and a promises to protect a suspect would render a

statement involuntary.

> We come now to an even more vital matter.
> Petitioner testified, concerning the conduct that
> immediately induced his confession, as follows: 'I
> was locked up upstairs and Chief Norman Young
> came up (about 1 p.m. on October 7) and told me that
> I had not told him all of the story—he said that there
> was 30 or 40 people outside that wanted to get me,
> and he said if I would come in and tell him the truth
> that he would probably keep them from coming in.'
> When again asked what the chief of police had said to
> him on that occasion petitioner testified: 'Chief
> Norman Young said thirty or forty people were
> outside wanting to get in to me and he asked me if I
> wanted to make a confession he would try to keep
> them out.'

*Payne*, 356 U.S. at 564-565.

Promises and threats by government agents need not involve violence

to overbear the will of a suspect. *See Payne*, 356 U.S. at 566 ("That

[defendant] was not physically tortured affords no answer to the question

whether the confession was coerced, for '[t]here is torture of mind as well as

body; the will is as much affected by fear as by force.'"). A threat as simple

as a threat to cut off financial aid for a suspect's infant children can render a

suspect's subsequent statement involuntary.

> It is thus abundantly clear that the petitioner's oral
> confession was made only after the police had told
> her that state financial aid for her infant children
> would be cut off, and her children taken from her, if

15

> she did not 'cooperate.'  These threats were made
> while she was encircled in her apartment by three
> police officers and a twice convicted felon who had
> purportedly 'set her up.'  There was no friend or
> adviser to whom she might turn.  She had had no
> previous experience with the criminal law, and had
> no reason not to believe that the police had ample
> power to carry out their threats.

*Lynumn v. Illinois*, 372 U.S. 528, 534 (1963).

When a suspect evidences a desire for something, and the object of their desire is withheld in order to produce a statement, that statement is involuntary.  The Supreme Court has found that something as simple as a promise of a phone call to a suspect's wife in exchange for a confession can render the statement involuntary.  *See Haynes v. Washington*, 373 U.S. 503 (1963).  In *Commonwealth v. Magee*, 668 N.E. 2d 339 (Mass. 1996), the Massachusetts Supreme Judicial Court found that promising medical treatment in exchange for an incriminating statement is coercive conduct that requires suppression of that statement.

> In particular, the promise that the defendant would
> receive the medical treatment she consistently
> requested, in return for her statement to the police
> regarding her involvement in the death of her child,
> constituted a form of psychological coercion which,
> in view of the defendant's debilitated physical and
> emotional state and the physical and temporal
> circumstances of the interrogations, rendered the
> statements involuntary, in view of the defendant's
> debilitated physical and emotional state and the
> physical and temporal circumstances of the
> interrogations, rendered the statements involuntary.

16

*Magee*, 668 N.E. 2d at 388.

Aware that Mr. Musaibli's multiple efforts to leave ISIS territory were unsuccessful, the Government exploited his failures to escape. They knew that he was unlikely to successfully leave without their help because they would not allow his family to send him the required financial assistance to hire a smuggler that would take him out the warn-torn area.

SA Kerner amplified Mr. Musaibli's fears of torture, severe physical incapacitation, and death. She emphasized the brutality of the Syrian regime toward Mr. Musaibli if he were captured by them. She repeatedly reinforced that the coalition and other combat groups in the area would continue to bomb Mr. Musaibli's environment and it would likely worsen. According to SA Kerner, Mr. Musaibli could be "bombed and killed. Or bombed and hurt terribly. . . . And what kind of life is it if you get your legs blown off. . . . Any day a bomb could drop and blow your legs off or worse." Ex. B at 126-27, 134. Even if these statements were possibly true, they were combined with the continued threat to leave him in this dangerous and precarious situation until he told the "truth" that fit with the government's already defined narrative, which "truth" SA Kerner needed to build the present case against Mr. Musaibli.

17

Whether SA Kerner's actions are characterized as a threat to leave Mr. Musaibli to his fate with coalition bombs, Russian bombs, or the Syrian regime (like the suspect in *Payne* who the police threatened with mob violence), or a promise to extract him from his current situation (like the promise of medical care in *Magee* or a phone call in *Haynes*), Mr. Musaibli was coerced to give multiple statements about his time in Iraq and Syria that he would not have made without this pressure.   For this reason, Mr. Musaibli's statements to SA Kerner over messaging applications must be suppressed.

## B. Defendant's statements in transit to the United States and in Gary, Indiana were tainted by his prior involuntary instant messaging statements and must be suppressed.

Mr. Musaibli's statements to SA Kerner in transit to the United States and in Gary, Indiana, were directly the product of his prior statements over messaging applications.   In order to be admissible there must be sufficient attenuation to purge the taint of his prior involuntary statements.   *Brown v. Illinois*, 422 U.S. 590 (1975).   When determining the voluntariness of a second confession following a prior involuntary confession, a court must determine the effect of the earlier violation on the suspect, "the effect of earlier abuse may be so clear as to forbid any other inference than that it

dominated the mind of the accused to such an extent that the later confession is involuntary." *Lyons v. Oklahoma*, 322 U.S. 596, 603 (1944).

Here, there can be no doubt that Mr. Musaibli's earlier confession dominated his decision to continue to speak with SA Kerner. Mr. Musaibli gave a series of statements over instant messaging applications during SA Kerner's interrogation in order to get help escaping from Syria. He was eventually taken into custody by SDF forces and held at an overcrowded non-governmental detention facility. He was detained in terrible conditions and in a state of pressure and fear of death. SDF forces finally transferred him to FBI custody handcuffed and blindfolded, and food-and-sleep deprived.

After the FBI took custody of him, Mr. Musaibli's face was covered with "blackout" goggles, and his hearing was muffled while he was transported by air to a Department of Defense facility and then moved to a military transport plane. The FBI removed his sensory blocks were only for the purpose of interrogating him mid-flight. The instant messaging statements he made to SA Kerner were the primary basis of his custodial interrogation while on the military transport. His treatment in FBI custody was inherently coercive and did not remove the taint of the earlier involuntary statements made to SA Kerner. *See* Defendant's Motion to Suppress Custodial Statements (to be docketed).

19

## Conclusion

Defendant Ibraheem Musaibli was coerced into making incriminating statements to SA Kerner over Telegram and Facebook IM apps in order to try and secure U.S. government help in escaping ISIS territory.  The FBI conditioned their help on Mr. Musaibli making statements that coincided with their belief in his criminal culpability, and his resulting statements were made in attempt to meet their demands.  His statements, provided in order to receive assistance for his escape into safety, were not made volitionally and with his own free will and must be suppressed.  His subsequent custodial statements were fatally tainted by the initial coerced statements and should also be suppressed.

For the above reasons, Mr. Musaibli requests that his statements made to SA Kerner over messaging applications and his statements to SA Kerner made in flight to the United States and in Gary, Indiana be suppressed.

Submitted,

s/James R. Gerometta

James R. Gerometta
Fabián Rentería Franco
Counsel for Ibraheem I. Musaibli
FEDERAL COMMUNITY DEFENDER
613 Abbott Street, Suite 500
Detroit, Michigan 48226
Email: james_gerometta@fd.org
Phone: 313.967.5542

20

Facsimile: 313.962.0685

John A. Shea (P37634)
Counsel for Ibraheem I. Musaibli
120 N. Fourth Avenue
Ann Arbor, Michigan 48104
Phone: 734.995.4646
Dated:  December 31, 2020            Email: jashea@earthlink.net

## Certificate of Service

I certify that on December 31, 2020, I filed

- **Motion to Suppress Statements Made During His Interrogation Over Remote Messaging Applications and Custodial Statements Tainted by the Involuntary Statements Made During This Interrogation**
- **List of Exhibits and Exhibits**

through the court's docketing system, which should send notification to opposing counsel of record.

/s/ Fabián Rentería Franco
Fabián Rentería Franco
Counsel for Ibraheem Musaibli
FEDERAL COMMUNITY DEFENDER
613 Abbott St., Suite 500
Detroit, MI 48226
P: 313.463.6143
Dated: December 31, 2020          E: Fabian_Renteria_Franco@fd.org