UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

IBRAHEEM IZZY MUSAIBLI,

        Defendant.

Case No.  18-20495
HON. DAVID M. LAWSON

**UNITED STATES' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT'S MOTONS TO SUPPRESS STATEMENTS**

Defendant Ibraheem Musaibli joined ISIS in 2015. In the spring of 2018, Musaibli voluntarily chatted online with the FBI prior to being captured by the Syrian Democratic Forces. The United States later took Musaibli into custody and returned him to the United States as part of a Foreign Transfer of Custody (FTOC). During the trip home, Musiabli made additional statements to the FBI on the plane and then upon landing in the United States. This Supplemental Response highlights the testimony and evidence received at the two-day evidentiary hearing on Musaibli's motions to suppress all of his statements. The evidence demonstrates that Musaibli's statements were made free from coercion. His motions should be denied.

    **I.**    **Supplemental Response to Motion to Suppress Chat Statements**

The FBI's nearly two-year investigation into Defendant Ibraheem Musaibli's membership in ISIS resulted in a variety of evidence, including two emailed tips to

the State Department, interviews with Musaibli's father, a review of Musaibli's Facebook Account, and the recovery of ISIS documents. (ECF No.163, PageID.1578-1597; Exhs. J-M). All of that evidence suggested Musaibli had unflinching support for ISIS. Then, in April 2018, Musaibli's father asked the FBI to communicate directly with Musaibli over the messaging application Telegram. Musaibli and Task Force Officer Wendy Kerner thereafter had 14 different chat sessions over a six-week period, all while TFO Kerner was in Detroit and Musaibli was in Syria with ISIS. (ECF No. 113, PageID.690).

Involuntary statements are inadmissible at trial for any purpose. *Michigan v. Harvey*, 494 U.S. 344, 351 (1990). To determine whether a non-custodial statement was involuntary, the court evaluates whether (1) the police activity was objectively coercive; (2) the defendant's will was overborne; and (3) police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

None of those circumstances is present here. First, there was no coercive police activity. Musaibli was not in custody, or even in country, when the communications occurred. Officer Kerner did not know where Musaibli was located. (ECF No. 163, PageID.1602). Throughout all of the communications—from April to June 2018—TFO Kerner never learned Musaibli's actual location (*Id.* at 1636) and he refused to tell her where he was located. (*Id.* at 1606-1607, 1615). As

2

Musaibli put it, "it's irrelevant where I'm at." (*Id.* at 1610; Exh. I at 25). Neither she nor the FBI could force Musaibli to communicate, and Musaibli controlled when and whether they messaged. (ECF No.163, PageID.1602, 1632, 1633 1636). It was Musaibli's request—relayed through his father—to communicate with TFO Kerner in the first place (*Id*. at 1601, 1604), and Musaibli chose which platform they used to communicate. (*Id*. at 1632-1633). Musaibli could have stopped the communications at any time by simply not responding or by deactivating his accounts. (*Id.* at 1617, 1636). But he did not want to do that, instead he wanted "24-hour contact with" TFO Kerner (*Id*. at 1617, 1620; Exh. I at 44), noting he "enjoy[ed] talking to [her]" and felt "special giving [his] story." (Exh. I at 359).

Moreover, the content of the chats themselves shows no coercive police activity or police misconduct. TFO Kerner never threatened Musaibli, never lied to him, and never induced him to speak by agreeing to his outrageous demands (such as a chance to negotiate with a judge, promises of no jail time, having his wife reside in his cell, or a presidential pardon). (ECF No. 163, PageID.1625-1627). Instead, TFO Kerner told Musaibli, "we can make no promises." (*Id.* at 1627; Exh. I at 223). She added, "If I wanted to trick you wouldn't I just make fake promises to you and say no jail time. . . . I'm not going to say that. I'm not going to trick you. That is not my interest. I am trying to keep you alive." (*Id.* at 1629; Exh. I at 584). "Absent police conduct causally related to the confession, there is simply no basis for

3

concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

Finally, Musaibli's will was never overborne. Musaibli initiated and voluntarily engaged in the conversations with TFO Kerner. Musaibli kept information from TFO Kerner, including his location (ECF No. 163, PageID.1602, 1606-1607, 1615), denied being a fighter, and did not provide his ISIS number. (Exh. I at 33, 38, 71). And, more than 20 times, Musaibli rejected TFO Kerner's offer to coordinate his safe return to the United States by surrendering to the SDF. (ECF No. 163, PageID.1622-24). Musaibli did not want to return to the United States, or to surrender to the SDF, (*Id.* at 1624-1625), stating that he was "safe," that "ISIS hadn't been treating [him] that bad lately," and that safety wasn't his "first priority." (Exh. I at 369, 370, 395). The strident and at times flippant way Musaibli interacted with TFO Kerner demonstrates his will was not overborne—while she stressed the danger Musaibli was in, he was unworried, sending images of fictional television characters and links to music. (ECF No. 163, PageID.1629-1630; Exh. I at 292-293, 362, 366). He even mockingly called the bombs falling around him "fireworks." (*Id.* at 1632).

The totality of the circumstances—namely, that Musaibli was not in custody or in country; his complete control over when, whether, and over which platform to speak to the FBI; the lack of threats or promises by TFO Kerner; and his repeated rejections of the government's assistance—merit denial of his motion to suppress.

## II. Supplemental Response to Motion to Suppress FTOC Statements

The Court should admit Musaibli's statements on the FTOC and in Indiana because they were "made voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

### A. Musaibli's *Miranda* waiver was voluntary, knowing, and intelligent

Five different law enforcement officers with more than 75 years of experience—including thousands of subject interviews and hundreds of prisoner transports—interacted with Musaibli in the hours leading up to his *Miranda* waiver. One was a certified EMT who had evaluated hundreds of patients (ECF No. 155, PageID.1329); another was a physician assistant who has evaluated thousands of patients. (*Id.* at 1455–56). Musaibli was alert, oriented, appeared to understand questions put to him, and responded to questions and comments in an appropriate manner. (*Id.* at 1341–42, 1419–20, 1464, 1507; ECF No. 163, PageID.1647). There were no signs of mistreatment (ECF No. 155, PageID.1475) and Musaibli never complained to anyone about feeling poorly or being tired. (*Id.* at 1506).

Neither of the interviewing agents had weapons and no one ever drew one in Musaibli's presence. (*Id.* at 1507–08). No one threatened Musaibli. (*Id.*). Musaibli never asked that questioning stop or that he be provided a lawyer. (*Id.* at 1506–07). In fact, Musaibli "appeared relieved" to be in U.S. custody (*Id.* at 1340), and "happy" to see TFO Kerner and the others. (ECF No. 163, PageID.1645). The record shows

5

that the transport team went above and beyond to make Musaibli comfortable on his flight home: he was repeatedly offered, and never denied, food or water (ECF No. 155, PageID.1431-32). He was allowed to pray and given breaks. (*Id*. at 1432–33). He also rested and slept, and officers gave him a padded footrest and a pillow to aid in his sleep. (*Id*. at 1433). Musaibli slept on several occasions—both before and after his *Miranda* waiver—for more than four hours. (*Id*. at 1345; Exh. A). And agents reminded Musaibli of his *Miranda* rights after a long break on the aircraft and again before talking with him in Indiana. (ECF No. 163, PageID.1662, 1716).

Musaibli now claims that his *Miranda* waiver was involuntary, primarily relying on his purported lack of sleep. The evidence shows that he slept twice prior to the *Miranda* waiver, once for 23 minutes and the other for 58 minutes. (Exh. A). Musaibli also told officers before questioning that he slept the day prior. (Exh. A). And most importantly, in cases alleging an involuntary waiver based on sleep deprivation, the focus is "*primarily* on how the police officers perceived the defendant," not the defendant's state of mind. *Otte v. Houk*, 654 F.3d 594, 605 (6th Cir. 2011). For example, in *United States v. Hampton*, 572 F. App'x 430, 434 (6th Cir. 2014), the Court rejected the defendant's claim that sleep deprivation rendered his *Miranda* waiver unknowing and unintelligent, even though the defendant "had been awake between 28 to 35 hours when he signed the 'Advice of Rights' forms." That is because "each officer provided specific, in-depth testimony demonstrating

6

that Defendant was alert and lucid. . . . No officer testified that [the defendant] appeared sleepy or otherwise disoriented during their interactions." *Id*. at 435.

So too here. Five officers with significant experience spent hours with Musaibli, and they all found him to be alert, oriented, and responding to questions appropriately. "The evidence simply does not indicate that [Musaibli] lacked the ability to make a voluntary and intelligent waiver of [his] rights. *Wernert v. Arn*, 819 F.2d 613, 616 (6th Cir. 1987); *see also, e.g., United States v. Yunis*, 859 F.2d 953, 963 (D.C. Cir. 1988) ("the unanimous testimony that Yunis was alert and attentive during the precise period when he waived his rights is highly significant"); *United States v. Busic,* 592 F.2d 13, 22 (2d Cir.1978) (despite weariness due to long flight and little sleep, written consent was not involuntarily given); *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) ("[W]e have upheld the conclusion that a suspect who recently used methamphetamine and had not slept for five days voluntarily waived his *Miranda* rights where police officers testified that they had no knowledge of these alleged impairments and the suspect did not act intoxicated.").

**B. The Intelligence Interview Did Not Render Musaibli's Waiver Invalid**

On July 14, 2018, two FBI agents conducted an intelligence interview of Musaibli after he was captured by the SDF. (ECF No. 155, PageID.1361). On July 23, two different FBI agents—Julius Nutter and TFO Wendy Kerner—questioned Musaibli on his way back to the United States. (*Id*. at 1514; Exh. C). Prior to the July

7

23 interview, Nutter and Kerner advised Musaibli of his *Miranda* rights verbally and in writing. (ECF No. 155, PageID.1514). The written Advice of Rights form addressed the previous intelligence interview, explicitly telling Musaibli that Nutter and Kerner (1) did not know any of the content of the intelligence interview; (2) were not interested in any statement Musaibli may have made during the intelligence interview; and (3) were "starting anew" with Musaibli. The form also made clear that Musaibli did not need to speak with Nutter and Kerner "just because you have spoken with others in the past," and that his previous statements likely would not be used against him in court. (*Id.* at 1514; Exh. C). Musaibli was given a head lamp to make sure he could see and appeared to read the Advice of Rights form before signing it. (ECF No. 155, PageID.1514).

Musaibli now claims that the July 14 intelligence interview rendered his July 23 *Miranda* waiver ineffective. Not so. Where an intelligence interview predates a second, post-*Miranda* interview, the question for the Court is whether the *Miranda* warning could function effectively. *United States v. Ray*, 803 F.3d 244, 268 (6th Cir. 2015) (citing *Missouri v. Seibert*, 542 U.S. 600, 611–12 (2004)). Courts in this circuit use a multi-factor test to answer the question, considering:

> (1) the completeness and detail involved in the first interrogation; (2) the overlapping content of the pre-and post-*Miranda* statements; (3) the timing and setting of the interrogations; (4) the continuity of police personnel during the two interrogations; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* (citing *Seibert*, 542 U.S. at 615). These factors support a conclusion that the *Miranda* warnings prior to Musaibli's July 23 interview functioned effectively.

First, the interviews were nine days apart and in different settings. The intelligence interview was conducted while Musaibli was in SDF custody in a Syrian prison. (ECF No. 155, PageID.1362). In contrast, the post-*Miranda* interview was conducted while he was in U.S. custody, in an aircraft protected by U.S. personnel, on his way back the United States. In *United States v. Abu Khatallah*, the court found a two-day break between intelligence and law enforcement interviews "significant," in holding that the subsequent *Miranda* warnings were effective. 275 F. Supp. 3d 32, 65–66 (D.D.C. 2017). Second, different people conducted the interviews: Nutter and Kerner were neither present for the intelligence interview nor aware of anything said during the interview. (ECF No. 155, PageID.1515; ECF No. 163, PageID.1649–50). "The absence of any shared personnel, information, or impressions of the interviewee between the first and second interview teams substantially undermines the claim of a coordinated effort to circumvent *Miranda*." *United States v. Khweis*, No. 1:16-CR-143, 2017 WL 2385355, at *14 (E.D. Va. June 1, 2017), aff'd, 971 F.3d 453 (4th Cir. 2020); *see also Abu Khatallah*, 275 F. Supp. 3d at 65.

Third, the Advice of Rights form was clear that the post-*Miranda* interview was not a continuation of the intelligence interview. Rather, Nutter and Kerner were "starting anew" with Musaibli, who did not have to speak with them at all. (Exh. C;

9

ECF No. 155, PageID.1514). And the interviewing agents "did not reference any information from the [intelligence interview], nor could they have, as they did not know what was discussed." *Abu Khatallah*, 275 F. Supp. 3d 32 at 65. Fourth, Musaibli's law enforcement interview was more detailed and "much longer" than his intelligence interview, as the defense recognized. (ECF No. 1527, PageID.1172).

In short, the nine-day break, change in personnel, clear Advice of Rights form, complete autonomy Musaibli had to refuse to speak with the agents, and assurance that his prior statements would likely not be admissible "all support a finding that 'a reasonable person in [Musaibli's] shoes' would have understood that he retained a choice about continuing to talk." *Abu Khatallah*, 275 F. Supp. 3d 32 at 66 (quoting *Seibert*, 542 U.S. at 617). Musaibli's *Miranda* warnings were effective.

### III.  CONCLUSION

The Court should deny defendant's motions to suppress his statements.

SAIMA S. MOHSIN<br>
United States Attorney<br>
s/<u>Kevin M. Mulcahy</u><br>
Kevin M. Mulcahy<br>
Hank Moon<br>
Assistant United States Attorneys

Date: July 21, 2021

### CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2021, I electronically filed the foregoing document using the ECF system, which will send notification of filing to the counsel of record.

s/Kevin M. Mulcahy