UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,         Case No. 18-20495

v.

                        Hon. David M. Lawson

Ibraheem Izzy Musaibli,

        Defendant.
_____/

**Post-Hearing Brief in Support of Defendant's
Motion to Suppress Custodial and Remote Messaging Statements**

**I.    Mr. Musaibli's Post-Arrest Statements Are the Product of Invalid and Involuntary Waivers of Rights.**

    **a.  Mr. Musaibli's in-flight *Miranda* waiver was involuntary.**

The Government bears the burden of proving that a defendant voluntarily, knowingly, and intelligently waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 475 (1966), to introduce said defendant's custodial statements at trial. Furthermore, it must prove that the defendant's waiver was an uncoerced choice; and the waiver must be done with full awareness of the rights "being abandoned and the consequences of the decision to abandon" such rights. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Courts are to consider the totality of the circumstances in determining whether the waiver was knowing and voluntary. *Id.*

Mr. Musaibli was taken into custody on July 23, 2018, at approximately 10:20 p.m. local time. Hearing Exh. A., FTOC Log. (Log times transposed +7 hours to Syrian time.) Mr. Musaibli's post-arrest *Miranda* waiver was the product of an incredibly

1

coercive environment which was created, maintained, and taken advantage of by arresting agents, including the "Foreign Transfer of Custody" (FTOC) team and FBI agents Wendy Kerner and Julius Nutter. That environment included:

- Mr. Musaibli being received by FTOC agents from Syrian Democratic Forces, in whose custody he had been since the beginning of July 2018. TR 6/21/21, ECF 163, PageID.1682.
- The transfer of custody occurred late at night. Exh. A.
- Mr. Musaibli was handcuffed and in sensory deprivation gear when FTOC took custody of him. TR 6/3/21 (Stepp/Alzner), ECF 155, PageID.1338-39, 1417-18.
- FTOC agents immediately replaced the SDF restraints and sensory deprivation gear with their own, prior to putting Mr. Musaibli on the FTOC aircraft. *Id.*
- The sensory deprivation gear included blacked-out goggles, *id.*, as well as ear coverings whose purpose in part was to keep Mr. Musaibli from becoming aware of others on the plane. *Id.*, PageID.1332, 1389-90.
- Mr. Musaibli remained in restraints throughout the process of his return to the U.S., *id.*, PageID.1358-59, which lasted over 23 hours, Exh. A.
- The sensory deprivation gear likewise remained on him except when questioned, *id.*, eating, or using the bathroom, TR 6/3/21, ECF 155, PageID.1447-48.
- During the 23-hour transport process, Mr. Musaibli had only brief and intermittent periods of sleep, totaling no more than 3-4 hours. Exh. A.
- The interview occurred following a previous un-Mirandized custodial interview by FBI agents while Mr. Musaibli was still in SDF custody and could not refuse to answer questions. TR 06/21/21, ECF 163, PageID.1649-51.

Mr. Musaibli was *Mirandized* at approximately 6:15 a.m. Syrian time, prior to his first in-flight interrogation. Ex. A. By then, FTOC/FBI agents had him in custody for 8 hours, in restraints and sensory deprivation gear throughout. During that 8-hour period, Mr. Musaibli slept for a mere 23 minutes on one occasion and 58 minutes on another, the last period of sleep ending at 3:10 a.m. Syrian time. *Id.* While the witnesses testified that Mr. Musaibli did not appear to be sleep deprived, they had no basis on

2

which to make that determination. The agents did not bother to confirm with the FTOC Log or others on the team how long he had slept prior to initiating questioning. TR 6/3/21 (Nutter), ECF 155, PageID.1552. They also did not know when or for how long he last had slept before being transferred by the SDF to FTOC custody, other than in some fashion the previous day. *Id.*, PageID.1536-37.

Certainly, Agents Kerner and Nutter knew that they were *Mirandizing* Mr. Musaibli at the equivalent of 6:15 a.m. Likewise, they knew of his restraints and sensory deprivation, and were on notice of his sleep deprivation, during the previous 8 hours (which was equivalent to the middle of the night for Mr. Musaibli). Agent Nutter acknowledged that sleep and sensory deprivation can be impairing to the point of rendering a person's actions involuntary. *Id.*, PageID.1531-32. It is instructive that FTOC agent Stepp told Mr. Musaibli to stop repeatedly dislocating his thumb, which Stepp knew could be a nervous reaction. *Id.*, PageID.1402-03. It also is telling that Mr. Musaibli's purported signature on the *Miranda* waiver form, Hearing Exh. C, is incomplete, and appears different from his signature provided 8 hours earlier on the FTOC property receipt, Exh. A, and on the waiver of right to prompt presentment, Hearing Exh. D, given just before landing in Gary, Indiana. Considering the totality of these circumstances, the Government has not met its burden of proving that any in-flight *Miranda* waiver was knowing and voluntary.

### b. Mr. Musaibli's in-flight statements likewise were involuntary.

As with a Miranda waiver, the Government bears the burden to prove by a preponderance of the evidence that a defendant's statement is voluntary. *Lego v. Twomey,* 404 U.S. 477, 487-89 (1972). When deciding whether a statement is involuntary, courts

3

must consider the totality of circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). In the Sixth Circuit, courts should examine the record to see (1) if "the police activity was objectively coercive"; (2) if the coercion was sufficient to overbear the defendant's will"; and (3) if the police misconduct was "the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

Agents Kerner and Nutter interviewed Mr. Musaibli for almost 5 hours following their report of *Mirandizing* him at 6:15 a.m. Syrian time. TR 6/3/21, ECF 155, PageID.1537-38. A 5½ hour break then ensued, the equivalent of Mr. Musaibli's afternoon, during which he slept for 1¾-2 hours and remained in sensory deprivation. *Id.*, PageID.1538-39; Exh. A. The agents then reinterviewed Mr. Musaibli for another 2-2½ hours. Exh. A. A third, 6-minute interview occurred 90 minutes later, shortly before arrival in Gary, during which Mr. Musaibli signed a waiver of prompt presentment. In between the second and third interviews, Mr. Musaibli did not sleep and remained in sensory deprivation.

All told, Mr. Musaibli was interviewed for 7-8 hours over a 15-hour period (commencing 8 hours into the 23-hour plane journey), on intermittent sleep totaling no more than 3-4 hours over the entire 23-hour period, and during which he was restrained, and suffered sensory deprivation except while being questioned. Of critical importance, the almost-5-hour first interview commenced at 6:15 a.m. Syrian time, after 8 hours of sensory deprivation in U.S. custody and an unknown amount of time in sensory deprivation during SDF transport custody prior to that, and with less than an

hour and half of sleep broken up into two sessions. This very long initial interview undoubtedly influenced Mr. Musaibli to submit to the later reinterviews.

The evidence strongly suggests that the agents not only knew that this environment was coercive, but manipulated and took advantage of it in order to obtain a confession. Email correspondence between Kerner and Nutter confirm that the purpose of them accompanying the FTOC team was, primarily, to obtain Mr. Musaibli's confession. TR 6/3/21, ECF 155, PageID.1529-30; TR 6/21/21, ECF 163, PageID.1701-02. Nutter did not rationally and persuasively answer why Mr. Musaibli's interrogations couldn't have waited until he was rested and safely back on U.S. soil. TFO Kerner confirmed she could have waited until Mr. Musaibli's return and interviewed him then, TR 6/21/21, ECF 163, PageID.1706, and he would not have suffered sensory deprivation before and after the questioning, *id.*, PageID.1719-20. Although Nutter professed concern for others potentially in harm's way in the Middle East to justify the in-flight questioning, he did not deny the emails which described that the primary purpose of the in-flight interviews was to obtain a confession from Mr. Musaibli. His concern about the exigency of these potential "others" also does not square with the fact that it took agents approximately a week to mobilize and travel to arrest Mr. Musaibli. *Id.*, PageID.1683.

Other facts also suggest manipulation. For instance, the case agents waited 4 hours after Mr. Musaibli was transferred to the C-130 aircraft to begin questioning, during which he got no sleep and remained restrained and sensorily deprived (and, additionally, without food, which only was offered after the *Miranda* warning and the start of the first interrogation). Exh. A. The agents also did not record any of their three

5

multiple in-flight interviews. TR 6/3/21, ECF 155, PageID.1502-03; TR 6/21/21, ECF 163, PageID.1660. This decision may not have rested with the agents on the plane, but it was made by a superior FBI official. TFO Kerner acknowledged that the other rendition passenger on the flight was not interrogated. TR 6/21/21, ECF 163, PageID.1686. And in a different hearing, Abdelhamid Al-Madioum confirmed that he was not interrogated when he was returned to the U.S. from Syria. TR 6/28/21, ECF 166, PageID.1949. FTOC Agent Stepp and Agent Nutter both acknowledged *never* interrogating a person domestically who was presented in sensory deprivation gear. TR 6/3/21, ECF 155, PageID.1398, 1532-33. Stepp went further in suggesting that the justification for interrogating a sleep-deprived subject depended on whether there was imminent need. *Id.*, PageID.1399-00.

There is plenty of jurisprudence that upholds confessions given in response to tricks, even prevarications, by law enforcement, absent coercion. However, where the Government helps create, maintains, and manipulates what it knows is a coercive environment for the precise purpose of obtaining a confession (which the Kerner/Nutter emails explicitly confirm), they cannot sustain their burden of proving that the statement was free of that coercion. The security protocols necessitating restraints, sensory deprivation gear, and flying late at night are one thing, and likely justifiable; it is quite another thing, and unjustifiable, to conduct repeated custodial interrogations under such conditions. The Court should rule that Mr. Musaibli's in-flight statements were involuntary.

6

### c. Mr. Musaibli's post-flight statements likewise are inadmissible.

Mr. Musaibli's post-flight interview in Gary, Indiana, is inadmissible for at least three reasons. First, for the same reasons as outlined in Sec. I.a. above, the waiver of prompt presentment should be deemed involuntary notwithstanding the self-serving statements in the form about the waiver not having been coerced. The coercion practiced in obtaining Mr. Musaibli's *Miranda* waiver, and his subsequent statements in response to interrogation, impacted his waiver of prompt presentment. Absent a valid waiver of either *Miranda* or prompt presentment, Mr. Musaibli should have immediately been taken before the nearest magistrate judge (9 miles from Gary) rather than reinterviewed. The case agents were far beyond the 6-hour "safe harbor" of 18 U.S.C. § 3501(c). And even if the initial 23 hours of travel were necessary, further delay upon arrival in Gary was not. *Corley v. United States*, 556 U.S. 303, 322 (2009); F.R.Cr.P 5(a).

Second, Mr. Musaibli was not re-*Mirandized* prior to being reinterviewed post-flight. Rather, he was "reminded" of the rights that he did not knowingly/voluntarily waive 15 hours earlier. TR 6/3/21, ECF 155, PageID.1540-41. Although counsel has not found a case addressing the precise issue, it seems to follow that a *Miranda* waiver not proved to have been knowing and voluntary cannot be used to support a later alleged waiver based merely on a "reminder" of rights previously read.

Third, for the same reasons as set out in Sec. I.b, statements provided in the reinterview should be deemed involuntary, or the purposeful fruit of the in-flight statements. Agent Nutter confirmed that the reinterview covered the same subjects as were addressed in-flight. TR 6/3/21, ECF 155, PageID.1540-42. Further, he confirmed that *this* reinterview, unlike the in-flight statements, was recorded. *Id.* It seems plain that

7

the purpose of the reinterview was to leverage the in-flight statements already made, and record them.

While not on all-fours, this tactic implicates *United States v. Ray*, 803 F.3d 244 (6th Cir. 2015) (adopting the plurality opinion in *Missouri v. Seibert*, 542 U.S. 600 (2004)). Although *Ray* addressed the admissibility of a *Mirandized* confession that closely followed an un-*Mirandized* one, the instant circumstances are similar: the Government seeks to admit statements following a *Miranda* "reminder" where the initial *Miranda* waiver was coerced. The continuity of interrogators, topics, timing, and the interrogators' treatment of the reinterview in Gary as a continuation of the in-flight questioning all militate in favor of finding the Gary statements so tainted by the earlier involuntary statements as to be inadmissible.

## II. The Government's Continued Threats to Leave Mr. Musaibli in a Rapidly Deteriorating Warzone if He Did Not Admit to Voluntarily Joining ISIS Was Coercive Activity Deliberately Designed to Overbear His Will.

In April 2018, Mr. Musaibli was trapped inside ISIS territory. At that time ISIS was being pushed into a smaller and smaller area by a combined assault of U.S. backed coalition forces on one side and Russian and Syrian forces on the other. TFO Kerner was aware of this desperate situation when she began communicating with Mr. Musaibli over messaging applications. TR 6/21/21 (Kerner), ECF 163, PageID.1674. As explained in Mr. Musaibli's Brief in Support of Motion to Suppress, the record of the chats reveals that Kerner made repeated statements to Mr. Musaibli reminding him of the danger he was in. ECF 107, PageID.410-11. The record also reveals that Kerner repeatedly told Mr. Musaibli that she would not help him unless he admitted the truth. *Id.*, PageID.412-15. The truth, as TFO Kerner saw it, required an admission from Mr. Musaibli that he travelled to Syria with the intent to voluntarily join ISIS. TR 6/21/21,

8

ECF 163, PageID.1678. There is no dispute that Kerner repeatedly conditioned U.S. government assistance to help Mr. Musaibli exit a life-threatening situation on his making incriminating statements that could be used against him at trial.

Threats against a suspect can render a statement involuntary and thus inadmissible at trial. *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991). The voluntariness of a statement is determined by reviewing the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). A defendant need not prove that his statement was involuntary, the burden is on the prosecution to prove voluntariness. *Lego v. Twomey*, 404 U.S. 477, 487-89 (1972).

TFO Kerner attempted to justify the threats against Mr. Musaibli by claiming that his admission was necessary so that they could sufficiently trust him enough to be able to render him assistance in escaping ISIS territory. This claim fails for two reasons: (1) she could never explain how this admission would give her confidence that he was sincere in escaping ISIS territory; and (2) there was never any aid available for Mr. Musaibli and he was simply instructed to turn himself into coalition forces.

TFO Kerner testified that she was concerned Mr. Musaibli's request for aid could be "some sort of trap." TR 6/21/21, ECF 163, PageID.1611. She had to have a basic trust so that she would know that he was not a threat to those coming to rescue him. *Id.*, PageID.1675. Although at one point Kerner thought Mr. Musaibli could be in Lebanon, one of her first questions to him was about his location. He told her he was in Susah, Syria. Telegram Communications Musaibli and Kerner, Exhibit B to Defendant's Motion to Suppress, ECF 107-3, Sealed, Page 8/185. Given the realities on the ground and the rapid collapse of ISIS, Susah and the surrounding area was one of the few places where Mr. Musaibli could be located. Map of Operation Al-Jazeera Storm, Exhibit A to Defendant's Motion to Suppress, ECF 107-2, PageID.428. TFO Kerner admitted that the only option ever available was for Mr. Musaibli to turn himself into SDF military forces. TR 6/21/21, ECF 163, PageID.1681.

9

There never was a possibility of a U.S. force rescuing Mr. Musaibli. His admission to being an ISIS member would have no bearing on his ability to turn himself into the SDF. *Id.*, PageID.1682. TFO Kerner's claims that Mr. Musaibli's admission to voluntarily joining ISIS would have been a watershed moment allowing her to trust Mr. Musaibli and formulate rescue plans are not credible. Kerner could not explain how this admission could make it less likely that his call for help was a trap. She knew early in their communications that he was in an area where the U.S. could offer no help. She sought his admission to voluntarily join ISIS in order to gain evidence for use at a criminal trial. She used his need to escape the collapsing ISIS territory and the threat death or capture by Syrian or Iraqi forces in an attempt to force him to make admissions. Such threats render his statements involuntary.

## Conclusion

For all the reasons set forth in briefing, including the testimony taken during the evidentiary hearing, the Court should find that Mr. Musaibli's statements should be suppressed.

Submitted,

John A. Shea (P37634)
Counsel for Ibraheem I. Musaibli
120 N. Fourth Avenue
Ann Arbor, Michigan 48104
Phone: 734.995.4646
Email: jashea@earthlink.net

Dated: July 21, 2021

s/James R. Gerometta
James R. Gerometta
Fabián Rentería Franco
Counsel for Ibraheem I. Musaibli
FEDERAL COMMUNITY DEFENDER
613 Abbott Street, Suite 500
Detroit, Michigan 48226
Email: james_gerometta@fd.org
Phone: 313.967.5542

## Certificate of Service

On July 21, 2021, counsel filed Post-Hearing Brief in Support of Defendant's Motion to Suppress Custodial and Remote Messaging Statements via CM/ECF, which should provide notification to opposing counsel registered to receive electronic notices.

s/James R. Gerometta
James R. Gerometta
