UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,                          Case Number 18-20495

v.                                                      Honorable David M. Lawson

IBRAHEEM IZZY MUSAIBLI,

                    Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS CUSTODIAL STATEMENTS AND ELECTRONIC MESSAGES

Defendant Ibraheem Izzy Musaibli is charged with crimes arising from his alleged involvement with a terrorist organization in the Middle East between October 2015 and June 2018. Starting in April 2018, he began a series of text message exchanges with Federal Bureau of Investigation Special Agent Wendy Kerner. Musaibli eventually was captured by the Syrian Democratic Forces (SDF) and was turned over to the FBI, who repatriated him to the United States. Musaibli made statements to government agents during the transport flight from Kuwait to the United States and immediately after the flight landed in Gary, Indiana. Now before the Court are his motions to suppress those statements and the text messages. The Court held an evidentiary hearing on the motions. The evidence establishes that the custodial statements were voluntary and preceded by the appropriate advice of constitutional rights and warnings, the defendant's waiver of those rights was knowing and voluntary, and there is no valid reason to suppress the statements or the text messages. The motions to suppress, therefore, will be denied.

I.

Musaibli is charged in a superseding indictment with providing, attempting to provide, and conspiring to provide material support to a terrorist organization, and receiving military-type

training from a foreign terrorist organization. These charges are based on Musaibli's alleged involvement with the Islamic State of Iraq and al-Sham (ISIS) from April 2015 through June 2018; during part of that time he supposedly provided military-type services for that organization.

Musaibli is an American citizen born in Dearborn, Michigan. In April 2015, he supposedly was radicalized after reading and viewing "jihadi materials," including lectures by Anwar al-Awlaki. That month, he traveled to Yemen. Six months later, he left Yemen and traveled to Syria by way of Saudi Arabia and Turkey. Upon arrival in Syria, he joined ISIS.

In April 2018, Musaibli contacted FBI agents, and he then had a series of communications about his situation with FBI Task Force Officer Wendy Kerner. The substance of those communications mostly consists of Musaibli asserting various demands for money, immunity, or transportation at the FBI's expense to facilitate his escape from Syria to Yemen. Agent Kerner responded to these demands by telling the defendant that if he wanted to get safely out of Syria, the safest course would be to surrender himself to the SDF and identify himself to them as a U.S. citizen, at which point the FBI could request to extradite him to the United States to face terrorism charges. Kerner also told the defendant that the FBI would not provide him with money or other resources to pursue schemes such as hiring a smuggler to get him out of Syria, because doing so would constitute illegal material support for his terrorist affiliated service with ISIS. The defendant last communicated with Agent Kerner around June 9, 2018.

Sometime after that last exchange, Musaibli was captured by SDF forces. He argues in his motion that while in SDF custody, he was interrogated by the SDF, and during those interrogations he was "threatened with physical violence, struck repeatedly, and spit upon." He says that he was interrogated "several times" during the six weeks he was in SDF custody, and frequently the interrogators threatened to turn him over to the Iraqi Army, which was reputed to be executing

prisoners thought to have ISIS affiliations. On July 14, 2018, he was interrogated by unidentified U.S. agents while in an SDF prison. Although the government has not revealed the substance of that interview, it asserts that Musaibli reportedly then appeared to be in good health and showed no signs of distress or mistreatment.

Musaibli was extracted from the Middle East on July 24, 2018. He says that when he was turned over to U.S. authorities, he had not eaten since the prior afternoon, and he had slept less than two hours within the prior 24 hours, although there is no record evidence backing up those assertions.

The five members of the foreign transfer of custody (FTOC) team testified at the evidentiary hearing. Three members — FBI agents Michael Stepp, Richard Alzner, and John McKinley — provided logistical and security support. Stepp was trained as an emergency medical technician. McKinley was trained as a physician's assistant and was able to furnish medical support if needed. The other two team members — agents Kerner and Julius Nutter — came along with the primary purpose of interrogating the defendant.

The team left the United States on July 23, 2018 and travelled to a base in Kuwait via Germany. Stepp, Alzner, and McKinley then flew in a C-130 to Syria to take custody of Musaibli from the SDF at 10:20 p.m. Syria local time (2:20 p.m. Eastern Time) on July 23, 2018. They wore civilian clothes and, although armed, they did not display weapons. There was another group of individuals that also was being extracted at the time. The agents took custody of Musaibli, who wore eye coverings and zip-cuff restraints. They told him they were FBI agents who were taking him back to the United States. Musaibli said he understood that he was being transferred to FBI custody and asked to speak with agent Kerner. He was cooperative during the transfer, and according to the agents, "appeared to be relieved" to be handed over to U.S. authorities.

- 3 -

They swapped the restraints for their own metal handcuffs and blackout goggles. McKinley performed a "quick" head-to-toe medical exam — five to six minutes — and pronounced Musaibli fit for travel.  McKinley testified that Musaibli was alert, responsive, oriented, and did not appear to be distressed, injured, agitated, or sleep-deprived.  He saw no indication that Musaibli had been tortured or beaten, and Musaibli did not complain about being hungry, tired, or exhausted.

Musaibli was brought aboard the C-130 first, and then the other extractees were boarded. After the flight took off, the pilot had to take evasive action because of a surface-to-air missile threat, which lasted five to ten seconds, but the aircraft was not damaged and none aboard were injured.  After about 25 minutes, the defendant fell asleep.  When he awoke, he was offered water, then went back to sleep.  The plane landed at the Kuwaiti airbase around three hours later.  These events were documented in the FTOC log, which was kept by Stepp and Alzner.

At the base in Kuwait, Musaibli was transferred to a C-17 for the flight back to the United States.  He remained in restraints and wore blackout goggles and ear protection.  He was confined to a partitioned space on the aircraft that measured 18 by 30 feet.  The five extraction team members were with him.  The other extractees also were boarded in another section of the C-17. Stepp offered Musaibli water and a bathroom break.  He declined both.  Alzner adjusted the seatbelt restraints to make Musaibli more comfortable.  He was offered water twice more before the plane took off around 10:00 p.m. Eastern Time.

One hour after the plane took off for its 16-hour flight to the United States, agents Nutter and Kerner approached Musaibli and asked if he wanted to speak with them.  When the agents spoke to the defendant his goggles were removed, and the noise cancelling earmuffs were replaced with a headset (the agents also wore headsets and ear protection) so the defendant and agents could

communicate over the din of the aircraft noise.  The agents offered the defendant food and water, which he declined.  Instead, he "immediately started telling 'Wendy' about what happened in the days after their last chat in June."  He asked if the agents had retrieved any of his personal property from the SDF, told the agents that he had slept the day before, and said that he "wanted to 'cooperate 100%' with the FBI."  Agent Kerner then provided a written advice of rights form and orally advised Musaibli of his *Miranda* rights.  In addition to the standard advice of rights, the form also stated that the agents were unaware of any statements previously made by the defendant, any such statements could not be used against the defendant in U.S. courts, and he was not obligated to make any further statements because he previously had spoken to other U.S. authorities.  Musaibli said he understood his rights and elected to waive them, and he signed the advice of rights form at 11:13 p.m. Eastern Time.

The interview continued thereafter for around five hours.  During the questioning, Musaibli was offered water five times, and an open bottle of water was left for him to drink.  He asked to pray and was allowed to do so.  He used the bathroom twice and declined when asked another time if he needed to do so.  He was offered and ate a hot meal, along with chips, a soda, a snack bar, a protein bar, and a Pop-Tart.  One of his hands was uncuffed at agent Kerner's request to make the defendant more comfortable, while the other remained cuffed to the seat.  The interrogation paused while the plane was refueled midair.  During the refueling operation, the defendant fell asleep.  He awoke briefly, and the agents brought a padded footrest to make the defendant more comfortable.  He fell asleep again, awaking eventually to use the bathroom.  The FTOC log indicates that the defendant slept between 4:43 a.m. and 9:00 a.m. Eastern Time.  At 6:34 a.m., the defendant asked for a pillow and to be allowed to lie down; both requests were accommodated.

The interview recommenced at 9:15 a.m. Eastern Time after the defendant awoke, washed up, and was offered water and a bathroom break.  He also ate some cereal.  During the interview the defendant was again offered water around 11:00 a.m., and the interview ended at 11:35 a.m.  The defendant then ate a hot meal and drank water.  The agents conducted a final brief in-flight interview at 2:08 p.m. Eastern Time before the plane landed in Gary, Indiana.  None of the interviews on the airplane were recorded.

During the last in-flight interview, the defendant was presented with a waiver of prompt appearance form and advised that he could be taken before a magistrate judge in Indiana if he wished.  He elected instead to wait and be transported to Detroit, and he then signed the waiver of his right to a prompt appearance.

When the plane landed in Indiana, the defendant was transferred to a minivan, and the goggles and handcuffs were removed.  He was handcuffed again once he was seated in the transport van.  Musaibli was transported a short distance to a nearby hangar for customs processing and to await transportation to Detroit.  While in the hangar, he was interrogated again by agents Nutter and Kerner, and an audio recording was made of that interview.  The interview began at 2:45 p.m., about 45 minutes after the plane landed, and it continued for only about 15 minutes.  Kerner reminded Musaibli of his *Miranda* rights at the outset of the interview, and the defendant again acknowledged his rights and said he wanted to speak to the agents.  The agents then asked several "clarifying questions" related to his prior statements, which the defendant answered.  At the end of the interview, the agents again offered the defendant water and a bathroom break, and then they drove him to Detroit.

- 6 -

II.

Musaibli argues that all his statements to the agents aboard the C-17 and in the hangar at Gary, Indiana must be suppressed.  He contends that the brutality that preceded his transfer to U.S. custody, along with the fact that when he first was interrogated he had been in restraints for many hours, had not eaten since the prior afternoon, and had slept less than two hours within the prior 24 hours, combined to make it impossible for him knowingly and voluntarily to waive his *Miranda* rights at the outset of the in-flight interrogation.  He further argues that the post-flight questioning upon arrival in the U.S. was a "direct follow-up" to the in-flight interrogation, and statements made at that time also must be suppressed due to the taint of an involuntary waiver before the first questioning.  He says that due to the "extrajudicial detention" by the SDF and the prior "coerced statements" elicited by Agent Kerner during approximately six weeks of electronic messaging communications before his surrender, he could not appreciate the gravity of his waiver of rights or the consequences of choosing to respond to interrogation by U.S. authorities.  He also contends that the *Miranda* warnings administered by agent Kerner were ineffective because of the earlier, un-*Miranda*-ized statements he gave to the intelligence officers covering the same subject matter, and that his waiver was nullified by the prior coercive interrogation.  Finally, the defendant argues that the post-flight statements made in Indiana must be suppressed under the so-called *McNabb-Mallory* rule, codified at 18 U.S.C. § 3501(c), which holds that a custodial statement made during a delay before presentment on charges of more than six hours must be suppressed if the Court finds that the delay was unreasonable or unnecessary.  *See McNabb v. United States*, 318 U.S. 332 (1943); *Mallory v. United States*, 354 U.S. 449 (1957).

A.

The iconic *Miranda* warnings that must precede police questioning of a person in custody have become embedded in our legal culture for nearly five decades. *Dickerson v. United States*, 530 U.S. 428, 443 (2000) ("*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture."). Police interrogators must tell a suspect about his right not to incriminate himself, and that if he gives up his right to remain silent, his statements can be used against him in court. *Miranda v. Arizona*, 384 U.S. 436, 497 (1966). He must be told that he has a right to a lawyer to advise him and that one will be furnished if he cannot afford one. *Ibid.* All of this must be explained to the suspect before any questioning can take place. *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010). And the suspect must "voluntarily, knowingly and intelligently" waive these rights, or else any statements made in response to police questioning "must be suppressed." *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)).

Musaibli makes no claim that his FBI interrogators failed to advise him properly of his rights. Instead, he says that his written and verbal waivers were not knowing, voluntary, or intelligent. "The test for whether a *Miranda* waiver is voluntary is essentially the same as the test for whether a confession is voluntary." *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (quotation omitted). That waiver analysis "'has two distinct dimensions.'" *United States v. Abdi*, 827 F. App'x 499, 507 (6th Cir. 2020) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Such a waiver is voluntary "when 'it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *United States v. Fein*, 843 F. App'x 765, 770 (6th Cir. 2021) (quoting *Moran*, 475 U.S. at 421). "It is knowing and intelligent when it is made with a full

awareness of both the nature of the right being abandoned and the consequences of' the decision to abandon it.'" *Ibid.*

Musaibli argues that agent Kerner's coercive conduct during the text message exchanges (insisting that he surrender to SDF forces so the FBI could repatriate him to face charges), followed by the brutality of his treatment at the hands of SDF forces, undermined the voluntariness of his waiver. When a defendant asserts that a waiver of his rights was involuntary due to police coercion, the Court must find that three criteria are satisfied before excluding a post-waiver custodial statement: "(1) the police activity was 'objectively coercive'; (2) the coercion in question was 'sufficient to overbear defendant's will'; and (3) the alleged police misconduct 'was the crucial motivating factor in the defendant's decision to offer the statements.'" *Ibid.* (quoting *United States v. Luck*, 852 F.3d 615, 622 (6th Cir. 2017); *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016)). The Supreme Court has held that, regardless of the defendant's subjective mental status when he was interrogated, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'" and therefore must be suppressed. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

When evaluating voluntariness under this standard, the Court considers "'the totality of the circumstances' to determine whether 'a defendant's will was overborne in a particular case.'" *United States v. Craft*, 495 F.3d 259, 263 (6th Cir. 2007) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). "Relevant factors include the defendant's age, his level of education and intelligence, whether he was advised of his rights, whether he suffered physical punishment and the length of the questioning he endured." *Ibid.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). These factors are viewed "primarily from the perspective of the police, such that where the police had no reason to believe that the defendant misunderstood the warnings, there

is no basis for invalidating the *Miranda* waiver." *United States v. Ramamoorthy*, 949 F.3d 955, 965 (6th Cir. 2020) (quoting *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (quotation marks and alterations omitted)).

The defendant here has not pointed to any circumstances suggesting doubt about the fact that he "possessed the level of comprehension necessary to make his waiver knowing and intelligent." *United States v. Abdi*, 827 F. App'x 499, 507-08 (6th Cir. 2020).  He also has not identified any nominal deficiency in the advice of rights that was given.  "'The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege,'" and it "simply requires 'that the suspect be fully advised' of the privilege not to be a witness against himself." *Ibid.* (quoting *Colorado v. Spring*, 479 U.S. at 574)); *see also Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) ("The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*.")

None of the other relevant circumstances favor a finding that the waiver here was the product of any coercive overreach by the interrogating agents or that the defendant's free will was overborne.  The defendant is an adult.  Although his level of education is unclear from this record, he grew up in the United States and is fluent in English.  All indications are that he has a typical intelligence level.  He has been twice evaluated and found not to have any mental defect that would render him incompetent for these proceedings.

It is undisputed that he was twice advised of his *Miranda* rights and affirmatively waived them orally and in writing.  The first written notice of rights particularly advised him that agents Kerner and Nutter did not know anything about statements he might have made during a prior interview with unidentified U.S. intelligence agents, which occurred while the defendant was held in an SDF prison.  There is no evidence that the interrogating agents used any intimidating,

- 10 -

deceptive, or physically abusive tactics during the questioning.  The defendant does not dispute the government's representation that the two interrogators were unarmed and dressed in civilian clothes during the interrogations.  The interrogation spanned one session of approximately five hours during a long-haul flight from Kuwait to the United States, with a follow-up session of around two hours and 20 minutes, brief follow-ups of a few minutes before the plane landed, and a final 15-minute session after arrival.

Before, during, and after the interrogation, the defendant repeatedly was offered and provided medical attention, clean clothes, food, water, and breaks to sleep, pray, and use the bathroom.  Agents took additional steps to improve his comfort during the lengthy flight, including adjusting his seatbelt to make him more comfortable, bringing him a padded footrest, and allowing him to have one hand uncuffed so he could lie down.

The defendant contends that he was worn down by lack of sleep and hunger by the time the in-flight interrogation began.  But when examined by an EMT and a PA he showed no signs of poor health, illness, or distress.  He was offered water several times before and during the questioning, accepted sometimes, and declined others.  He also was offered food and bathroom access before the questioning started, which he declined.  He later twice was amply fed during breaks in the questioning.  At the outset of the interview, the defendant told agents he had slept the day before, and it is undisputed that he slept for around an hour and 20 minutes on the first flight from Syria to Kuwait.  He was allowed to sleep again for around five hours on the second flight during a break in the interrogation.  There is no suggestion that the defendant ever told the questioning agents at any time that he was fatigued, hungry, or needed access to rest, food, water, or any other amenities that were withheld from him.  The defendant says he "only" slept for less than two hours in the prior 24 hours before the questioning started, but he never asked to be allowed

to sleep more.  He says he had not eaten since "the prior afternoon," but by the official timeline it was only around eight hours from his turnover to U.S. authorities before he was served an ample meal on the second flight.  He has not suggested that he ever asked to be fed earlier, and the agents testified that he was offered food just before the interrogation began, which he declined.

The defendant says that the use of "sensory deprivation gear" was coercive, but the employment of security measures like blackout goggles and handcuffs has been found not to invalidate an otherwise properly obtained *Miranda* waiver.  *United States v. Abu Ghayth*, 945 F. Supp. 2d 511, 517 (S.D.N.Y. 2013).  The noise cancelling earmuffs used were also worn by the government agents, when not replaced with audio headsets, and apparently were employed to protect the hearing of all onboard the flight from a high level of environmental noise, which would be expected in a military transport aircraft.

The defendant's briefs focus on his allegedly beleaguered mental condition when he was transferred to U.S. custody.  But a showing of compromised mental state alone is insufficient to invalidate the waiver of rights.  "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry."  *Connelly*, 479 U.S. at 165.  "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'"  *Id.* at 170 (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).

It is apparent from the testimony at the hearing that the FBI agents fully intended to take advantage of the long repatriation flight to interrogate the defendant.  He was confined to the restricted area within the C-17 and subjected to sensory deprivation devices, except when he was being questioned, and the agents had unfettered access to him during the transport, shortly after he was released from the custody of a foreign power.  But that opportunism does not amount to the

- 12 -

type of "police overreaching" that the Supreme Court has required to find before a defendant's statements should be suppressed. *Ibid.* (citing *Moran v. Burbine*, 475 U.S., at 421) ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."); *Fare v. Michael C.*, 442 U.S. 707, 726-727 (1979) (finding that the defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit. . . . The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*.")). There is no evidence that the questioning by agents Nutter and Kerner amounted to "coercion of a confession by physical violence or other deliberate means calculated to break his will," and there is no "evidence that his will was overborne and his capacity for self-determination critically impaired because of coercive police conduct." *United States v. Abdi*, 827 F. App'x 499, 507 (6th Cir. 2020) (quoting *Spring*, 479 U.S. at 573-74; *Elstad*, 470 U.S. at 312); *see also United States v. Yousef*, 925 F. Supp. 1063, 1077 (S.D.N.Y. 1996) ("Even if I were to accept Dr. Hegarty's assessment that [the defendant] suffered from post-traumatic stress disorder at the time the statement was made (which I do not); [the defendant]'s psychological state at the time the statement was given, without a showing of official coercion, does not dispose of the question of voluntariness. There is absolutely no allegation that the FBI agents who questioned [the defendant] in any way threatened, coerced, or tricked him into giving a statement.") (citing *Elstad*, 470 U.S. at 304; *Connelly*, 479 U.S. at 162).

The defendant also contends that the "coercive impact" of the conditions he faced while in SDF custody somehow cumulatively contributes to circumstances that invalidate his waiver of rights, which occurred more than eight hours after he was turned over to U.S. agents, while he was aboard an international flight bound for the United States, and many thousands of miles away. The

decisions on point do not support the defendant's argument. Coercive conduct by foreign authorities cannot be imputed to domestic government agents who did not participate in any of the alleged prior abuse. *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (holding that "while it is reasonable that Egyptian incarceration and torture, if true, would likely weaken one's mental state, one's mental state does not become part of the calculus for the suppression of evidence unless there is an allegation that agents of the United States engaged in some type of coercion"); *Yousef*, 925 F. Supp. at 1074 ("The rationale behind the policies set by the Supreme Court in *Miranda* and like cases just has no relevance to proceedings in a foreign country. The courts of this nation cannot enforce our constitutional guarantees as against foreign government officials acting in their own lands. The fact that the actions of these governmental officials occurred during extradition or expulsion to this country does not make the foreign officials agents of the United States."); *see also United States v. Khweis*, 971 F.3d 453, 464 (4th Cir. 2020) ("In any event, the context of Khweis's capture in the Middle East, a circumstance of Khweis's own making when he chose to travel to Syria and Iraq to join ISIL, does not undermine the effectiveness of the *Miranda* warnings he received or his waiver of those rights."). Moreover, as the government points out here, the stark contrast between the defendant's treatment by foreign authorities and domestic government agents mitigates against a finding that the experiences would be viewed by a reasonable person in the defendant's position as a single continuous ordeal. *See United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 67 (D.D.C. 2017) (contrasting the defendant's prior "expos[ure] to tyrannical, intolerant, and abusive government authorities" in Libya with "nearly a week of humane treatment" aboard a U.S. battleship before questioning, and concluding that "it would not have been reasonable for him to believe that waiving his *Miranda* rights was necessary to avoid abuse, let alone crucial for his survival").

The defendant says that the circumstances of the interrogations by foreign and domestic authorities were indistinguishable to him, but that assertion is belied by his own account of his treatment while in foreign hands and how he was handled by the FBI interrogators in this case. The defendant's assertion that he saw no distinction between his legal situation in Syria and after he was turned over to U.S. authorities also is undercut by the fact that he is a U.S. citizen who grew up in this country, which gave him ample opportunities to assimilate the more obvious social, cultural, and legal differences between the United States and Syria. Moreover, there is no evidence that the interrogating agents had any awareness of the defendant's supposed confusion about his legal situation, or that they made any effort to exploit any such misunderstanding. *See Ramamoorthy*, 949 F.3d at 965 (recounting the defendant's experience with the police in India, concluding "[e]ven assuming that [the defendant] subjectively believed that he simply had to tell the agents what they wanted to hear, the officers would have had no way of knowing that this was his understanding").

The defendant's waiver of his *Miranda* rights was knowing and voluntary.

## B.

Musaibli also argues that the *Miranda* warnings given by agents Kerner and Nutter were tainted by the previous interrogation conducted by U.S. agents while he still was in SDF custody. It is undisputed that no *Miranda* warnings were given then. He likens this to the practice condemned by the Supreme Court in *Missouri v. Seibert*, 542 U.S. 600 (2004), where a police interrogator would obtain incriminating statements from a suspect without giving proper warnings and then give the *Miranda* advice "midstream" and cause the suspect to repeat the confession.

In *Seibert*, a plurality decision, various members of the Court suggested alternative tests for evaluating the effectiveness of a midstream *Miranda* waiver. The Sixth Circuit later undertook

a careful evaluation of the competing rules of decision and held that the multi-factor test endorsed by the plurality opinion was the best approach.  *United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015).  Thus, in this circuit, the "*Seibert* plurality's multi-factor test" controls; under that approach "the admissibility of statements given after midstream *Miranda* warnings hinges on whether 'a reasonable person in the suspect's shoes could have seen the [second round of] questioning as a new and distinct experience, [and whether] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.'"  *Id.* at 272-73 (quoting *Seibert*, 542 U.S. at 616 (plurality opinion)).  The factors identified by the plurality as relevant to this inquiry are "'the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.'"  *Id.* at 273 (quoting *Seibert*).

None of these factors supports a finding that the defendant's waiver of his *Miranda* rights was involuntary or unknowing.  No showing has been made about the content or extent of the questioning during the "intelligence interview."  The defendant says that the two sessions overlapped topically in certain respects, but he has not cited any authority holding that even comprehensive topical overlap can alone justify exclusion.  And there is no evidence that the agents who interrogated Musaibli aboard the C-17 knew about any content from the previous intelligence interview.  The timing and setting of the two interviews indisputably are vastly separated.  They occurred more than nine days apart and at places separated by many thousands of miles.  One was in a foreign prison, the other was onboard a U.S. military aircraft bound for the United States.  Nothing else about the situations suggests that they were perceptibly similar.  The physical

conditions and treatment afforded by interrogators during the two sessions contrast starkly, as noted above. It is undisputed that there was no overlap of personnel. The FBI agents did not make any allusion to the prior questioning or statements, the substance of which they say they were unaware of until after this case formally was indicted. They expressly advised the defendant that they knew nothing about the prior interview, that anything he said in the prior encounter could not be used against him in United States courts, and that he was not obligated to talk to them merely because he might previously have made statements to other, unidentified U.S. agents. There are no grounds for application of the *Seibert* principle in this case.

## C.

The defendant also raises a challenge to his statements under the *McNabb-Mallory* rule. That rule is based on the common-law requirement that obliged "an arresting officer to bring his prisoner before a magistrate as soon as he reasonably could." *Corley v. United States*, 556 U.S. 303, 306 (2009). That requirement is now codified in Federal Rule of Criminal Procedure 5(a)(1)(A), which states that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise."

"In an effort to add 'teeth' to the requirement, the Supreme Court, in the exercise of its supervisory authority, held that defendants' confessions would be deemed inadmissible at trial 'when obtained during unreasonable presentment delay.'" *United States v. Woodley*, 713 F. App'x 449, 455-56 (6th Cir. 2017) (quoting *Corley*, 556 U.S. at 307; discussing the holding in *McNabb v. United States*, 318 U.S. 332 (1943)). "Then, in *Mallory v. United States*, 354 U.S. 449 (1957), the Court held a defendant's confession inadmissible when it was given seven hours after arrest but prior to presentment before a magistrate judge, even though the confession took place 'within

the vicinity of numerous committing magistrates.'"  *Id.* at 456.  "The principle that 'generally rendered inadmissible confessions made during periods of detention that violated the prompt presentment requirement of Rule 5(a)' thus came to be known as the *McNabb-Mallory* rule."  *Ibid.* (quoting *United States v. Alvarez-Sanchez*, 511 U.S. 350, 354 (1994)).

"In passing 18 U.S.C. § 3501, Congress 'modified *McNabb-Mallory* without supplanting it.'  That statutory provision creates a six-hour 'safe harbor,' deeming any delay of six hours or less between arrest and presentment reasonable enough that any confession given within that time frame will be admissible if 'made voluntarily and if the weight to be given the confession is left to the jury.'"  *Ibid.* (quoting *Corley*, 556 U.S. at 322; 18 U.S.C. § 3501(c)).  "'If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed.'"  *Ibid.* (quoting *Corley*, 556 U.S. at 322).

That rule, although well established, does not help Musaibli, however, because his valid waiver of his *Miranda* rights forecloses suppression on that basis.  "Sixth Circuit precedent holds that 'waiver of one's *Miranda* rights also constitutes a waiver under *McNabb-Mallory*,' meaning that '[a] valid *Miranda* waiver also waives the prompt judicial warning of one's constitutional rights.'"  *Woodley*, 713 F. App'x at 456 (quoting *United States v. Barlow*, 693 F.2d 954, 959 (6th Cir. 1982)).

\*  \*  \*  \*  \*

The statements that the defendant made to government agents during and following his repatriation flight on July 24, 2018 were voluntary and preceded by knowing and intelligent waivers of his constitutional rights.  They are not subject to suppression on the basis of the Fifth Amendment or related procedural rules.

- 18 -

III.

In a separate motion, Musaibli argues that his statements made to agent Kerner in text messages that the two exchanged over several weeks in April and early June 2018 must be suppressed because (1) he asked agent Kerner for help escaping Syria and the dangerous circumstances in which he found himself there, (2) her responses indicated that he would have to make admissions that "conformed with her view" of his reasons for traveling to Syria to justify any attempt by the FBI to extract the defendant from a foreign country, and (3) the "coercive pressure" of that conditional response forced the defendant to make involuntary and compromising admissions.  He further contends that all of his subsequent statements made during interrogations after the turnover to U.S. authorities must be suppressed because they were tainted by the prior involuntary confession.

It is settled law that "an accused's confession must be 'made freely, voluntarily and without compulsion or inducement of any sort.'"  *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (quoting *Haynes v. Washington*, 373 U.S. 503, 513 (1963)).  "In determining whether a confession is involuntary due to police coercion, [the] court employs a three-step analysis: '(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements.'"  *Ibid.* (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

The defendant's argument touches none of these bases.  He has not cited any authority supporting the remarkable proposition that an agent's mere engagement in consensual, intermittent text message communications with a defendant, when the two were separated by thousands of miles, where the defendant was at various locations of his own choosing unknown to the agent,

- 19 -

and during which honest impressions about the dangers of the defendant's situation and genuine offers to facilitate the defendant's cooperation and apprehension were made, can in any sense be viewed as "coercion" by the communicating agent. The defendant was free to engage or not as he wished in any further communications, or to stop communicating at any time, and the hazards that he faced during the time period of the exchanges were consequences of his own decisions that put him in harm's way, having nothing to do with any conduct by the investigating agent.

There is nothing improper or "coercive" about a government agent's statement of truthful opinions about the dangers that a defendant might face from a proposed course of action, or from genuine promises to attempt extradition if the defendant is willing to consent to apprehension and account for his crimes. *United States v. Khweis*, 971 F.3d 453, 464 (4th Cir. 2020) ("[Neither was] [t]here anything improper about Connelly's truthful statement that he could not promise extradition or his encouragement to Khweis to be truthful.") (citing *United States v. Shears*, 762 F.2d 397, 401 (4th Cir. 1985) ("[G]overnment agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary.")). If an agent makes promises that she knows she cannot keep during an interrogation, then those deceptive assurances could in some cases be found to have coercive effect. *Binford*, 818 F.3d at 271 ("[I]n some situations, '[p]olice promises of leniency . . . can be objectively coercive,'" but "generally, such promises are coercive only 'if they are broken or illusory.'") (quoting *United States v. Johnson*, 351 F.3d 254, 261-62 (6th Cir. 2003)). But there is no suggestion here that agent Kerner offered to do anything that she could not accomplish.

Applying the factors discussed above to assess the voluntariness of Musaibli's texting statements, the analysis of the circumstances of the electronic messages here supplies even less ground for suppression than the conditions under which the defendant was interrogated after the

turnover to U.S. authorities.   The "length of the interrogation" is a particularly apposite circumstance, since there is no evidence that the agent had any ability to dictate the defendant's engagement in any communications.   At any time the defendant simply could have ignored agent Kerner's messages and elected not to respond, and she would have no way to locate him or compel him to reengage.   For the same reasons noted above, there is no indication that the defendant was unusually mentally susceptible or that his youth or inexperience put him at any distinct disadvantage.   He was not advised of his rights at any point, but no such advice was required where he was not in custody.   No suggestion has been made that the defendant suffered any physical harm at the hands of agent Kerner or any other U.S. agents between April and June 2018.

The defendant asserts that he was apprehensive for his safety and desperately wanted aid that Kerner refused to supply, but the defendant's subjective mental state is not enough to warrant exclusion absent some tangible proof of coercive overreach by the interrogator.   *Connelly*, 479 U.S. at 170 ("The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word."); *Moran*, 475 U.S. at 421 ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. . . . [T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements."); *Fare*, 442 U.S. at 726-727 (The defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit. . . . The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*."); *see also Khweis*, 971 F.3d at 464.   Here, agent Kerner was not able to compel the defendant to do or say anything, and there is no suggestion

that she did anything other than make sincere offers to assist the defendant with repatriation if he would consent to apprehension.

The defendant's argument that his electronic messaging statements were "coerced" is groundless, and his position that any other statements of his ought to be suppressed as illegally obtained fruits of the electronic communications must be rejected as well.

IV.

The evidence adduced at the evidentiary hearing establishes that the statements the defendant made while in the custody of the agents on the flight from the Middle East to the United States were voluntary and preceded by the appropriate advice of constitutional rights and warnings, and the defendant's waiver of those rights was knowing and voluntary. The statements the defendant made in text messages with FBI agent Kerner were voluntary and not the product of coercion by the government agent. There is no valid reason to suppress the statements or the text messages.

Accordingly, it is **ORDERED** that the defendant's motions to suppress his custodial statements and text messages (ECF No. 106, 107) are **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  December 13, 2021