UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                Case Number 18-20495

v.                                           Honorable David M. Lawson

IBRAHEEM IZZY MUSAIBLI,

                Defendant.

_____/

## OPINION AND ORDER DENYING GOVERNMENT'S MOTION TO ADMIT CERTAIN DOCUMENTS ATTRIBUTED TO THE ISLAMIC STATE OF IRAQ AND AL-SHAM

Defendant Ibraheem Izzy Musaibli is charged with crimes involving the provision of material support to a terrorist organization and receiving military-type training from a foreign terrorist organization, that organization being the Islamic State of Iraq and al-Sham (ISIS). Before the Court is the government's motion for pretrial rulings on the admissibility of several documents attributed to ISIS military operations, which it intends to offer as evidence at trial. The Court held an evidentiary hearing on the motion at which six witnesses testified and thirteen sets of documents and a video were presented. The evidentiary questions to be resolved are whether there is enough evidence to establish that the documents and video are authentic, whether the documents constitute hearsay, and if they do, whether a hearsay exception applies.

Based on the evidence presented at the hearing, it appears that many of the documents are authentic, if not accurate. Because the government's purpose for offering the documents in evidence is to prove the assertions they contain, all of the documents would amount to hearsay, unless they could be excluded from that definition under Federal Rule of Evidence 801(d)(2)(E) as statements made during the course and in furtherance of a conspiracy. That determination, however, cannot be made based on the record thus far established. If the documents do not qualify

under that exclusion, then they would not be received, as no recognized or novel exception to the rule against hearsay has been established.

## I.

The government has accused Musaibli of serving as a soldier for ISIS from April 2015 through June 2018 in Syria.  Musaibli, an American citizen born in Dearborn, Michigan, was supposedly radicalized in April 2015 and traveled to Yemen.  Six months later, he left Yemen and traveled to Syria (by way of Saudi Arabia and Turkey), where he joined ISIS.

The government posits that after his enlistment with ISIS, Musaibli spent three weeks training with two terrorist units of the organization and then was sent to Raqqa, Syria for ten days of religious instruction.  After that, he was sent to Mosul, Iraq, where he spent 20 days reading and viewing more ISIS propaganda materials, and a further 20 days being trained in an ISIS military camp.  The military training began in December 2015 and ran through January 2016, and Musaibli was trained alongside 50 other fellow ISIS recruits.  During his training, Musaibli allegedly was issued an assault rifle, magazines, grenades, and a tactical vest.  The training included lectures on combat tactics and physical fitness routines, and the defendant was taught how to shoot and maintain his rifle and how to use other weapons such as grenades.  He also was instructed in military routines such as carrying out guard duty, and on the final day of training he allegedly swore an oath of loyalty to ISIS.

The government contends that after his military training, Musaibli was assigned to the Tariq bin Ziyad (TBZ) battalion of ISIS forces, which is made up mostly of foreign fighters.  His battalion then was deployed to join ongoing fighting in Hit, Iraq.  While in Hit, the government believes that the defendant fought in battles and stood guard duty.  He continued in service with

ISIS forces for around two and a half years.  He saw action on several fronts in Iraq and, finally, at ISIS's last stand in Syria, at Dayr Az Zawr.

The government proposes to introduce at trial several categories of documents to show that the defendant was enlisted with ISIS military forces and to establish the sorts of support he provided and training he received during his service.  The documents were recovered during various battlefield operations and found their way into the hands of intelligence officials.  They include (1) a brigade roster recovered in February 2017, (2) payroll records recovered in June 2017 in electronic form, (3) a treasury administration report recovered in December 2017 in electronic form, (4) hospital records, and (5) other documents relating to ISIS military operations that do not mention the defendant.  The government identified them by exhibit numbers at a two-day hearing held in June of this year, and they will be discussed by referring to those exhibit numbers, although they are not the exhibit numbers that would be used at trial.

It appears that all the documents were obtained by the government for this case from the FBI's National Media Exploitation Center (NMEC).  Joseph Pilkus, a liaison officer assigned to NMEC, testified that NMEC mainly received information from overseas Regional Exploitation Centers ("RECs"), which are facilities where information captured from enemy forces was brought for processing by the FBI and U.S. military forces.  NMEC serves as a clearinghouse for all intelligence materials collected abroad, which is cataloged and examined for exploitation by interested agencies including the FBI, CIA, NSA, Department of Homeland Security (DHS), Defense Intelligence Agency (DIA), and other U.S. agencies.  Pilkus testified that the primary purpose of NMEC operations was to support exploitation of materials by intelligence agencies; law enforcement usage of the information was a "smaller priority."

Pilkus testified that the NMEC houses in total between 14 and 20 petabytes of information, which is equivalent to 500 billion pages, or around 240 to 400 million four-drawer file cabinets full of paper documents. The material includes images of documents captured in paper form, as well as electronic duplicates of devices such as cell phones. Pilkus testified that only electronic copies of materials were retained because it was impractical to physically store every device and document captured. Pilkus testified that when investigators from outside agencies want to access data at the NMEC, they have to obtain a security clearance and travel to the facility in person, where they would be given access to the requested information. However, Pilkus said that a limited selection of information stored at the NMEC would be transferred to software called Harmony, which could be accessed by outside agencies without traveling to the NMEC. The information put into Harmony would include the original materials as well as the results of any analysis or translation.

FBI agent Wendy Kerner, the case agent on this case, testified that she traveled to NMEC to run searches about the defendant. She also searched the Harmony database.

Pilkus stated that his role was not to test the veracity or authenticity of the documents, but only to collect, store, and make them available for use. He acknowledged that he could not say whether any of the 500 billion pages of information stored at NMEC might contain "inaccurate" information, and that there was no way to tell. He also conceded that he had no information about, and no way to know how, any of the materials were captured or handled in the field by non-U.S. forces before they were turned over to the U.S. military. To that end, Pilkus admitted that he could not say how any of the documents or information stored by NMEC originally were created, or by whom, before they were seized and turned over to U.S. forces. He also admitted that, although he

was "not aware of any falsified information" in NMEC's records, there was "no way to know" if any particular item had been falsified.

## A.  Exhibit 1

Exhibit 1 purports to be an ISIS roster listing members of the TBZ foreign fighter battalion. Michael Frost, an intelligence analyst with the Federal Bureau of Investigation (FBI), testified that the roster bore a distinctive ISIS stamp that he had seen on many similar unit rosters that he had examined.  Frost, who had worked in the FBI's counter-terrorism division in Washington, D.C., was stationed in Iraq from December 2016 through April 2017 working on terrorism investigations.  While in Iraq, he worked at a REC, which was a facility where information captured from enemy forces was brought for processing by the FBI and U.S. military forces.  The captured material included different sorts of organizational and personnel documents and electronic storage devices captured on the battlefield.  He said that the goal at the REC was to examine the information to find anything useful for understanding enemy operations or assisting U.S. operations in the theater.  Frost's job was to review materials looking for persons who might be American citizens potentially subject to prosecution under U.S. law, and then produce reports summarizing any information about those persons and their activities.

In February 2017, large batches of material were being captured daily around Mosul, Iraq, and delivered to the REC.  Among those materials, Frost discovered several ISIS unit rosters that listed persons known to be Americans, who were designated as "foreign fighters," meaning persons not from Iraq or Syria.  One of the indications Frost looked for was the "kunya" or Arabic nickname used for each fighter listed on a unit roster.  The kunya "Al-Amiriki" translates as "from America" and meant a person hailed from the United States.

The government says that Exhibit 1 lists information about 341 ISIS fighters who were enlisted in the TBZ battalion, and it highlights the following record, which it believes is a memorial of the defendant's service in the unit:

> Kunya: Abu 'Abd-al-Rahman Al-Yemeni
> Date of birth: 27/5/1990
> Census Number: 1200015723
> Nationality: Yemen
> Position: Fighter
> Remarks: He left the frontline twice without permission

Frost explained that ISIS "tried to operate like a government," and was "like a bureaucracy," in keeping many records of its operations. He said that ISIS assigned a "census number" to identify uniquely each enlisted fighter in the organization's records.

However, Frost acknowledged that he was not present when the documents were recovered around Mosul; instead, he was told that they were captured by Iraqi military forces during operations in the area. He conceded that he did not know whether the documents were originals or copies, how or when they were created, who produced them, or if they may have been altered before recovery by the Iraqi military. He said, however, that it was assumed that the documents were created by ISIS because they were found in areas known to be recently dominated by ISIS forces. Frost testified that the document images offered by the government were scans of documents received at the REC, and the original documents received were unavailable or unobtainable because they were returned to the Iraqi military. Frost understood that the Iraqi military had its own intelligence processing procedures, but he did not know how the documents were handled after their return.

Frost admitted that he did not know when (or if) the unit rosters were created by ISIS, who created them, how they were managed, or if or how often the records were audited to ensure accuracy. And he testified that when reviewing documents to locate names of Americans, he

typically would look for two or more uniquely identifying items of information, such as the census number or date of birth, since several persons might be using the same kunya.

Agent Kerner testified that she believed the person identified on Exhibit 1 as Abu 'Abd Al-Rahman Al-Yemeni is the defendant, because "'abd" means "father of" and Al-Rahman is the name of the defendant's oldest son, the date of birth noted in the roster is the same as the defendant's date of birth, and the defendant's family originally is from Yemen.

Government witness Abdelhamid Al-Madioum testified that he worked as a database administrator for ISIS in Syria for about five or six months beginning in about May 2016. He had been raised in New York and Minnesota, but he left his family during a trip to his native Morocco and found his way to Syria where he joined ISIS in July 2015. After joining ISIS and receiving military training, he was assigned to the TBZ brigade, which had around 150 soldiers. Al-Madioum testified that ISIS generally assigned "almost every non-Russian-speaking immigrant fighter" to TBZ. The brigade was assigned to Baiji, Iraq, later to another city in Iraq, and after that to Anbar Province.

Al-Madioum's combat tour with ISIS lasted around two months, until he was severely injured by an explosion. He was treated at ISIS hospitals in Ramadi and Mosul, and then was taken to an ISIS guesthouse for recovery, a total of around six months. After his recovery, Al-Madioum was assigned to be a database administrator for the TBZ battalion.

Al-Madioum eventually was captured. After he was returned to the United States, he was charged with and pleaded guilty to providing material support to a foreign terrorist organization, based on his activities while in service with ISIS. He testified as a government cooperating witness. He said that the defendant (who appeared at the hearing by remote video conference link)

was known to him as a person he encountered while serving in the TBZ brigade, who went by the kunya Abu 'Abd Al-Rahman Al-Yemeni.

While a database administrator, Al-Madioum said he worked in a covert "office" in a residential home, which was selected to provide a less conspicuous target for drone strikes.  The office was furnished with desks, laptop computers, a printer, phones, and a safe.  Al-Madioum testified that he used a database created in Microsoft Access to collect information about all of the fighters in TBZ, including their "first name, father's name, grandfather's name, [] great grandfather's name, family name, birth date, [] ISIS-issued ID number, [and] the number of wives and kids that they had."  Other linked databases also collated information such as "the condition of the soldier, is he in combat or is he injured, [and] is his injury temporary."  The database also designated the status of soldiers such as whether they were in active service, disabled, killed, retired, away without leave (AWOL), or transferred out of the battalion.

Al-Madioum testified that other persons also worked in the office including an administrative leader and an accountant.  He explained that for a one-month period during his work there, the administrative leader "kind of pushed me off to the side and started changing the database himself."  When he resumed his maintenance duties, he found the database had been "messed up" during the time the administrative leader maintained it.  He said that he had to go back in and correct mistakes that were made, and he could not vouch for the accuracy of any work done during that month.

Al-Madioum testified that government's Exhibit 1 was formatted exactly the same as reports that he regularly printed from the TBZ database, and he noted that the document image included a purple streak down the page, which was caused by a problem with the office printer that always created that color artifact.  He also indicated that the document bore an emblem of the

Islamic State that was used regularly on ISIS documents.  And he said that he personally knew many of the people listed in Exhibit 1, including the defendant, with varying degrees of familiarity.

However, although Al-Madioum apparently inputted data into the database, he did not know if he was the person who originally entered or updated any of the data for records of specific fighters who were named in the government's exhibits.  He also said that when he took over the maintenance of the TBZ roster database, it already was populated with information, and he then took over the task of updating and adding to the existing records.

In addition, Al-Madioum testified that although he knew the person who provided him information that he periodically entered into the TBZ database, which was typical of information in Exhibits 1, 2, and 3, he did not know how that person sourced the information, that is, whether it came from anyone with knowledge.  He also conceded that, although he knew the person who had maintained the TBZ database before he took over the job, he did not know anything about how that was done before he was assigned to the job, and he did not know where the information came from that his predecessor entered into the database.  He told the FBI agents investigating the case that "mistakes in ISIS records were common and happened all the time," and he conceded that there were errors in the information that he noted in the government's exhibits.  "Basic errors" had occurred in the battalion database, such as listing a person as killed when they were still alive and in active service, and the listing of dependents, which determined a fighter's pay, had in some cases been incorrect, and even deliberately falsely misstated.

Al-Madioum admitted that he did not know how the database was handled or whether the information was kept securely after he left the administration assignment.  He also said that while he was on subsequent assignments in Syria, he encountered other ISIS databases that were not securely maintained or protected by passwords or other security measures.

Al-Madioum acknowledged that he could not say if he had created any of the documents in Exhibits 1, 2, or 3, and he could not say whether he personally ever entered or updated any information about the defendant in the TBZ database.  He also admitted that the database did not indicate who had entered the data for any particular record or where the information came from.

The government solicited testimony from Aymenn Jawad Al-Tamimi, a researcher with the George Washington University Program on Extremism, to provide an expert opinion on the authenticity of the unit roster documents.   He works on an initiative called the ISIS Files Project, which focuses on collecting and cataloging ISIS documents recovered from northern Iraq.  His work involves collecting, indexing, translating, and analyzing such documents.  He is fluent in both English and Arabic.

Al-Tamimi testified that he has worked on the ISIS Files Project since 2015, and he traveled to Iraq and Syria several times between 2015 and 2018 to interview witnesses and gather documents.  The project also involved a partnership with the New York Times, which originally discovered many ISIS documents in northern Iraq.  He said that during his work he has reviewed "thousands" of ISIS documents, comprising "tens of thousands" of pages.  Al-Tamimi testified that in addition to collecting and indexing documents, he also has written reports on documents that he determined were forgeries based on various indicia.  He has published academic papers about authenticating ISIS documents, and he has testified before various international and governmental agencies about ISIS document authenticity.

Al-Tamimi testified that, in his opinion, Exhibit 1 is an authentic ISIS document.  He based that opinion on (1) the heading "Islamic State Soldiers Department," which was written in characteristic green type, (2) the use of an Islamic calendar date stamp, and (3) the names of persons listed on the unit roster, which appeared to be persons not from Syria or Iraq, which was

consistent with the assignment of such foreign or immigrant fighters to the TBZ battalion, (4) the use of the "12000" series of census numbers, which were assigned to foreign fighters enlisted with ISIS, and (5) the use of the term "ijiza" to denote that certain fighters were on "leave permit," which is a term often used by the ISIS military when granting leave to enlisted soldiers.

Although he believed the document was authentic, Al-Tamimi had no knowledge about how the ISIS bureaucracy created and maintained records. He had written an academic paper that discussed the fact that over time the ability of the Islamic State to function as a government had diminished due to lack of funding and competent workers to perform administrative and technical tasks. Al-Tamimi said that as comparators for assessing authenticity, he relied on several caches of documents that he had collected in Iraq and Syria, which consisted of some "blank judicial forms" left behind at a sports stadium, lists of prisoners detained in certain facilities, records of patients treated in ISIS hospitals, and various books and pamphlets associated with religious indoctrination that he gathered in other locations. He admitted that he also had interviewed a dozen or so ISIS members online about the organization's records, but he never obtained any details about how ISIS records were created or maintained.

## B. Exhibit 2

Exhibit 2 purports to be a biographical sheet for a person identified as Abu Salih Al-Britani. Agent Frost was not familiar with that person, other than reporting that the document was received in a batch of 149 documents that came in at the same time with the TBZ unit roster. However, agent Kerner testified that she believed he was an ISIS operative who tried to recruit two teenagers from London, U.K. to join ISIS and come to fight in Syria. His name was relevant to the investigation, she said, because in some cell phone messages Al-Britani supplied the potential

recruits with a phone number known to have been used by the defendant.  However, she conceded that she never found evidence that the defendant communicated directly with either teen.

Nonetheless, Abdelhamid Al-Madioum testified that Exhibit 2 was an example of a biographical report of an individual that was printed from the battalion database.  He said that he knew the person identified in the report as Abu Salih Al-Britani, recalling in particular that Al-Britani had asked to have his named changed in the records, because he was "afraid of being drone striked [sic]."  However, Al-Madioum declined the request, saying that it wasn't going to stop him from being targeted.  Exhibit 2 similarly featured the same purple streak artifact from the printer, and the same ISIS logo.

Aymenn Al-Tamimi testified that in his opinion government's Exhibit 2 was an authentic document produced by the TBZ battalion, because it was "identical" in form to many other TBZ documents that he had collected and reviewed, except for the indication that the person concerned in the record was absent or away without leave.

## C.  Exhibit 3

Exhibit 3 purports to be another excerpt from a roster of members of the TBZ battalion. The relevance of this document is not readily apparent, and there was not much testimony at the hearing that focused on it.  Abdelhamid Al-Madioum described the document categorically as one that he may have inputted into the database, but he could not say if he actually created the record or where the information came from.  And he remarked that his own record in the TBZ database that was featured in Exhibit 3 was inaccurate, omitting that he had a son, and also incorrectly stating his day and month of birth.

D.  Exhibit 4

Exhibit 4 purports to be an ISIS payroll records spreadsheet.  Like the other documents, agent Frost testified that he was told it was recovered by Iraqi military forces during operations in the Mosul area.  Agent Kerner testified that she located this document in the Harmony database. It is a listing of a large number of ISIS fighters, with such details as each fighter's full name, census number, date of birth, how many wives and children they had, their pay amount, and their battalion. The spreadsheet includes more than 300,000 lines of information about ISIS fighters.

Kerner testified that the information in Harmony indicated that Exhibit 4 was recovered in Mosul, Iraq in June 2017, but she had no other information about the provenance or information source of the spreadsheet.  She believed that line 274431 of the spreadsheet corresponded to the defendant because the person's full name is listed as "Ibraheem 'Izd 'Umar Salih Msaibad," which she said includes a variant ('Izd) of the defendant's father's name ("Izzy"), and the defendant's grandfather's name ('Umar), along with a "misspelling" of defendant's last name, which appears in the record as "Msaibad."  She said that the census number and kunya from line 274431 on Exhibit 4 matches the same census number and kunya that appears consistently in other documents, including the unit roster (Exhibit 1).

Kerner testified that the defendant told her, during an in-flight interview while the defendant was being returned to the United States, that he had used the kunya that appears in the government's exhibits, and that she knew his date of birth was May 27, 1990.

Kerner testified that, although the defendant is married and has children, the relevant fields on Exhibit 4 indicate that he has no wives and no children.  However, she found text messages (from an app called "Telegram") where the defendant asked his father to send proof of his marriage

and birth certificates for his children, which she believed defendant intended to submit so that his ISIS record could be corrected, which would result in an increase to his pay as a fighter.

Kerner testified that there were many rows in Exhibit 4 that included the defendant's information, which corresponded to one row for each month that he was paid from January 2016 through November 2016.  Other than those rows, none of the other fighters listed in the sheet used the same kunya as that attributed to the defendant.

Kerner testified that Exhibit 4 also included columns indicating that the defendant was assigned to the "Diwan Al-Jund," which translates as "Department of Soldiers," and which identified his military unit as the division Abu Mutaz Al-Qarashi, and battalion TBZ.  She acknowledged, however, that the payroll records in this exhibit were inconsistent in that they listed the defendant variously as stationed in both Allepo, Syria and Raqqah, Iraq, and also because some lines contained geographic assignment information while others did not.

Al-Madioum testified that government's Exhibit 4 was not from a database that he worked on personally, but it included similar categories of information as the database that he maintained for the TBZ battalion.  He recognized the names of several fighters listed in Exhibit 4 as persons he knew and had served with while in TBZ.

E.  Exhibit 5

Exhibit 5 appears to be an organizational chart in block form, described by the government as a Soldiers Administration Budget Chart.  Agent Kerner said that she located that document in the Harmony database, which indicated that it was captured in Hasakah, Syria in December 2017. The document bore an image of a map and flag that Kerner said is associated with the Islamic State, in particular the map corresponding to a vision of the world that ISIS promoted as how the world would appear if the Islamic Caliphate reached global dominance.  Kerner testified that the

document also bore a heading identifying it as a budget statement from the Islamic State, Office of the Treasury, which was labeled as corresponding to the organization's budget for June 2016.

Kerner testified that various spreadsheets included as "linked" components of the budget document (collectively incorporated in Exhibit 5) contained various lines corresponding to the defendant, which records the same biographical details discussed above.

Aymenn Al-Tamimi testified that he believed that Exhibit 5 was an authentic document produced by ISIS, because it bore similar indications such as the Islamic State heading, along with characteristic ISIS symbology.  He also testified that it contained terms such as "kifalat," translated as "sponsorship," which he said is a term characteristically used by ISIS to denote salaries paid to ISIS members.  He also testified that the figures for salaries paid corresponded with ISIS's custom of paying $50 per fighter, along with $50 for each wife, and $35 for each child.

### F.  Exhibit 6

Exhibit 6 is an excerpt from another roster of soldiers who fought in Syria.  Agent Kerner testified that this document is another similar spreadsheet that she located in Harmony, which also included rows she believed to correspond to the defendant based on inclusion of the same biographical and institutional details.  Neither Kerner nor any other witness provided information about the provenance or authenticity of this document.

### G.  Exhibit 7

Exhibit 7 is a series of spreadsheets that represent a manifest of ISIS fighters who were treated at an ISIS hospital operated by the "Diwan of Health" at Raqqah Hospital, in the ISIS capital of Raqqah.  It also included certain payroll records.  Agent Kerner found this record in Harmony, which indicated that it was recovered in Raqqah in November 2017.  It appears to include entries from September, October, and November 2016 for an individual with the kunya

(but not the census number) that the government believes is associated with the defendant.  Kerner testified that information in the hospital record indicated that a person with a kunya associated with the defendant was treated at Raqqah Hospital and subjected to lab tests and x-rays on various dates in September, October, and November 2016.  Kerner testified that the defendant's father told her that the defendant said he was transferred to Raqqah in December 2016, and she also learned that he has an injury from a bullet lodged in his head.

Again, however, neither Kerner nor any other witness provided information about the provenance or authenticity of this document.

### H.  Exhibit 8

Exhibit 8 is a collection of budget spreadsheets that the government attributes to ISIS operations in Iraq.  These records were discussed by Paulo Irani, an investigator with the United Nations Investigative Team to Promote Accountability for the Crimes of Daesh (UNITAD).  (He testified that Daesh is another name for ISIS, a.k.a. ISIL.).  He explained that after ISIS took over Mosul in June 2014, the organization "became much more bureaucratic once it started controlling large swaths of territory in Iraq and Syria, especially after the takeover of Mosul, because their numbers grew rapidly."  He said that ISIS typically kept "detailed records," because it was "trying to act as a state administering large cities, sewers, water, payrolls, financial assistance, [collecting] taxes, [and providing] education."

Irani located this record at the request of the government prosecutor in this case, producing it from the UNITAD repository.  He testified that aspects of Exhibit 8A, such as the image of an ISIS flag and map, were typical of other records that he has seen that were produced by ISIS.  He described the document as a budget report from the ISIS Diwan of Finance, or Department of Finance.  Irani also translated certain portions of the supporting documents (Exhibits 8B, C, D,

and E), describing them as payroll records for ISIS members, with biographical details of those individuals.  He did not say how the documents were created or the source of the information contained in them.  And he did not vouch for their accuracy.

### I.  Exhibit 9

Irani testified that Exhibit 9 was another document that he produced to the prosecutor from the UNITAD repository, which he characterized as a roster of ISIS fighters from countries other than Iraq and Syria.  Aymenn Al-Tamimi testified that Exhibit 9 appeared to be an authentic report of salaries paid to ISIS members, based on features similar to those he found in Exhibit 5.

### J.  Exhibit 11

The government did not produce any evidence labeled as Exhibit 10.  Exhibit 11 is an image of a marriage contract that, according to the government, involves the defendant as one of the parties.  Agent Kerner testified that the defendant's parents told her the defendant sent this document to them via cell phone in March 2017, along with a request that the parents provide him with money for a dowry.

Al-Tamimi believed that Exhibit 11 was an authentic ISIS document memorializing a marriage contract, which he surmised from the use of a characteristic stamp reading "Islamic State" inside an oval, with a notation of the local ISIS court that issued the license, which was from a town located in eastern Syria.  He also noted that the caption of the documents included "Diwan Al-Qada Al-Madhalin," translated as the judicial department of the Islamic State.  He also said that the content of the document was consistent with marriage contracts issued by ISIS, because it included such things as the fingerprint of a male relative of the bride signifying consent to the marriage.

### K.  Exhibit 12

Agent Kerner testified that Exhibit 12 is a document that she located in Harmony, describing it as an explanation of ISIS's system for assigning "census numbers."  Harmony indicated that the document was seized in Raqqah in January 2017.  Kerner explained that "ISIS ran themselves [sic] like a government," which they designated as the Caliphate, regarded by ISIS as the sovereign of Iraq and Syria, which ISIS "didn't recognize [] as countries."

Kerner testified that the ISIS census numbering system called for persons not from Iraq or Syria to be assigned census numbers in the 12000 series, and she observed from her review of "thousands" of ISIS documents that this prefix consistently was used to denominate foreign fighters in the ISIS military.  She testified that the census number corresponding to the defendant was in the 12000 series.  But Kerner admitted that she did not know when or how the serial number part of census numbers was assigned.  However, she surmised from certain training records she had seen that numbers were assigned sequentially to groups of recruits upon their enlistment with the ISIS military.

Al-Tamimi testified that in his opinion the census numbers listed in government's Exhibit 12 indicated that it likely was authentic, but he conceded that before he first reviewed Exhibit 12 in connection with this case, he "didn't really, truly, have a full grasp [of this census numbering system]."  He said that the circumstances under which all of government's Exhibits 1 through 12 were seized in Iraq and Syria would bolster his opinion that the documents were authentic records of the Islamic State.  No evidence was offered, however, as to how the documents were created or the sources of information.

### L.  Exhibit 13

The government identified Exhibit 13 as a video entitled as "The Structure of the Khilafah." Kerner characterized it as an ISIS propaganda video, which she said explained the governmental structure of the ISIS Caliphate, including the hierarchy and roles of the various departments noted above.  She said that the government's copy of Exhibit 13 was obtained from an unattributed website on the internet known as Jihadology, ostensibly devoted to archiving and cataloging ISIS propaganda materials.  She said, however, that copies of the video also had been located in FBI repositories of information about ISIS.

Kerner testified that the video included images of the ISIS flag, which was used by the ISIS "media department" in its propaganda publications.  However, she admitted that she had no knowledge about when this or any of the government's exhibits were created, or by whom, and the only information she had about the capture of the documents in the field came from associated information that was stored in Harmony.

### M.  Exhibits 14 and 15

Exhibit 14 is collection of photographs purporting to depict the seizure of the storage media that contained the digitized documents that the government wants to introduce at trial.  The story behind these photographs came from Paulo Irani, the UNITAD investigator.  He explained that after the government prosecutor in this case contacted him in January 2020, he searched UNITAD's document repository for information about the defendant under the name and ISIS census number supplied by the government.  He searched documents that UNITAD had in its possession, and he contacted an unnamed source, who had provided those documents to the agency.  Irani described the unnamed source as an investigative judge in Mosul, Iraq, who was charged with prosecuting crimes committed by ISIS.

Irani testified in a somewhat disjointed fashion about how he received information from the investigative judge. He said that on August 5, 2018, counter-intelligence officers operating in Mosul were alerted by residents of the area that a certain building had been used by ISIS forces. The officers went to the building and discovered a large cache of computer hard drives. They then returned to the police station and alerted the investigative judge, who went to the location. The judge instructed the officers to photograph the hard drives and then seize them. Irani identified Exhibit 14 as a photograph of the drives as they were laid out in the location where they were seized. The judge then told the officers to take the drives back to the police station and copy their contents onto a single hard drive so that he could analyzes the contents. Irani identified government's Exhibit 15 as a manifest (in Arabic) of the storage media that was seized.

Irani also testified that in July 2019, a colleague of his at UNITAD received the single large hard drive from the investigative judge. UNITAD copied the drive, then returned the original media to the investigative judge. When Irani received the request from the prosecutor in this case in 2020, his colleague performed a search on UNITAD's copy of the single hard drive to locate documents relating to the defendant. Documents turned up by that search then were printed and conveyed to Irani, who then conveyed them to the prosecutor in this case.

Irani acknowledged that he was not present when the hard drives in question originally were seized, and he did not know the procedures that were followed to maintain a chain of custody by the Iraqi personnel who initially discovered them. He also admitted that he had no knowledge about how any of the documents found on the hard drives originally were created, when, or by whom.

II.

A.  Authenticity

As the proponent of the evidence, the government has the obligation to establish that each of these items is authentic, that is, it must produce proof "sufficient to support a finding that the [each document or photograph is] what the proponent claims it is."  Fed. R. Evid. 901(a); *Lyngaas v. Ag*, 992 F.3d 412, 431 (6th Cir. 2021).  "This requirement does not erect a particularly high hurdle for a proponent to clear."  *United States v. Hall*, --- F.4th ---, No. 20-4128, 2021 WL 5933100, at *12 (6th Cir. Dec. 16, 2021) (cleaned up).  Nonetheless, authentication is "a condition precedent to admissibility."  *Ibid.* (quoting *United States v. Jones*, 107 F.3d 1147, 1150 (6th Cir. 1997)).

The level of proof does not have to be conclusive, Weinstein's Evidence Manual, ¶ 901(a), at 901-19 (5th ed. 1996) ("The [authentication] rule requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification. The rest is up to the jury."), and there are a number of ways to achieve that goal, *United States v. Farrad*, 895 F.3d 859, 876 (6th Cir. 2018) ("This task can be accomplished in a number of ways — with testimony from someone with knowledge of the evidence offered, for example, or by pointing to distinctive characteristics that establish authenticity.").  Rule 901(b) provides a non-exclusive list of examples, such as the testimony of a witness with knowledge "that an item is what it is claimed to be," "[a] comparison with an authenticated specimen by an expert witness or the trier of fact'," or circumstantial evidence consisting of "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  Fed. R. Evid. 901(b)(1), (3), (4).  A qualified expert's opinion on the

authenticity of a document may be sufficient.  *See* Fed. R. Evid. 901(b)(3); *Vox Mktg. Grp., LLC v. Prodigy Promos L.C.*, 521 F. Supp. 3d 1135, 1146 (D. Utah 2021).

The government has offered sufficient evidence to support a finding that the TBZ rosters and biographical sheet (Exhibits 1, 2, 3) are authentic ISIS documents, as it contends.  Abdelhamid Al-Madioum identified them as coming from the database that he maintained, although he could not say that he inputted the exact information found in the exhibits.  But he was able to describe the characteristics of the rosters, even to the point of the unique purple stripe that was affixed by the defective printer he used.  Aymenn Al-Tamimi also opined that those exhibits were authentic ISIS documents, based on his knowledge and expertise informed by comparing other documents he had seen that had been seized during military operations in Iraq and Syria.

Al-Tamimi gave a similar opinion on the authenticity of the payroll spreadsheet, Exhibit 4.  Agent Kerner said she found this spreadsheet in the Harmony database, which in turn noted that it was recovered in Mosul, Iraq in June 2017.  There are gaps in the chain of custody for this exhibit, but a perfect chain of custody is not necessary to authenticate an item of physical evidence that has distinctive characteristics and when there is little likelihood that the item could be altered or tampered with.  *United States v. Abreu*, 952 F.2d 1458, 1467 (1st Cir. 1992) (explaining that "[t]he purpose of testimonial tracing is to render it improbable that the original item either has been exchanged with another or has been tampered with or contaminated," and holding that "even though there may be gaps in the chain of custody for a certain piece of evidence, such gaps factor into the weight given to the evidence rather than its admissibility"); *see also United States v. Thomas*, 749 F.3d 1302, 1310 (10th Cir. 2014); *United States v. Mills*, 194 F.3d 1108, 1111-12 (10th Cir. 1999); *United States v. Howard-Arias*, 679 F.2d 363, 366 (4th Cir. 1982).  Moreover, Kerner testified that the defendant admitted to using the kunya that was found on the spreadsheet.

That foundational testimony is sufficient to allow a reasonable juror to conclude that the document is what the government says it is: a payroll roster generated by ISIS. After that, it is up to the jury to accept that representation or reject it. *United States v. Scharon*, 187 F.3d 17, 22 (1st Cir. 1999).

Al-Tamimi's opinion that Exhibit 5, the organizational chart, is a document created by the ISIS bureaucracy is based mainly on the stamps and the markings found on the chart. Kerner testified that she found this document in the Harmony database and that it supposedly was seized in Hasakah, Syria in 2017. Although evidence of the document's provenance is thin, the legends on the document and the conditions under which it was discovered provide sufficient circumstantial evidence to allow the jury to conclude that it is what the government contends it is.

The same cannot be said for Exhibit 6, another roster of soldiers who allegedly fought in Syria. Agent Kerner located the document in Harmony, but there was little other evidence offered at the hearing to establish the document's provenance or authenticity. Likewise with the documents collected in Exhibit 7, the purported hospital records. No witness provided information about the provenance or authenticity of this document.

Paulo Irani, the UNITAD investigator, provided sufficient opinion testimony that the budget spreadsheets in Exhibit 8 were genuine records of ISIS operations in Iraq. He said that he compared those records with other documents known to him to be ISIS documents. *See* Fed. R. Evid. 901(b)(3). Irani also testified that Exhibit 9, a roster of ISIS fighters from countries other than Iraq and Syria, was a genuine ISIS document. The authenticity of that document also was supported by Aymenn Al-Tamimi. That information would permit a jury to conclude that those documents are what the government represents them to be.

Al-Tamimi's testimony that Exhibit 11, the marriage contract, was an authentic ISIS document also satisfies Rule 901's authenticity requirement. Al Tamimi said that the record bore

the characteristic stamp reading "Islamic State" inside an oval and a notation of the local ISIS court that issued the license.  He also compared that document with other marriage contracts he had known to be issued by ISIS.

The government says that Exhibit 12 is a schedule that describes how ISIS census numbers are assigned.  Agent Kerner says that she located it in the Harmony database, but the document itself bears no distinctive markings or legends.  Harmony included a notation that it was seized in Raqqah in January 2017.  Al-Tamimi was equivocal about the document's provenance, explaining that he "didn't really, truly, have a full grasp" of this census numbering system when he reviewed the document.  The evidence at this point is not sufficient to authenticate the document.

The government offered little evidence on the authenticity of Exhibit 13, the video entitled as "The Structure of the Khilafah."  Agent Kerner was able to say only that it is an ISIS propaganda video, which she obtained from an unattributed website on the internet.  The video included images of the ISIS flag, but there is no evidence where it came from, and Kerner acknowledged that she had no knowledge about when it was created, or by whom.  The government has not furnished information sufficient to authenticate that exhibit.

Paulo Irani's testimony describing the photographs and the manifest of the storage media that contained the digitized documents Exhibits 14 and 15 falls considerably short of establishing the authenticity of those items.  He had no first-hand knowledge about how these exhibits came to be and he could not say for himself that they were accurate representations of what they purported to depict.  The only information he could offer supposedly came from an unnamed source — an investigative judge in Mosul who prosecuted crimes committed by ISIS.  That evidence is insufficient to allow the jury to conclude that Exhibits 14 and 15 are what the government claims they are.

## B.  Hearsay

When determining whether evidence is admissible at a trial, an initial guidepost is fixed by identifying the purpose for which the evidence is offered; and the burden of identifying a permissible purpose falls to the proponent of the evidence. *United States v. Merriweather*, 78 F.3d 1070, 1076 (6th Cir. 1996).  Here, it is apparent that the government intends to offer these exhibits — save the photographs and perhaps the marriage certificate — to prove the truth of what is asserted in the respective documents.  Because the documents comprise statements made out of court, they may constitute hearsay, Fed. R. Evid. 801(c), unless they fall within a category of evidence that the rules exclude from the hearsay definition, *see United States v. Dunnican*, 961 F.3d 859, 872 (6th Cir. 2020) (noting that the evidence rules' hearsay "definition leaves open a fairly wide category of statements that are not hearsay") (citing Fed. R. Evid. 801(d)).

The government contends that all of these exhibits should be excluded from the hearsay definition because they are statements made by the defendant's co-conspirators.  *See* Fed. R Evid. 801(d)(2)(E).  This rule incorporates the idea that "conspiracies to commit a crime . . . are analogous to a partnership," so that the declarations of one "partner" that furthers the venture constitute "vicarious admissions" of the other partners.  2 McCormick on Evidence § 259, p. 288 (7th ed. 2013); *see also Van Riper v. United States*, 13 F.2d 961, 967 (2d Cir. 1926) (L. Hand, J.) ("When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made 'a partnership in crime.'").  Although co-conspirators' statements are considered party admissions, the Federal Rules of Evidence treat the agency concept narrowly and impose limitations on the statements that qualify as non-hearsay.  *See* Fed. R. Evid. 801(d)(2)(E) 1972 Adv. Comm. Note (citing Levie, *Hearsay and Conspiracy*, 52 Mich. L. Rev. 1159 (1954)).

To invoke this hearsay exclusion, the government must demonstrate by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant was a member of the conspiracy, and (3) the co-conspirator's statement was made [during and] in furtherance of the conspiracy." *United States v. Bailey*, 973 F.3d 548, 560 (6th Cir. 2020).  The elements of a conspiracy, in turn, are (1) the existence of an agreement between two or more persons to violate the law, (2) the defendant's knowing and voluntary joinder in the conspiracy, and (3) the defendant's specific intent to further the conspiracy's common unlawful objective.  *United States v. Trevino*, 7 F.4th 414, 424–25 (6th Cir. 2021) (citing *Ocasio v. United States*, 578 U.S. 282, 287-88 (2016)); *Merriweather*, 78 F.3d at 1078; *see also United States v. Alebbini*, 979 F.3d 537, 544 (6th Cir. 2020).  The conspiracy must be proved by independent evidence (although the challenged statements may be considered as well), *Bourjaily v. United States*, 483 U.S. 171, 181 (1987), and the defendant's participation must be established by a preponderance of the evidence, *United States v. Conrad*, 507 F.3d 424, 429 (6th Cir. 2007).

In an earlier motion by the defendant, the Court determined that the question of the admissibility of co-conspirator statements under Rule 801(d)(2)(E) must await trial and an evaluation of the government's proofs.  *See* ECF No. 134.  At that time, the Court considered the three options generally available for handling this type of evidence: the pretrial "mini-trial"; requiring the government to establish the conspiracy at trial before receiving any co-conspirator statements; and conditionally admitting the statements during the government's proofs subject to a ruling before the government rests on the elements of Rule 801(d)(2)(E).  *See United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979).  Although the first option "has been criticized as burdensome, time-consuming and uneconomic," *ibid.*, the hearing held at the government's request on the present motion amounts to the same thing.

When applying the elements, it is important to gauge the scope of the conspiracy that purportedly was "advanced" by any statements offered into proof.  There is a serious danger in this case of conflating (or inflating) the defendant's culpability based on the ISIS organization's criminal and terrorist activities generally.  The hazard here is highlighted by the government's tendency in its briefing to characterize "the conspiracy" in sweeping terms, where it refers to supposed objectives such as "running the Caliphate as a legitimate government."  But the defendant here is not charged with "running the Caliphate," and no information has been offered to suggest that he had any prominent role or position of authority in the ISIS organization.  Agent Kerner testified to her suspicion that the defendant may have been involved with another in an attempt to recruit two British teenagers into ISIS.  But there is no evidence in this record that substantiates that suspicion, and the scope of that conspiracy is quite narrow.

The government's case to date suggests no more than that the defendant was enlisted as a foot soldier with an ISIS military branch, that he received some military training after recruitment, and that he provided support to ISIS by participating in some fighting and other routine tasks like guard duty, after which he eventually became disillusioned with the cause and decided to desert. The government's own witnesses suggested that while in service he was employed in a menial capacity and was regarded as unreliable and incapable even for that limited role.  There has been no information put forth to suggest that the defendant was in any way aware of or deliberately acted to support such grand goals as "running the Caliphate as a legitimate government."  Rather, the comments attributed to him suggest that the motivation for his enlistment was to "fight the infidels" who had "invaded the territory of Allah."

The government correctly points out that "a statement need not actually advance the conspiracy to be admissible," and generally it is regarded that "statements which identify the

participants and their roles in the conspiracy are made in furtherance of a conspiracy." *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994). Some of the documents here conceivably could be viewed as identifying participants in *some* conspiracy, perhaps along with the defendant, if additional proof is put forth to associate the assumed identity recorded in the documents with his person. Agent Frost, for instance, testified that for reliability, the government agents generally require "two pieces [of information] to identify a person." Hr'g Tr., ECF No. 166, PageID.1778. The defendant also has pointed to significant problems with some of the documents that may preclude their admission, which include, for example, whether the identification on the rosters and hospital records actually refers to the defendant himself. Other exhibits, such as the budget charts and spreadsheets and the organizational charts, have unknown sources and have not been shown to further a conspiracy that the defendant allegedly joined. Altogether, the record does not yet establish the scope of the conspiracy that the defendant allegedly joined with sufficient precision to permit the statements in the exhibits to be considered his "vicarious admissions."

There is no proof so far that the statements in the exhibits are sufficiently related to a conspiracy that the defendant knowingly joined. "To prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Bailey*, 973 F.3d 548, 569 (6th Cir. 2020) (quotations omitted). "A defendant may be convicted for a single conspiracy if the evidence supports a finding that he had knowledge or foresight of the conspiracy's multiplicity of objectives even where the conspiracy is open-ended and the specifics of the future crimes is undetermined or at least unknown to the defendant." *Id.* at 569-70. However, to establish that the documents advanced the goals of the particular conspiracy that has been charged in this case requires careful parsing of proofs to discern what conspiracy has been

proven to exist, so that appropriate consideration can be given to whether "the conspiracy" purportedly advanced by any hearsay statement offered was the same that the defendant joined.

Moreover, the defendant also says that proofs may be offered to show that he withdrew from the conspiracy, possibly before some of the statements at issue were uttered.  The parties apparently do not dispute the principle that "'[o]nce a party withdraws from a conspiracy subsequent statements by a co-conspirator do not fall within this exemption.'"  *United States v. Lebedev*, 932 F.3d 40, 51 (2d Cir. 2019) (quoting *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988)).

The current state of the record does not allow a determination that the statements in the exhibits tendered by the government at the evidentiary hearing qualify as non-hearsay under Rule 801(d)(2)(E).

### C.  Hearsay Exceptions

#### 1.  Business records

Even if the documents are considered hearsay under Rule 801(c), the government argues that they are admissible under the so-called business records exception in Rule 803(6) ("Records of a Regularly Conducted Activity").  To qualify an item for admission under that rule, the proponent must show that the proffered record was "(a) made at or near the time by, or from information transmitted by, a person with knowledge; (b) kept in the course of a regularly conducted business activity; and (c) made as part of a regular practice of the business."  *United States v. Daneshvar*, 925 F.3d 766, 777 (6th Cir. 2019) (citing Fed. R. Evid. 803(6)(A)-(C)).  "The final two prongs in Rule 803(6), in turn, complete the set of prerequisites for Rule 803(6)'s exception to the rule against hearsay: the first three conditions must have been demonstrated by a qualifying certification from an authorized source, and the opponent must not have 'show[n] that

- 29 -

the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.'" *United States v. Farrad*, 895 F.3d 859, 876 (6th Cir. 2018) (quoting Fed. R. Evid. 803(6)(D), (E)).

For Exhibits 4 through 13, the government has not offered a certificate or testimony from anyone who could be considered a "custodian" of the records or "another qualified witness." It is true that the sponsoring witness need not have personal knowledge or involvement in the preparation of the records. *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003). "[A]ll that is required of the witness is that he or she is familiar with the record keeping procedures of the organization." *Id.* at 936 (citing *Dyno Construction Co. v. McWane, Inc.*, 198 F.3d 567, 576 (6th Cir. 1999)). But here, the government has not even gone that far.

The story is slightly different for Exhibits 1 through 3. Abdelhamid Al-Madioum testified that he was familiar with how the TBZ rosters were maintained, having inputted some of the data himself (although not necessarily for the specific government exhibits). However, there is no evidence that any of those documents were created either contemporaneously with the activities memorialized, or by a person with personal knowledge of the information recorded. *See United States v. Laster*, 258 F.3d 525, 529 (6th Cir. 2001). Timeliness of the recordation is an essential element for admissibility under this exception, and here there are no proofs to sustain it. *Abascal v. Fleckenstein*, 820 F.3d 561, 565 (2d Cir. 2016) ("The Report was not 'made at or near the time by — or from information transmitted by — someone with knowledge.' Fed. R. Evid. 803(6)(a). Timeliness is essential because 'any trustworthy habit of making regular business records will ordinarily involve the making of the record contemporaneously.' Association employees visited Attica on March 17, 2005, and the Report was not issued until September 5, 2005. A six-month

delay is too long a time to be considered a contemporaneous recording." (quoting *United States v. Strother*, 49 F.3d 869, 876 (2d Cir. 1995)).

Personal knowledge of the *process* for creating the records also is a crucial element for establishing admissibility under Rule 803(6), and the government has not offered anything on that point. Personal knowledge is a particularly acute concern where the information involved could have been relayed through a "telephone game" involving an indeterminate train of persons with no personal involvement in the events supposedly memorialized. *United States v. Houser*, 746 F.2d 55, 61 (D.C. Cir. 1984) ("[N]either the BATF tracing section clerk nor the manufacturer's employee was even identified, much less produced. In addition to the usual chance of error in recording a business record, there were clear chances of error in passing the weapon's serial number from the Special Agent to the BATF clerk and then on to the manufacturer's employee; compounding those possibilities was the possibility of error in the manufacturer's employee's recovery of the information sought, and in the BATF clerk's subsequent recording of that information on the form.").

Finally, as the defendant correctly points out, not every document that happens to be produced by an organization qualifies for admission under the records exception. As the Sixth Circuit has explained, a document is not a "business record" merely because someone involved with a business created it in the course of their work. *Daneshvar*, 925 F.3d at 777 (referencing emails exchanged between company employees). Some of the documents here, such as the Hit Battle Report, are records of distinctly exceptional activities — i.e., post-hoc naming and shaming after a catastrophic defeat. Similar records such as accident reports produced by a business to assess causation for a loss have been held not to be records of a regularly conducted activity, since

a business presumably does not regularly engage in the "activity" of causing accidents — or, as in this instance, disastrous defeats. *Palmer v. Hoffman*, 318 U.S. 109, 113 (1943).

Based on the evidence presented, none of the exhibits qualify for admission under Rule 803(6).

### 2. Residual Exception

As a fallback, the government invokes the residual exception to the rule against hearsay found in Evidence Rule 807. However, "[t]he residual hearsay exception is to be used only rarely, in truly exceptional cases." *United States v. Walker*, 410 F.3d 754, 757 (5th Cir. 2005). It applies to statements "not specifically covered" by another exception, but which possess "equivalent circumstantial guarantees of trustworthiness." Fed. R. Evid. 807 Adv. Comm. Note.

Rule 807 states that "[u]nder the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804: (1) the statement is supported by sufficient guarantees of trustworthiness — after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and ; (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a); *see also United States v. Wandahsega*, 924 F.3d 868, 881 (6th Cir. 2019).

This rule does not help the government here. Contrary to the government's position, the circumstances of the creation and maintenance of the documents described by the testimony at the hearing in this case suggest ample grounds for concern about their *un*-trustworthiness. That is a particularly serious concern where the lone witness with anything approaching personal knowledge about some of the documents is an alleged co-conspirator who apparently is charged with similar crimes, based on a temporally proximate and similar course of conduct. "In making

this determination," trial courts are advised to "consider the declarant's relationship with both the defendant and the government, the declarant's motivation to testify . . ., the extent to which the testimony reflects the declarant's personal knowledge, whether the declarant has ever recanted the testimony, and the existence of corroborating evidence available for cross-examination." *United States v. Barlow*, 693 F.2d 954, 962 (6th Cir. 1982); *United States v. Brown*, No. 18-20075, 2019 WL 3543253, at *9 (E.D. Mich. Aug. 5, 2019) ("The trustworthiness of these statements is further damaged by their source. The Government seeks to introduce this statement through CW, a co-conspirator, who has pleaded guilty and is awaiting sentencing.  CW may have a 'strong motivation to implicate [Brown] and to exonerate himself,' so his statements about Brown's involvement — and what A.B. told him about Brown's involvement — should be viewed with 'special suspicion.'").

Moreover, the fact that there are significant failures of proof in the government's case for the application of other particular hearsay exceptions such as the business records rule weighs against endorsement of the exhibits' admission under the residual exception.  *United States v. Houser*, 746 F.2d 55, 62 (D.C. Cir. 1984) ("Here, an examination of the procedures followed in compiling the BATF form leads inexorably to substantial concern over the total lack of 'indicia of reliability' and 'circumstantial guaranties of trustworthiness.'  That uneasiness is compounded by the fact that the specific requirements of the business records exception, requirements designed to assure that reliability and trustworthiness, were not met.").  The failure to qualify as business records was no near miss. *Laster*, 258 F.3d at 534 (Moore, J., dissenting) (observing that a view of the residual exception that prohibits admission of a hearsay statement even when a recognized exception may not apply precisely "is sometimes described by its detractors as the 'near-miss theory' of the residual exception: '[t]he doctrine that a "near miss" under a specified

exception . . . renders evidence inadmissible under [the] residual exception'") (quoting *United States v. Clarke*, 2 F.3d 81, 84 (4th Cir. 1993)); *see also Katt v. Lafler*, 271 F. App'x 479, 480, 483 (6th Cir. 2008) (alluding to potential Confrontation Clause problems under current law).

The government contends that "other circumstantial guarantees" of trustworthiness justify admission of the documents, but that position is belied by the fact that the documents conspicuously are *lacking* in several of the indications of trustworthiness enumerated by other hearsay exceptions. *United States v. Brown*, No. 18-20075, 2019 WL 3543253, at *9 (E.D. Mich. Aug. 5, 2019) ("Statements Five and Six appear to be exactly the type of statements that the rule against hearsay guards against. In Statement Five, A.B. told CW that he had bought drugs from Brown's co-conspirator at Brown's house and in Brown's presence. In Statement Six, A.B. confirmed that he had ingested a large quantity of the heroin he purchased from Brown's co-conspirator. Both of these statements are assertions about past acts, and there is no indication that they have circumstantial guarantees equivalent to those supporting the enumerated hearsay exceptions."). No witness could vouch for the contents of the records, and both agent Frost and UNITAD investigator Paulo Irani disclaimed any opinion about accuracy. And witness Al-Madioum readily acknowledged that "mistakes in ISIS records were common and happened all the time," there were errors in the information that he noted in the government's exhibits, and "basic errors" had occurred in the battalion database. The evidence here, rather than bolstering the veracity of the documents presented, amply suggests grounds for grave concern about the in-accuracy and un-reliability of the information they contain.

Moreover, according to the government, the principal goal of ISIS's campaign in Syria was to wrest control of territories from the recognized sovereigns that held them, exercise dominion over those areas, and proceed to "run the Caliphate as a legitimate government" therein. Equally

apparent is the organization's inherently related goal of *appearing* to be successful in that endeavor, even when it was not. It is undisputed that what actually transpired was a course of war in which ISIS repeatedly was dealt crushing defeats by the allied forces of the nations arrayed against it. In those circumstances, there would be a pressing and apparent temptation at all levels of the organization to overplay any success achieved and underplay any failures, including, in particular, with respect to demonstrations of apparent vs. actual military strength and loyalty of ISIS members in military service. Thus, an ISIS commander charged with recruiting and maintaining strength of the TBZ battalion might be tempted to overstate the numbers and loyalty of his soldiers, to avoid criticism by his superiors. At large, the organization would have a powerful incentive to overrepresent the strength of its ranks in the hope of persuading others who might gravitate to the cause that they would be well accompanied in battle. Or, as Al-Madioum explained, the organization's records widely were regarded by ISIS record keepers and officials as systematically inaccurate and incomplete, due to the circumstance that many ISIS recruits were reluctant to give accurate biographical information to the organization's record keepers, based on fears of being targeted by ISIS opponents. Another government witness, Paulo Irani, further testified, based on his extensive research and examinations involving thousands of ISIS documents, that the organization's records widely were regarded by outside observers as systematically *understating* the full complement of ISIS military enlistment, because many members did not want their information to be recorded at all, fearing that ultimately the information might be used to track them down or enact retribution for their efforts to support ISIS. Hr'g Tr., ECF No. 167, PageID.2042-43.

The opinion testimony by the government's document expert, and the testimony of its first-hand document custodian, both of whom acknowledged numerous omissions and errors in the

information in the government's exhibits, along with the readily apparent incentives for *inaccuracy* in record keeping discussed above, create serious grounds for concern about the regularity, accuracy, and completeness of ISIS enlistment records.  In addition to the incentives that many front-line ISIS members might have to withhold their information to obfuscate their own culpability, there also would have been every reason for those in higher positions to inflate the rolls at any opportunity, perhaps by failing to remove the names of those who had deserted or been killed in action, or even by enrolling names of persons who never actively served, or who did so only unwillingly, after being conscripted.  Such apparent reasons that would motivate deliberate falsification of records were not pertinent to the cases cited by the government, where, by contrast, criminal drug dealers and illegal casino operators typically would have every reason to keep scrupulously *accurate* accounts of persons owing them money, and the amounts owed, for all goods and services purveyed.

The exhibits do not qualify for admission under Evidence rule 807.

### III.

The government has not offered sufficient evidence or other information that would permit a definitive advance ruling that its proposed exhibits are admissible in evidence at trial.  Although some of the exhibits can be authenticated, the government has not established that they can be regarded as non-hearsay, and there is no exception to the rule against hearsay, Fed. R. Evid. 802, that would allow their admission at trial.  The hearing also demonstrated potential problems with the prospect of establishing the foundational elements for admission of the exhibits — and perhaps other potential hearsay statements — under the co-conspirator exclusion in Evidence Rule 801(d)(2)(E).  Therefore, the prudent approach to this evidence will be to adopt the second *Vinson* option for dealing with that evidence, namely, to "require the government to meet its initial burden

by producing the non-hearsay evidence of conspiracy first prior to making the *Enright* finding concerning the hearsay's admissibility." *Vinson*, 606 F.2d at 152.

For now, however, at this liminal stage of the case, the Court cannot declare that the government's proposed exhibits constitute are admissible evidence.

Accordingly, it is **ORDERED** that the government's motion to admit ISIS documents (ECF No. 102) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  December 28, 2021