# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed:  August 02, 2022

Mr. James R. Gerometta
Mr. Fabian Franco Renteria
Federal Defender Office
613 Abbott Street, Suite 500
Detroit, MI 48226

Mr. Andrew Goetz
Mr. Daniel R. Hurley
Mr. Henry Edward Moon III
Mr. Kevin M. Mulcahy
Office of the U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226

Mr. John A. Shea
120 N. Fourth Avenue
Ann Arbor, MI 48104-0000

Re:  Case No. 22-1013, *USA v. Ibraheem Musaibli*
Originating Case No. : 2:18-cr-20495-1

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0168p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellant*,

    *v*.

IBRAHEEM IZZY MUSAIBLI,

    *Defendant-Appellee*.

No. 22-1013

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:18-cr-20495-1—David M. Lawson, District Judge.

Argued: June 9, 2022

Decided and Filed: August 2, 2022

Before: BOGGS, MOORE, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellant. John A. Shea, Ann Arbor, Michigan, for Appellee. **ON BRIEF:** Daniel R. Hurley, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellant. John A. Shea, Ann Arbor, Michigan, James R. Gerometta, Fabián Rentería Franco, OFFICE OF THE FEDERAL COMMUNITY DEFENDER, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. International terrorism raises a host of complex legal issues, not the least regarding the rule against hearsay. For example, if a criminal defendant is alleged to have been part of a terrorist group, then do records documenting that

group's organizational structure, logistics, and activities qualify as statements of co-conspirators under Federal Rule of Evidence 801(d)(2)(E)?  This interlocutory appeal poses that question. Because the district court answered incorrectly, we **REVERSE** its denial of the government's motion to admit the evidence at issue and **REMAND** with instructions that this evidence may be admitted.  Consequently, the government's motion to expedite is **DENIED** as moot.

## I. BACKGROUND

### A. Facts

Amidst the fallout of the 2003 invasion of Iraq, the Arab Spring of 2011, and the ongoing Syrian Civil War, a new terrorist group emerged near the Syrian-Iraqi border:  the Islamic State of Iraq and Syria ("ISIS").  Unlike other terrorist groups in the region, ISIS set as its goal the conquest of territory that it would then administer as a state.  R. 166 (06/28/2021 Evidentiary Hr'g Tr. at 27:2–8) (Page ID #1764); R. 167 (06/29/2021 Evidentiary Hr'g Tr. at 274:22–275:6) (Page ID #2011–12).  ISIS made this aim clear in 2014 when it announced that it sought to create a "Caliphate," or a self-proclaimed "Islamic State."  R. 167 (06/29/2021 Evidentiary Hr'g Tr. at 326:17–327:5) (Page ID #2063–64).  By this time, the group already controlled large swaths of territory in both Syria and Iraq.  *Id.*

Territorial expansion, however, required more than willpower.  It took logistics. In acquiring additional lands in Syria and Iraq, ISIS acquired additional resources, including oil fields and millions of dollars from the region's financial institutions.  *Id.* at 304:20–22 (Page ID #2041).  The number of ISIS's members also ballooned as the group's influence over these lands spread.  *Id.* at 274:6–9 (Page ID #2011).  This growth spurred the need for organization, and so to administer its expansive domain, manage its troops, and allocate its resources, the terrorist group became increasingly bureaucratic.  *Id.*  ISIS accordingly divided its operations into ministries to manage its affairs.  *Id.* at 283:19–22 (Page ID #2020).  These included offices that focused on matters such as finances and defense.  *Id.*

As the existence of a ministry of defense connotes, ISIS applied this bureaucratic mindset to how it structured and operated its military.  Units were divided into divisions and then subdivided into battalions.  R. 166 (06/28/2021 Evidentiary Hr'g Tr. at 87:10–20) (Page ID

#1824).   Before being assigned to a battalion, fighters underwent religious, ideological, and military training.  *Id.* at 144:10–145:16 (Page ID #1881–82).  For their services, fighters were paid a monthly salary and their dependents received benefits if a fighter was killed in combat. *Id.* at 145:22–25, 152:21–25 (Page ID #1182, 1889).  ISIS maintained payroll records to help to administer the salaries and keep track of its members.  R. 167 (06/29/2021 Evidentiary Hr'g Tr. at 285:18–286:2, 292:7–18) (Page ID #2022–23, 2029).

Given its complexity, the lifeblood of this bureaucracy was information and ISIS accordingly kept detailed entries in databases about its fighters.  These entries included the names of fighters' family members, their country of origin, their birthday, and their "kunya," a fighter's internal military name.  R. 166 (06/28/2021 Evidentiary Hr'g Tr. at 150:16–19, 162:12–17) (Page ID #1887, 1899).  In a similar vein, ISIS monitored and recorded the combat readiness of its fighters.  *Id.* at 150:20–23.  Fighters were assigned unique ten-digit numbers akin to Social Security numbers to facilitate administration.  *Id.* at 77:19–21, 133–35 (Page ID #1814, 1870–72).  Only those who swore allegiance to ISIS received an identification number.  R. 167 (06/29/2021 Evidentiary Hr'g Tr. at 337:23–338:11) (Page ID #2074–75).

Among those allegedly recruited to fight for ISIS was the defendant, Ibraheem Izzy Musaibli.  Originally from Dearborn, Michigan, Musaibli moved to Yemen in April 2015. Appellee Br. at 4.  He concedes that he then traveled from there to Syria in the fall of 2015.  *Id.* What happened in Syria, on the other hand, is a matter of dispute.  Whereas Musaibli claims that he was forced to join ISIS, the government claims that his allegiance was voluntary.  *Id.*; Appellant Br. at 5–6.  In the government's timeline, Musaibli freely attended an ISIS-run religious training camp from October to November 2015 before undergoing military training from December 2015 to January 2016.  R. 185 (Bill of Particulars at 2) (Page ID #2243).

Regardless of why he was there, Musaibli traveled to Iraq and attended a military training camp sometime after entering Syria.  Approximately forty nascent fighters, including, as he later admitted, Musaibli, were present at the training in the Iraqi city of Mosul, which lasted for twenty days.  Ex. E.1 (Gary Interview at 4, 7).  There, Musaibli was instructed in matters such as physical fitness, how to operate an assault rifle, and ways to conduct ambushes.  *Id.* at 5, 7–11.

The training culminated in Musaibli and his fellow attendees swearing allegiance to ISIS. *Id.* at 15–16.

ISIS collected information from Musaibli, as it did from other fighters. Various entries in the terrorist group's databases included his birthday. *See, e.g.*, R. 166 (06/28/2021 Evidentiary Hr'g Tr. at 29:7–8, 84:15–16) (Page ID #1766, 1821). Likewise, Musaibli's kunya, "Abu 'abd al-Rahman al-Yemeni," appears throughout the databases next to his birthday. *Id.* at 28:23–29:1, 74:4–9, 83:25–84:18 (Page ID #1765–66, 1811, 1820–21). Musaibli corroborated that this was his kunya. Ex. E.1 (Gary Interview at 19). As with other members of the battalion, Musaibli also had an identification number—1200015723—and this, too, recurred next to his birthday and kunya in different entries. R. 166 (06/28/2021 Evidentiary Hr'g Tr. at 83:16–24, 250:5–19) (Page ID #1820, 1987). Numbers starting with 120 were associated in ISIS's bureaucracy with non-Iraqi and non-Syrian fighters, though not exclusively so. R. 167 (06/29/2021 Evidentiary Hr'g Tr. at 336:12–337:1) (Page ID #2073–74).

These entries were not always perfect. Musaibli's name was sometimes misspelled. R. 166 (06/28/2021 Evidentiary Hr'g Tr. at 233:8–12, 236:2–15) (Page ID #1970, 1973). Other mistakes with ISIS's recordkeeping were more serious. Different fighters had incorrect birthdates in their entries, were erroneously listed as either dead or alive, and had the number of their dependents fraudulently altered to increase their monthly stipend. *Id.* at 236:16–237:20 (Page ID #1973–74). Although the database administrators failed to correct every mistake, such issues did not escape Musaibli's notice. On one occasion, he complained to an administrator, Abdelhamid Al-Madioum, that despite his entries reporting otherwise, he was married and should be receiving a marital stipend. *Id.* at 224:4–7, 251:16–252:15 (Page ID #1961, 1988–89).

Nor was Musaibli's service in ISIS without blemish. Because of his nationality, Musaibli was assigned to the Tariq Bin Ziyad battalion, which was composed mainly of non-Iraqi and non-Syrian fighters and numbered between 100 and 150 members. *Id.* at 75:2–4, 145:18–19 (Page ID #1812, 1882). After training, Musaibli was sent with the battalion to Hit, Iraq, where fighting was ongoing. Ex. E.1 (Gary Interview at 19); *United States v. Musaibli*, No. 18-20495, 2021 WL 6125849, at *1 (E.D. Mich. Dec. 28, 2021). His main duties appear to have been conducting "Ribat," which the government has explained is a form of armed guard duty near the

frontline. Ex. E.1 (Gary Interview at 9–10); *Musaibli*, 2021 WL 6125849, at *1. His performance of these responsibilities was tainted, however, as someone in ISIS documented that Musaibli "left the frontline twice without permission." Ex. 1. Musaibli later alleged that he was a hostage of ISIS and imprisoned by the group ten times while he was in Syria and Iraq. R. 163 (06/21/2021 Mot. to Suppress Hr'g Tr. at 279:2–3) (Page ID #1605).

During his tenure with ISIS, Musaibli also communicated with family members on various occasions. Through messages sent on Facebook, for instance, Musaibli told family members that he was with ISIS in Iraq and that he was fighting Americans and Shia Muslims there. R. 163 (06/21/2021 Mot. to Suppress Hr'g Tr. at 265:23–266:9) (Page ID #1591–92); Ex. L (Facebook R. at 114). On another occasion, Musaibli encouraged his family to travel to ISIS territory. R. 163 (06/21/2021 Mot. to Suppress Hr'g Tr. at 270:1–21) (Page ID #1596). He was apparently unsuccessful at that endeavor, and in August 2016 Musaibli's cousin asked him whether he wanted to leave ISIS. Musaibli responded to the effect that he was not ready to go yet. *Id.* at 267:7–11 (Page ID #1593); Ex. L (Facebook R. at 270–71). Musaibli separately relayed to his father the kunya that he used. R. 166 (06/28/2021 Evidentiary Hr'g Tr. at 84:4–13) (Page ID #1821).

Musaibli departed from the region two years later. Over several weeks in April and early June 2018, Musaibli exchanged messages with a federal agent about the possibility of leaving Syria. *United States v. Musaibli*, No. 18-20495, 2021 WL 5879405, at *1 (E.D. Mich. Dec. 13, 2021). By June or July 2018, the possibility became a reality. During one of those months, Musaibli was apprehended by Syrian Democratic Forces while, he alleges, trying to flee ISIS. *Id.* at *1; Appellee Br. at 6. Soon after he was captured, federal law-enforcement agents took Musaibli into custody in Syria and brought him back to the United States. *Musaibli*, 2021 WL 5879405, at *2. Enroute, Musaibli waived his *Miranda* rights and discussed his time in ISIS with the federal agents. *Id.* at *2–3. As a result of these discussions and other evidence, the government alleges that Musaibli was a member of ISIS from October 2015 until his capture in either June or July 2018. R. 185 (Bill of Particulars at 1) (Page ID #2242).

## B. Procedural History

Back in the United States, Musaibli faced criminal charges for his ISIS-related activities. A grand jury indicted him for "providing and attempting to provide material support to a designated foreign terrorist organization" in violation of 18 U.S.C. § 2339B; "conspiracy to provide material support to a foreign terrorist organization" also in violation of 18 U.S.C. § 2339B; possessing and discharging a firearm (machine gun) in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A), (B)(ii); and "receipt of military-type training from a foreign terrorist organization" in violation of 18 U.S.C. § 2339D(a). R. 48 (First Superseding Indictment at 1–5) (Page ID #104–08); R. 185 (Bill of Particulars at 1–4) (Page ID #2242–45).

In preparing for trial, the government identified the following exhibits that were recovered from various ISIS facilities (collectively, the "ISIS documents"):

- *Exhibit One*: A roster of fighters assigned to the Tariq Bin Ziyad battalion, which contained Musaibli's kunya, census number, and other personal details. R. 166 (06/28/2021 Evidentiary Hr'g Tr. at 26:1–29:17) (Page ID #1763–66).

- *Exhibit Two*: A biographical sheet for a member of the Tariq Bin Ziyad battalion other than Musaibli who had gone missing and with whom Musaibli had allegedly worked to recruit others to ISIS. *Id.* at 29:18–30:25, 75:8–77:3, 165:13–167:19 (Page ID #1766–67, 1812–14, 1902–04).

- *Exhibit Three*: Another roster of members of the Tariq Bin Ziyad battalion, this one of battalion administrators, including Al-Madioum. *Id.* at 167:20–170:16 (Page ID #1904–07).

- *Exhibit Four*: ISIS payroll records for fighters, administrators, and other members of the terrorist group, including a fighter later identified as Musaibli. *Id.* at 81:11–88:20 (Page ID #1818–25).

- *Exhibit Five*: A spreadsheet containing Musaibli's kunya, census number, and other personal details, and which appears to have been connected to a budget prepared by ISIS's Office of Treasury. *Id.* at 88:21–93:13 (Page ID #1825–30).

- *Exhibit Eight*: Budget databases, which included reports from the "Soldier's Administration" of ISIS covering months in 2016 and recording payments to fighters and administrators, including to a fighter later identified as Musaibli. *Id.* at 184:17–203:8 (Page ID #1921–40).

- *Exhibit Nine*:  A roster of non-Iraqi and non-Syrian fighters in both the Tariq Bin Ziyad battalion and other ISIS military units with their payments; one fighter was later identified as Musaibli.  *Id.* at 203:12–206:6 (Page ID #1940–43).

- *Exhibit Eleven*:  Musaibli's marriage certificate that he sent his parents.  *Id.* at 103:23–25 (Page ID #1840).  The certificate bore ISIS's stamp and apparently was issued by the group.  *Id.* at 104:1–15 (Page ID #1841).

Because many documents referenced Musaibli, the government believed that the ISIS documents were vital to their case against Musaibli.  To ensure that they could be used as evidence, the government moved to admit the documents before trial, arguing that they were relevant to establishing three facts:  that a conspiracy existed between "Musaibli and others to provide material support to ISIS"; that Musaibli "provided material support to ISIS in the form of his own personal service, specifically, serving under the direction and control of ISIS as a solider"; and that Musaibli "attended a training camp . . . because soldiers for ISIS received military training from the group."  R. 102 (Mot. to Admit at 10) (Page ID #325).

Musaibli opposed the government's motion.  He countered that the documents could not be properly authenticated and that, pertinent on appeal, they were hearsay.  R. 153 (Resp. at 7–14) (Page ID #1274–81).  He separately moved to suppress the statements that he made to federal agents both before and during his journey back to the United States.  R. 106 (Mot. to Suppress) (Page ID #381–400); R. 107 (Mot. to Suppress) (Page ID #401–26).

With the rule against hearsay in mind, the government offered three arguments for admitting the ISIS documents.  To start, the government argued that the documents were statements of co-conspirators admissible under Federal Rule of Evidence 801(d)(2)(E), though the government offered different theories about the conspiracy's scope.  R. 102 (Mot. to Admit at 24–30) (Page ID #339–45).  At one point, the government defined the conspiracy in which Musaibli was allegedly involved as aiming both to run "the Caliphate as a legitimate government" and to engage "in repeated battles with Coalition Forces," explaining that the documents furthered these goals by helping the terrorist group to manage its resources.  *Id.* at 27–28, 30 (Page ID #342–43, 345).  At other points, the government hewed closer to the indictment, noting that the United States had designated ISIS as a terrorist organization in May

2014, and that fighters like Musaibli who pledged allegiance to the group and fought for it had entered a conspiracy to provide material support to it. *Id.* at 25–26 (Page ID #340–41).

Should the co-conspirator-statements argument prove to be unconvincing, the government had backups. The government pointed to Federal Rule of Evidence 803(6), which provides an exception to the rule against hearsay for records of a regularly conducted activity. *Id.* at 30–32 (Page ID #345–47). According to the government, "ISIS focused as much on its bureaucracy as it did on its fight against Coalition Forces," with several of the proffered documents being part of the routine inner workings of the terrorist group, such as payroll records and troop distribution sheets. *Id.* at 32 (Page ID #347). As a final argument, the government maintained that the documents fell within the residual hearsay exception, Federal Rule of Evidence 807. *Id.* at 33 (Page ID #348).

Four days of evidentiary hearings followed. During the first two days, the district court heard testimony on Musaibli's motion to suppress. R. 155 (06/03/2021 Mot. to Suppress Hr'g Tr.) (Page ID #1319–1559); R. 163 (06/21/2021 Mot. to Suppress Hr'g Tr.) (Page ID #1568–1730). The district court ultimately denied that motion, and that ruling is not at issue on appeal. *See United States v. Musaibli*, No. 18-20495, 2021 WL 5879405, at *10 (E.D. Mich. Dec. 13, 2021). The next two days of hearings were devoted solely to the government's motion to admit the ISIS documents. R. 166 (06/28/2021 Evidentiary Hr'g Tr.) (Page ID #1738–1998); R. 167 (06/29/2021 Evidentiary Hr'g Tr.) (Page ID #1999–2117).

In these hearings, the government called six witnesses to lay the foundation for admitting the ISIS documents. Each testified to various aspects of the documents. Several of the witnesses identified Musaibli's information as belonging to him and including features of ISIS's organizational structure. *See, e.g.*, R. 166 (06/28/2021 Evidentiary Hr'g Tr. at 29:7–8, 83:16–24, 84:15–16, 105:19–106:13, 250:5–19) (Page ID #1766, 1820, 1821, 1842–43, 1987). These witnesses included Abdelhamid Al-Madioum, the administrator to whom Musaibli had complained about not receiving a marital stipend. Al-Madioum had been taken into custody by the United States, had pleaded guilty to providing material support to a foreign designated terrorist organization, and had since agreed to cooperate with the government. *Id.* at 207:10–209:1 (Page ID #1944–46).

During his stint in ISIS, Al-Madioum served as a database administrator for the Tariq Bin Ziyad battalion from around May 2016 to about November 2016. *Id.* at 149:6–11, 213:1–14, 214:8–215:9 (Page ID #1886, 1950, 1951–52). As part of his job, Al-Madioum helped to collect and manage information about members of the battalion, including fighters' names, families' names, birthdates, ISIS-issued identification numbers, and the number of wives and children that they had. *Id.* at 150:1–23 (Page ID #1887). In addition to the time that Musaibli spoke with him about a faulty marital-status entry in his information, Al-Madioum observed Musaibli in areas where ISIS operated on three other occasions while both were in the group. *Id.* at 147:9, 223:1–224:17 (Page ID #1884, 1960–61). Al-Madioum identified various entries in the ISIS documents as belonging to Musaibli. *See, e.g.*, *id.* at 180:2–15, 187:1–189:2, 203:12–206:6 (Page ID #1917, 1924–26,1940–43).

On December 28, 2021, the district court issued its evidentiary ruling, which appeared to agree with the government on several points. The district court agreed that the government had laid a sufficient foundation at least to "suggest[]" that Musaibli had "enlisted as a foot soldier with an ISIS military branch." *Musaibli*, 2021 WL 6125849, at *13. The district court also agreed that the government had provided evidence indicating that Musaibli had "received some military training after recruitment" from ISIS. *Id.* The district court even agreed that the government provided sufficient evidence to suggest that Musaibli had "provided support to ISIS by participating in some fighting and other routine tasks like guard duty" based on the government's proffer. *Id.*

Where the district court and the government parted ways was in what conclusions could be drawn from these facts. Analyzing whether the ISIS documents qualified as statements of co-conspirators, the district court concluded that they did not, explaining that "the record does not yet establish the scope of the conspiracy that the defendant allegedly joined with sufficient precision to permit the statements in the exhibits to be considered his 'vicarious admissions.'" *Id.* The district court underscored its concern that "[t]here is a serious danger in this case of conflating (or inflating) the defendant's culpability based on the ISIS organization's criminal and terrorist activities generally." *Id.*

The government fared no better on its other two theories. For the purposes of Federal Rule of Evidence 803(6), the district court determined that the government had failed to show that the "documents were created either contemporaneously with the activities memorialized, or by a person with personal knowledge of the information recorded," which disqualified them under this rule. *Id.* at \*14. For the purposes of Federal Rule of Evidence 807, the district court concluded that the ISIS documents were both too untrustworthy and too closely related to existing hearsay exceptions and exemptions to qualify for the residual exception. *Id.* at \*15–17. Trial was set to start on January 11, 2022, two weeks after the district court issued its evidentiary ruling. R. 180 (09/09/21 Dist. Ct. Order at 3) (Page ID #2212).

Facing the imminent prospect of going to trial without key evidence, the government filed an interlocutory appeal under 18 U.S.C. § 3731 and an emergency motion with this court to stay the district court proceedings. App. R. 11 (Emergency Mot. at 1). After some conferencing below, the district court adjourned the trial pending appeal, thus mooting the government's emergency motion. R. 221 (01/07/2022 Dist. Ct. Order at 1–2) (Page ID #2530–31). This appeal on the merits of the evidentiary issues followed.

## II. ANALYSIS

### A. Jurisdiction under 18 U.S.C. § 3731

Before addressing the evidentiary question of whether the ISIS documents are inadmissible hearsay, we must resolve a threshold jurisdictional issue. Namely, Musaibli argues that we do not have jurisdiction under 18 U.S.C. § 3731 to review the district court's evidentiary ruling. For the reasons that follow, we disagree and hold that our jurisdiction is proper.

The procedural posture of this case is unique to criminal law. Our jurisdiction to review district-court decisions is normally limited to appeals brought once a final judgment has issued. *See* 28 U.S.C. § 1291. When the government prosecutes a criminal case, this limitation poses a dilemma. Waiting to file an appeal until after the district court issues a final judgment runs up against the Fifth Amendment's prohibition against putting a defendant in jeopardy of punishment twice for the same offense. U.S. Const. amend V. Indeed, the Double Jeopardy Clause severely constricts the timeline of when the government can seek appellate review during a jury trial

because "jeopardy attaches when a jury is empaneled and sworn." *Serfass v. United States*, 420 U.S. 377, 388 (1975). This means that whereas defendants may seek further review if they are convicted, "[p]retrial review is usually the government's only option to appeal erroneous evidentiary rulings." *United States v. Williams*, 30 F.4th 263, 265 (5th Cir. 2022).

Seeking to rebalance this asymmetry, Congress enacted 18 U.S.C. § 3731 to "remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit." *United States v. Wilson*, 420 U.S. 332, 337 (1975). To this end, § 3731 provides the government with "a one-party path for interlocutory review" of orders excluding evidence in criminal cases. *United States v. Clariot*, 655 F.3d 550, 552 (6th Cir. 2011). To proceed down this avenue, five criteria must be met. First, there must be "a decision or order of a district court *suppressing or excluding evidence*" from which the government is appealing. 18 U.S.C. § 3731 (emphasis added). Second, the defendant cannot have already been put in jeopardy. *Id*. Third, the "United States attorney [must] certif[y] to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." *Id*. Fourth, the government must appeal "within thirty days after the decision . . . or order has been rendered." *Id*. Fifth, the government must "diligently prosecute[]" the appeal. *Id*.

Musaibli does not contest that the government has satisfied the second through the fifth criteria. This choice is understandable. Because the district court adjourned trial during the pendency of this appeal, no jury has been empaneled and jeopardy has not attached. R. 221 (01/07/2022 Dist. Ct. Order at 2) (Page ID #2531). The United States Attorney for the Eastern District of Michigan also certified that the appeal "in this case is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in this proceeding." R. 212-1 (Certification) (Page ID #2426). The district court issued its order on December 28, 2021, and the government filed its notice of appeal on January 5, 2022, making the notice timely. R. 212 (Notice of Appeal) (Page ID #2425). Finally, the government has diligently prosecuted this appeal; for one thing, it sought expedited briefing. App. R. 26 (Mot. to Expedite). In short, the undisputed criteria are clearly satisfied.

Musaibli focuses instead on the first criterion: whether the government is appealing a decision that suppresses or excludes evidence. His argument can be summarized syllogistically.

According to Musaibli, we cannot exercise appellate jurisdiction under § 3731 unless the district court either suppressed or excluded evidence. But here, "no potential document evidence has been excluded or suppressed from the criminal trial"; the district court simply failed to admit evidence. Appellee Br. at 20. Therefore, he argues, § 3731 cannot provide us with jurisdiction over the government's appeal. We are not convinced.

Although it is true that the district court's order denied the government's motion to _admit_ the ISIS documents, rather than granted a motion by Musaibli to _exclude_ them, that distinction is semantic in this case. Section 3731 must be interpreted by its own terms, which include the mandate that the statute's text "be liberally construed to effectuate its purposes." 18 U.S.C. § 3731. As the Supreme Court has repeatedly observed of § 3731, Congress's aim in enacting the law was the removal of "all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit" of adverse evidentiary rulings. _United States v. Helstoski_, 442 U.S. 477, 487 n.6 (1979) (quoting _Wilson_, 420 U.S. at 337).

These textual indications have led courts to eschew formalistic analysis, with the Supreme Court concluding that the inquiry under § 3731 "must be guided in determining the question of appealability of [a] trial court's action not by the name the court gave [its decision] but by what in legal effect it actually was." _United States v. Sisson_, 399 U.S. 267, 279 n.7 (1970) (quoting _United States v. Waters_, 175 F.2d 340, 341 (D.C. Cir. 1948)) (second alteration in original); _see also United States v. Siegel_, 536 F.3d 306, 314–15 (4th Cir. 2008); _United States v. Horwitz_, 622 F.2d 1101, 1104–05 (2d Cir. 1980). That § 3731 favors appellate jurisdiction is further driven home by the fact that Congress added the command of liberality to curb stingier interpretations of the section. _See United States v. Watson_, 386 F.3d 304, 309 (1st Cir. 2004). In other words, determining whether we have jurisdiction "requires us to apply section 3731 in a pragmatic, common-sense manner," with an eye on the problems and purposes animating the law. _United States v. Flemmi_, 225 F.3d 78, 84 (1st Cir. 2000).

Such pragmatic considerations settle jurisdictional concerns in this appeal. Once the government moved to admit the ISIS documents, Musaibli filed a response in opposition. R. 102 (Mot. to Admit) (Page ID #316–49); R. 111 (Resp.) (Page ID #681–86). The district court subsequently held evidentiary hearings on two separate days related to the government's motion.

R. 166 (06/28/2021 Evidentiary Hr'g Tr.) (Page ID #1738–1998); R. 167 (06/29/2021 Evidentiary Hr'g Tr.) (Page ID #1999–2117). During those hearings, the government offered testimony from six witnesses to support the documents' admissibility, one of whom both helped to create some of the documents and met with Musaibli about the documents' contents while the two were in ISIS. The district court also had before it Musaibli's confession regarding his involvement in the group and his messages with his family about that involvement. *Musaibli*, 2021 WL 5879405, at *10. Having received all this evidence, the district court then closely considered all the government's arguments for admission of the ISIS documents, rejecting each in its ruling. *Musaibli*, 2021 WL 6125849, at *12–17. This rejection included the district court's indication that the ISIS documents were inadmissible hearsay. *Id*. at *17.

Put differently, the government has proffered what is likely the best foundation that can be expected prior to trial, leaving the issue of admissibility thoroughly ventilated below and nothing but a set of legal questions—namely, whether the government's foundation is sufficient for any hearsay exemption or exception to apply—for us to consider. The district court has also provided every indication that it believes the documents to be hearsay, and we have every reason to conclude that this qualifies as a de facto exclusion of the ISIS documents. The fact that the district court might change its mind does not alter the analysis under 18 U.S.C. § 3731.

Indeed, if the mere possibility of reconsideration foreclosed our review, then no evidentiary ruling would ever be the basis for appellate jurisdiction because "evidentiary rulings are by their very nature nonfinal." *United States v. Decinces*, 808 F.3d 785, 789 (9th Cir. 2015). Congress recognized this feature of evidentiary rulings when it crafted 18 U.S.C. § 3731 "to create exceptions to the finality requirement of [28 U.S.C.] § 1291," *United States v. Rodriguez*, 975 F.2d 404, 408 (7th Cir. 1992), and we have been loath to overlook that recognition based on speculations of what might happen below, *see United States v. Presser*, 844 F.2d 1275, 1279–80 (6th Cir. 1988) (expressing similar concern with reference to a conditionally phrased order). For these reasons, we hold that the district court's ruling is an order excluding evidence within the scope of 18 U.S.C. § 3731.

## B. Co-conspirator Statements

On the merits, this appeal centers on whether the ISIS documents are hearsay. Under Federal Rule of Evidence 802, hearsay testimony—that is, "a statement that . . . the declarant does not make while testifying at the current trial or hearing; and . . . a party offers in evidence to prove the truth of the matter asserted in the statement," FED. R. EVID. 801(c)—is inadmissible. This leaves the proponent of possible hearsay evidence with a couple of options for gaining its admission. The proponent could show that the evidence is not hearsay, as the government attempted to do by invoking Federal Rule of Evidence 801(d)(2)(E). *See United States v. Damra*, 621 F.3d 474, 492 (6th Cir. 2010) (noting that statements admitted under this exemption are "explicitly not hearsay"). Failing that, the proponent could identify an applicable exception to the rule against hearsay, as the government tried to do when it relied on Federal Rules of Evidence 803(6) and 807.

Although the district court de facto excluded the ISIS documents on all three grounds, our analysis begins and ends with Federal Rule of Evidence 801(d)(2)(E). Under that rule, a statement is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). "To invoke this hearsay exclusion, the government must demonstrate by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant was a member of the conspiracy, and (3) the co-conspirator's statement was made in furtherance of the conspiracy." *United States v. Bailey*, 973 F.3d 548, 560 (6th Cir. 2020). The government may rely on the contents of the co-conspirator statements to demonstrate each of these elements, but must also offer independent, corroborating evidence to that effect. *United States v. Payne*, 437 F.3d 540, 544 (6th Cir. 2006). On appeal, we review for clear error the three predicate factual determinations of whether a conspiracy existed, whether the defendant was a member of that conspiracy, and whether the statement in question was made in furtherance of it. *Damra*, 621 F.3d at 492; *United States v. Gessa*, 971 F.2d 1257, 1260–61 (6th Cir. 1992) (en banc). We then review de novo the legal conclusions drawn from these factual determinations. *Damra*, 621 F.3d at 492; *Gessa*, 971 F.2d at 1261.

Because both the district court below and Musaibli on appeal have focused on the first element of Rule 801(d)(2)(E), particularly whether the government adequately defined the scope of the conspiracy that it claimed existed, so do we. When determining whether a conspiracy existed under Rule 801(d)(2)(E), "[t]he key is coordinated action." 30B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 6778 (2022 ed.). For this reason, we have repeatedly stressed that the alleged conspiracy need not be the same as the one charged. *See, e.g.*, *United States v. Maliszewski*, 161 F.3d 992, 1008–09 (6th Cir. 1998); *United States v. Bonds*, 12 F.3d 540, 573 (6th Cir. 1993). In fact, there need not even be a conspiracy charge in the case for Rule 801(d)(2)(E) to apply. *See, e.g.*, *United States v. Horton*, 847 F.2d 313, 323–24 (6th Cir. 1988); *United States v. McCullah*, 745 F.2d 350, 358 (6th Cir. 1984); *United States v. Kendricks*, 623 F.2d 1165, 1168 n.5 (6th Cir. 1980).

Nevertheless, an indictment can be instructive to the analysis under Rule 801(d)(2)(E). Musaibli was charged with conspiring "with others to provide material support and resources in the form of personnel and services" to ISIS in violation of 18 U.S.C. § 2339B and the government identified this as the conspiracy that existed for purposes of Rule 801(d)(2)(E) to the district court. R. 48 (First Superseding Indictment at 3) (Page ID #106); R. 102 (Mot. to Admit at 25–26) (Page ID #340–41). We have previously upheld a criminal conviction for a similarly defined conspiracy. *See United States v. Alebbini*, 979 F.3d 537, 543–46 (6th Cir. 2020). Given that the standard of proof for determining whether a conspiracy existed under Rule 801(d)(2)(E) is the less onerous preponderance-of-the-evidence standard, Musaibli's indictment provides an intuitive set of boundaries defining the conspiracy's scope. *Cf. United States v. Squillacote*, 221 F.3d 542, 563 (4th Cir. 2000) (using an indictment analogously in case involving international espionage). What remains to be seen is whether the government carried its burden in demonstrating the existence of a conspiracy to provide ISIS with the alleged material support.

After reviewing the record, we hold that the government carried its burden and that the district court clearly erred in ruling otherwise. Beginning with the ISIS documents that directly implicate Musaibli, we consider witness testimony offered by the government that establishes that Exhibits One, Four, Five, Eight, and Nine all identify Musaibli and others as providing services to ISIS, specifically as members of the Tariq Bin Ziyad battalion. *See, e.g.*, R. 166

(06/28/2021 Evidentiary Hr'g Tr. at 26:1–29:17, 81:11–88:20, 88:21–93:13, 184:17–203:8, 203:12–206:6) (Page ID #1763–66, 1818–25, 1825–30, 1921–40, 1940–43). Exhibit Eleven meanwhile appears to be a marriage certificate issued by ISIS, which is indicative not only of Musaibli's involvement in the terrorist group, but also, considering his conversation with Al-Madioum concerning his marital status and the benefits that should have attended it, of how the group incentivized people to provide their services. *Id.* at 103:23–25, 104:1–15 (Page ID #1840, 1841). These documents alone are probative of both a coordinated effort to provide ISIS with material support and of Musaibli's involvement in those efforts.

Other exhibits further bolster the existence of that conspiracy. Exhibit Two provides biographical details of a different fighter from the battalion who had become missing and with whom Musaibli had allegedly worked to recruit new members to ISIS. *Id.* at 29:18–30:25, 75:8–77:3, 165:13–167:19 (Page ID #1766–67, 1812–14, 1902–04). Exhibit Three identifies administrators of the battalion including Al-Madioum, whose testimony provides some of the foundation for the ISIS documents. *Id.* at 167:20–170:16 (Page ID #1904–07). Although neither of these exhibits identify Musaibli, they do identify others with whom he served in the Tariq Bin Ziyad battalion, the roles that they played in the unit, and how the organization operated. If, as we note again later, "statements which identify the participants and their roles in the conspiracy are made '*in furtherance*' of a conspiracy," then such statements once paired with corroborating evidence are also a good indication that a highly organized and bureaucratic conspiracy to provide a group with personnel and services existed. *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994) (emphasis added); *see also Payne*, 437 F.3d at 544 (corroboration requirement).

Separate evidence offered by the government provides the required corroborating evidence. Musaibli's own words supported the existence of a conspiracy to provide ISIS with personnel and services. His confession detailed how he and others went through training and swore allegiance to ISIS as part of their enrollment in the unit. Ex. E.1 (Gary Interview at 4, 7, 15–16). Even before making this confession, the messages that Musaibli sent via social media informed his family that he was aiding in the terrorist group's broader fight against Americans and Shia Muslims and encouraged family members to join him. R. 163 (06/21/2021 Mot. to Suppress Hr'g Tr. at 265:23–266:9, 270:1–21) (Page ID #1591–92, 1596); Ex. L (Facebook R. at

114). In terms of identifying Musaibli in the ISIS documents, Musaibli corroborated his kunya both in communications with his father and in his confession. R. 166 (06/28/2021 Evidentiary Hr'g Tr. at 84:4–13) (Page ID #1821); Ex. E.1 (Gary Interview at 19).

All of this led the district court to conclude that the government's proffer was sufficient to "suggest[]" that Musaibli enlisted in, was trained by, and fought for ISIS and Musaibli does not appear to challenge these conclusions on appeal. *Musaibli*, 2021 WL 6125849, at *13. This evidence, however, does more than merely suggest these facts; it establishes them by a preponderance of the evidence. By the same standard, the repeated references to other fighters and description of the training that Musaibli underwent and the oath he took also establish that he did not engage in the described conduct alone or absent coordination. Rather, that conduct was clearly undertaken with compatriots to provide ISIS with personnel and services.

Any lingering doubts about whether the district court erred are dispelled by the testimony of the government's most unique—perhaps even extraordinary—witness, Al-Madioum. A database administrator for the Tariq Bin Ziyad battalion during part of Musaibli's time in the unit, Al-Madioum had personal knowledge of the battalion's operations and its members. Salient here, Al-Madioum recognized Musaibli's entries in the database and testified to seeing Musaibli on several occasions around areas where ISIS operated. R. 166 (06/28/2021 Evidentiary Hr'g Tr. at 147:9, 180:2–15, 187:1–189:2, 203:12–206:6, 223:1–224:17) (Page ID #1884, 1917, 1924–26,1940–43, 1960–61).

Al-Madioum then went beyond testifying merely to recognizing Musaibli's database entries and having seen him around while both were members of ISIS. He also testified that Musaibli approached him at one point about correcting information in his record so that Musaibli could receive additional benefits. *Id*. at 224:4–7, 251:16–252:15 (Page ID #1961, 1988–89). Al-Madioum provided similar testimony regarding the person detailed in Exhibit Two who, like Musaibli, also requested that some of his information be changed in the database. *Id*. at 165:13–166:18 (Page ID #1902–03). When paired with the other evidence in the record, Al-Madioum's testimony clearly establishes by a preponderance that an intricate conspiracy to provide ISIS with personnel and services existed, that this conspiracy was supported by a sophisticated

bureaucratic apparatus that kept track of its members and incentivized their service through salaries and other benefits, and that Musaibli was one such member.

In defense of the district court's ruling, Musaibli echoes its concern. Specifically, he cautions that allowing the co-conspirator-statement exemption to include the conspiracy at issue would allow the government to enter any statement made by any participant in ISIS's sizeable membership, regardless both of how tangentially connected this was to his conduct, which he characterizes as being a "mere solider" who fought for the group "in a discrete place at a discrete point in time." Appellee Br. at 30. For this reason, he argues, we should affirm the district court's de facto exclusion of the ISIS documents.

Framed generally, Musaibli's concern has merit. Admitting statements of co-conspirators into evidence has long been based on principles that have the potential to exempt large categories of statements from the rule against hearsay. As the Supreme Court explained, the rule's common-law origins are rooted in

> the principle that when any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, is the act of all, and is admissible as primary and original evidence against them.

*Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 249 (1917). Rule 801(d)(2)(E) continues to embody these agency principles, predicating admission of co-conspirator statements on a tacit understanding that conspiracies are forms of principal-agent relationships. *See* Fed. R. Evid. 801 Adv. Comm. Note; *see also United States v. El-Mezain*, 664 F. 3d 467, 503 (5th Cir. 2011) (collecting cases from different circuits discussing agency principles underpinning Rule 801(d)(2)(E)).

Due to the breadth with which Rule 801(d)(2)(E) can sweep statements into evidence, the requirement that an agreement existed to achieve some end provides an important limiting principle. To take one prominent example from the cases cited by the parties, membership in one Mafia family without more is insufficient to have statements made by members of other families be admissible under Rule 801(d)(2)(E). *United States v. Gigante*, 166 F.3d 75, 83 (2d

Cir. 1999). There must be a "unity of interests," not just analogous identities, before statements of alleged co-conspirators can speak in one's name. *Id.* Otherwise, a conspiracy could be defined at such a general level—"organized crime" or "terrorism" or just "breaking the law"—to include statements that shared no other purpose than the one superimposed on them after the fact by prosecutors. The agency theory of co-conspirator statements demands more agreement in advance than that.

But there is no magic number of co-conspirators past which unity unravels. Statements made in furtherance of a large conspiracy are no more outside the bounds of Rule 801(d)(2)(E) than ones made in service of a small conspiracy. As commentators and courts alike have noted, large conspiracies will necessarily encompass a greater number of statements under Rule 801(d)(2)(E). *See Gigante*, 166 F.3d at 82 ("The conspiratorial ingenuity of La Cosa Nostra expands the normal boundaries of a criminal enterprise, and Rule 801(d)(2)(E) must expand accordingly to encompass the full extent of the conspiracy."); WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 6778 ("The rule is flexible enough to capture conspiracies ranging from a two-person robbery team to a hundred-person crime family."). Instead of altering the rules of evidence, cases that involve wide-reaching conspiracies simply underscore the importance of the proponent of the evidence demonstrating that a common objective bound the conspiracy together, that the defendant agreed to this goal, and that the statements at issue were made in furtherance of it. *See, e.g.*, *United States v. Russo*, 302 F.3d 37, 46 (2d Cir. 2002) (stressing that in large conspiracies, admissibility under Rule 801(d)(2)(E) "depends on the nature of the statement offered—in particular what objective it sought to advance—and whether the defendant was jointly engaged with the declarant in a conspiracy seeking that objective.").

As the records from ISIS's databases attest, the conspiracy at issue was large. It was not, however, boundless. The alleged conspiracy of which Musaibli was a part was providing ISIS with material support and resources in the form of personnel and services. Those goals set a clear boundary to the plot. For example, statements made by those offering services and personnel to *other* terrorist groups are outside the limits of this conspiracy. *Cf. Gigante*, 166 F.3d at 83. Nor could a statement that a member of ISIS made after withdrawing from the conspiracy or after the conspiracy had terminated fall within the conspiracy's ambit.

*See United States v. Conrad*, 507 F.3d 424, 430 (6th Cir. 2007) ("[O]ut-of-court statements made *after* the conclusion of the conspiracy are not made 'in furtherance of the conspiracy.'"); WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 6779 ("[A] statement cannot be offered under Rule 801(d)(2)(E) if it was made after the party against whom it is offered has withdrawn from the conspiracy."). But statements generated by ISIS's bureaucratic apparatus to support the mission of providing the terrorist group with personnel and services are different. Those statements fit comfortably within the alleged conspiracy's scope.

The ISIS documents are also in furtherance of the alleged conspiracy. "A statement is 'in furtherance of' a conspiracy if it is intended to promote the objectives of the conspiracy. The statement need not actually advance the conspiracy to be admissible. Additionally, statements which identify the participants and their roles in the conspiracy are made 'in furtherance' of a conspiracy." *Conrad*, 507 F.3d at 430 (quoting *Clark*, 18 F.3d at 1342). For example, because statements identifying Musaibli as an ISIS fighter attest both to the services that Musaibli agreed with others to render to the terrorist group and to how the group managed its personnel, they further the conspiracy with which he is charged. Likewise, statements identifying the administrators who managed information about alleged fighters like Musaibli—one of whom he met and directed to alter parts of his entry—are not "idle chatter," but rather clearly indicative and in furtherance of a conspiracy to provide services and personnel to ISIS. *United States v. Wright*, 343 F.3d 849, 867 (6th Cir. 2003). The sinews of shared purpose tether these statements to one another and back to Musaibli.

Finally, Musaibli's attempt to break this chain by suggesting that he might show that he withdrew from the conspiracy does not merit de facto exclusion of the ISIS documents. Appellee Br. at 5–6. Although we have noted that the lower a person's position in a conspiracy is, the weaker the presumption that the person continues to belong to the conspiracy becomes, *see United States v. Brown*, 332 F.3d 363, 374 (6th Cir. 2003), Musaibli has yet to offer sufficient evidence indicating that he withdrew from the conspiracy before the statements at issue were made. In sum, we conclude that the district court erred.

*United States v. Musaibli*

### III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court and **REMAND** for further proceedings with instructions that the ISIS documents may be admitted as statement of co-conspirators pursuant to Federal Rule of Evidence 801(d)(2)(E). Furthermore, the government's motion to expedite is **DENIED** as moot.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-1013

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

    v.

IBRAHEEM IZZY MUSAIBLI,

    Defendant - Appellee.

**FILED**
Aug 02, 2022
DEBORAH S. HUNT, Clerk

Before: BOGGS, MOORE, and GRIFFIN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's denial of the government's motion to admit the evidence at issue is REVERSED, and the case is REMANDED with instructions that the evidence may be admitted.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk