United States District Court
Eastern District of Michigan
Southern Division

United States of America,

        Plaintiff,

                                    Case No.  18-20495

v.

                                    Hon. David M. Lawson

Ibraheem Izzy Musaibli,

        Defendant.

## Government's Motion *in Limine* to Preclude Duress Defense and Brief in Support

The United States of America respectfully moves to preclude the defendant from presenting evidence on, or asserting an affirmative defense of, duress or coercion. The defendant cannot as a matter of law establish the elements of this defense and therefore is not entitled to present the defense at trial. The burden here is on the defendant, and he should be precluded from arguing duress or coercion unless he is able to make a pretrial, *prima facie* showing "that he can produce evidence on each of the elements of the defense." *United States v. Johnson*, 416 F.3d 464, 468 (6th Cir. 2005), *cert. denied*, 546 U.S. 1191 (2006). Otherwise, allowing the defendant to argue duress or coercion when the defense is legally unavailable to him would be inappropriate: it would confuse the issues, mislead the jury, and be unfairly prejudicial because it invites a decision "on an improper basis." *United States v. Langhorn*, 473 F. App'x 436, 441 (6th Cir. 2012).

1

Finally, there is no need to adjourn the trial for purposes of securing testimony on this topic as there are still six weeks until trial.

Pursuant to Local Rule 7.1, there was a conference between attorneys for the government and an attorney for the defendant in which the government explained the nature of this motion and its legal basis and requested but did not obtain concurrence in the relief sought.

Respectfully submitted,

DAWN N. ISON
United States Attorney

s/*Michael C. Martin*
Michael C. Martin
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Michael.C.Martin@usdoj.gov
(313) 226-9100

s/*Hank Moon*
Hank Moon
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Hank.Moon@usdoj.gov
(313) 226-9100

Date:  December 5, 2022

<u>**Brief in Support of Motion to Preclude Duress Defense**</u>

### I.      Background

Ibraheem Musaibli was born and raised in Dearborn, Michigan. By 2013 he
was emailing links to lectures by American Anwar al-Awlaki, al-Qaeda's "leading
English-language propagandist" who was later "embraced by the Islamic State and
its followers." https://ctc.westpoint.edu/the-enduring-influence-of-anwar-al-
awlaki-in-the-age-of-the-islamic-state/. While dead by 2013, al-Awlaki remained
an "online recruiter for global jihad" who has had an "influence in more than half
of U.S. jihadist terrorism cases in the years since his death." *Id*.

In February 2015, Musaibli exchanged emails with religious websites and
asked whether he had "an obligation to find a way to go to Syria/Iraq and join
Sunni fighters?" He was unequivocally told not to go: in response to his questions,
he was told "It is prohibited to go to conflict zones such as Syria and join the
khawarij [extremists]." Musaibli was undeterred, and said in response that "I
believe the Islamic State 'Isis' are true mujahideen . . ." In April, Musaibli paid
cash for a one-way ticket from Detroit to Oman, and then made his way to Yemen.
While in Yemen, he watched more al-Awlaki videos and searched for,
downloaded, and read issues of Dabiq—ISIS' online recruiting and propaganda
magazine. He also downloaded an ISIS book explaining how to get into Syria.

Musaibli flew from Yemen to Saudi Arabia, where he visited the U.S. Embassy to "get financial support for my turkey expenses." The Embassy offered him a ticket back to the United States, but he refused: he wanted $500 in cash to pay for the rest of his trip. Musaibli flew to Turkey on October 9, 2015, and crossed the border into Syria from there to join the al-Nusrah Front, Ahrar al-Sham, or ISIS, according to a post-*Miranda* interview. He admitted that he knew that Raqqa was ISIS' capital and went there for that very reason. Once with ISIS, Musaibli admitted that he received religious education and attended a military training camp. The military training camp was in Mosul, Iraq, and he learned ambush tactics, how to maintain and fire an AK assault weapon, and how to conduct Ribat [armed guard duty]. At the end of training camp, Musaibli was issued an AK assault weapon, magazines, and grenades. He and his fellow graduates pledged allegiance to ISIS and its commander, Abu Bakr al-Baghdadi. Musaibli finished training camp around December 2015 or January 2016.

After training camp, Musaibli was assigned to a foreign fighter battalion and went with that battalion to Hit, Iraq. According to Musaibli, he stayed there around ten to fourteen days before heading back to the area around Mosul, Iraq. Musaibli made many contemporaneous statements to friends and family in the summer and fall of 2016 confirming that he was in Mosul fighting with ISIS. For example, in Facebook messages in May 2016, Musaibli said that he was in Iraq "conducting

4

Jihad in the Salam State [believed to be a typographical error in Arabic meaning the Islamic State] against America and the Rafidah [derogatory term for Shi'ah Muslims] Iran." In that same series of messages, Musaibli said that "our Amir Abu 'Umar al-Baghdadi leads us." In a set of Facebook messages in July 2016, Musaibli said again that he was in Iraq "with the Islamic State . . . fighting Americans and their friends." He confirmed in a second set of Facebook messages in July that he was "presently on the outskirts of Mosul" and "fighting the Americans and Iranians."

In September and October of 2016, Musaibli confirmed in chats with his father Izzy ("Izzy") that he was still in "Mosul" waiting on the expected "long siege on Mosul." The coalition's campaign to liberate Mosul from ISIS began in approximately October 2016, and the Iraqi Prime Minister declared victory over ISIS in Mosul in July 2017. https://www.wilsoncenter.org/article/timeline-the-rise-spread-and-fall-the-islamic-state. Izzy repeatedly asked Musaibli to leave ISIS and Iraq, to no avail. On September 29, 2016, Izzy told Musaibli: "My advice to you is to give your self to the American embassy or forces[.] You are American and will be treated fairly." On October 19, 2016, Izzy tried again, saying: "Try to leave Mosil as soon as possible. Leave with civilians towards Turkey. . . . Many American like you returned and help is there for any one willing to go back to America even the airline ticket." Musaibli refused: "I can't right now it's a very

busy season for us right now[.] No more land of adultery. It's over." When Izzy

tried to get Musaibli to leave Iraq for Yemen, Musaibli again refused, saying "Yes

Yemen God willing but after I finished my work here[.]"

Musaibli maintained contact with his family, primarily Izzy, in 2017, often

asking for money. For example, in March 2017 Musaibli asked Izzy to send him

money from Yemen. In response, Izzy again told Musaibli to leave ISIS. "This is

the time to think wisely and seriously to plan to leave from where you at . . . If you

see the situation there is getting worse and becomes hard for you to leave on your

own , then the best thing you can do is to give your self to USA Forces . . . Talk to

the FBI your self . . . Talk to them please I have their number." Musaibli refused,

telling Izzy to "tell Fbi that I'm just living as a civilian not involved with isis and

it's very risky and dangerous to leave no everywhere is mines and pkk [Turkish

armed group]," so that Izzy could send him money. When Izzy told Musaibli that

he would need "to get the Fbi approval" to send money, because providing

material support to ISIS is a federal crime, Musaibli again responded "Tell I am no

longer involved with isis."

At least as early as March 2017, Musaibli knew that his family was in

contact with the FBI—and Izzy was repeatedly telling him to leave ISIS. But

Musaibli never wanted to leave: he did not say that he was imprisoned, he did not

say that he was a hostage or there against his will, and he did not ask for the FBI's

help—he wanted money. Musaibli was in Syria in 2017 and 2018. When later asked by the FBI about his time in Syria, Musaibli said that he spent time in prison. But he also admitted that, when he wasn't in prison, he spent a lot of time watching movies: *Hunger Games*, *Joy*, *Legend*, and *Cinderella*.

On April 21, 2018, Izzy sent the FBI a text message saying that Musaibli was interested in speaking with the FBI directly. Musaibli exchanged hundreds of messages with the FBI in April, May, and June 2018. In summary, Musaibli said that he traveled to Raqqa, Syria—which he knew to be ISIS's capital—out of curiosity. Musaibli admitted to attending an ISIS religious and military training but said that ISIS forced him to. Musaibli admitted to joining an ISIS fighting battalion but said that he never fought for ISIS. In these conversations with the FBI, Musaibli said that he was regularly imprisoned by ISIS. Musaibli also made it clear that he spent his time in Syria at the market, in internet cafes, and downloading movies and tv shows to watch. Musaibli even sent the FBI screenshots of episodes of *The Big Bang Theory*, and the movies *Captain Fantastic*, *The Passion of the Christ*, and *Jumanji II*, and said "This is wat I do now." When the FBI searched Musaibli's phone, they found evidence of countless TV shows and movies as well as internet searches for women actresses, dating sites, and pornography.

In these conversations, the FBI repeatedly offered to help get Musaibli out of ISIS territory and bring him home:

7

- "turn yourself into SDF. Then we can try and negotiate them turning you over to U.S. . . . If that happens, I will try and personally come get you."

- "I'm trying to figure out what your capability of movement is. So we can come up with a plan . . . If you get to the SDF, I could tell them you are cooperating and work on trying to get you turned over to us. . . . If/when they turn you over I will try and fly out ASAP to bring you home[.]"

- "I know in your particular case, we will let SDF know that I intend on flying out to see you and work on getting you back to the U.S."

- "I am pleading with you do go to the SDF today or tomorrow."

- "I focus on your situation trying to get you out of Syria safely."

- "I want to make sure you are out of Syria safely and away from ISIS and everything that goes along with them."

But instead of taking the FBI up on its offer to help him leave ISIS territory, Musaibli started by asking for money so that he "can pay the smuggler $2000" to get him to Turkey so that he could return to Yemen—not the United States. When the FBI told Musaibli that no one could send him money, that it was a crime, he switched tactics and repeatedly tried to negotiate a deal, asking for, among other things: (1) a presidential pardon; (2) a guarantee of no jail time; (3) for the FBI to

8

take him to Yemen where he could live with his wife; (4) for the FBI to help bring his wife to live with him in Syria; (5) for his wife to live in his prison cell with him, "So it would feel like 'home'""; and (6) two months in jail with "a t.v. and three meals in my cell" and house arrest/parole in Yemen.

Ultimately, in or around June 2018, Musaibli came into custody of the Syrian Democratic Forces. Musaibli was transferred to the custody of the FBI and transported to the United States on July 24, 2018. During his flight to the United States, Musaibli waived his *Miranda* rights and spoke with FBI agents. Relevantly and in summary, Musaibli again admitted to attending an ISIS religious and military training camp but said that he was forced to. Musaibli admitted to swearing allegiance to ISIS and its leader, Abu Bakr al-Baghdadi. Musaibli said that he was assigned to an ISIS fighting and guard battalion and that he went with this battalion to Hit, Iraq. But he now said that he went to Hit to get out of prison.

Musaibli was indicted for three terrorism related crimes, and in a pretrial hearing on November 3, 2022, and in subsequent conversations with undersigned counsel, Musaibli's defense counsel indicated that they intend to raise a duress defense.

## II.   The defense cannot establish the elements of a duress or coercion defense as a matter of law

The affirmative defense that a defendant should be excused from his criminal acts because of duress or coercion is reserved for "rare situations," and is

9

to be "construed very narrowly." *United States v. Singleton*, 902 F.2d 471, 472 (6th Cir.), *cert. denied*, 498 U.S. 872 (1990). The Sixth Circuit has held that the defense is only available if a defendant establishes five elements: (1) that the defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) that the defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct; (3) that the defendant had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm; (4) that a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm; and (5) that the defendant did not maintain the illegal conduct any longer than absolutely necessary. *United States v. Newcomb*, 6 F.3d 1129, 1134-35 (6th Cir. 1993) (citing *Singleton*, 902 F.2d at 472–73).

A defendant is entitled to the defense if he is able to offer "some support[ing]" evidence, even if it "is weak or of doubtful credibility." *Johnson*, 416 F.3d at 467. However, a district court has a "duty to require a *prima facie* showing by the defendant that he can produce evidence on each of the elements of the defense." *Id*. at 468; *United States v. Campbell*, 675 F.2d 815, 821 (6th Cir.), *cert. denied*, 459 U.S. 850 (1982) (defendant "must introduce evidence on all elements

of the defense"). The defense fails in the absence of sufficient evidence on every element, even if the defendant produces adequate evidence as to one or more of the elements. *Campbell*, 675 F.2d at 821 (If "it is apparent that all of the requirements of the coercion defense are not addressed, the trial court is not obligated to allow the evidence to remain for consideration by the jury").

Whether a defendant has established a *prima facie* case of duress is not a question that should be left to the jury; it is a question of law to be decided in the first instance by the district court. *Johnson*, 416 F.3d at 468. As a consequence, "the trial judge should not allow its [the duress defense] presentation to the jury" when "as is in this case, the issue is raised in a pretrial motion" and "the defendant's proffered evidence is legally insufficient . . . ." *Id.*; *see also United States v. Grainger*, 239 F. App'x. 188, 190 (6th Cir. 2007) (affirming district court's grant of government's pre-trial motion *in limine* to preclude duress defense and stating that "[w]hether or not a defendant has established a prima facie case of the affirmative defense of necessity is a question of law.").

Musaibli cannot meet the first element of the duress defense because there is no factual basis to conclude that he faced an imminent and impending threat of death or serious bodily injury. And even if Musaibli could offer some evidence on this front, he would still not be entitled to assert the duress defense because he cannot meet the second, third, fourth, or fifth elements either. Perhaps most

11

obvious is the second element, which requires that Musaibli provide some evidence that he did not recklessly or negligently put himself in a situation where he might be forced to choose criminal conduct. But here, Musaibli left the United States, flew halfway around the world, stopped in Yemen, Saudi Arabia, and Turkey—giving him ample time to think about his actions, illegally crossed into Syria, and intentionally went to Raqqa, which he knew to be ISIS's capital.

### a. Musaibli intentional, recklessly, or negligently joined ISIS

Musaibli cannot show that he had not "recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct." *Newcomb*, 6 F.3d at 1134 (cleaned up). Here, the evidence shows that Musaibli intentionally traveled to Syria to join ISIS, making the duress defense clearly unavailable to him. But even accepting as true Musaibli's after-the-fact explanation that he traveled to Raqqa, Syria, which he knew to be ISIS's capital, out of curiosity, then he recklessly and negligently put himself in this position by intentionally going to ISIS's capital in the first place. As explained by the Sixth Circuit, "the burden of proving duress as an affirmative defense is placed on the defendant precisely because 'consciously performed acts are presumed voluntary.'" *United States v. Shemami*, 425 F. App'x 425 n.1, 428 (6th Cir. 2011) (quoting *Vance v. Terrazas*, 444 U.S. 252, 268 (1980)).

So even if Musaibli were truly forced into working for ISIS due to threats of death or serious bodily injury, he could have avoided such conduct and threats by simply staying in the United States and not going to ISIS's capital as a purported "tourist." By voluntarily and intentionally entering Syria and ISIS controlled territory, the defendant—at best—put himself into a situation where working for ISIS was a likelihood, precluding him from raising a duress defense. "[T]he keystone of the [duress] analysis is that the defendant must have no alternative-either before or during the event-to avoid violating the law." *Id*., at 428 (quoting *United States v. Ridner*, 512 F.3d 846, 850 (6th Cir. 2008)). Further, the voluntary nature of Musaibli's actions "tends to negate" any evidence he may try to offer on the third and fifth prongs as well. *Id*. at 427.

### b. The defendant did not face an imminent threat of death or serious bodily injury

The duress defense requires an imminent, well-grounded apprehension of death or serious bodily injury, which the Sixth Circuit has said means physical harm or a threat of physical harm. *See United States v. Huff*, 1998 WL 385555, 5 (6th Cir. 1998) (affirming refusal to give duress instruction because no evidence of a threat of physical harm). Musaibli said that he was tortured once and repeatedly imprisoned. There is no evidence of either of these claims; but even taking them as true, the threat must be *imminent*—and there is no evidence that Musaibli ever faced an imminent threat of death or serious bodily injury. The Sixth Circuit is

13

clear that imprisonment is not enough: "The alleged fact that a defendant is told he will suffer incarceration if he does not engage in criminal activity provides no legal excuse for committing a crime." *United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir. 1984).

And there is no evidence that Musaibli was tortured. But even if he was, there is no evidence that the threat of torture lasted the entire time, the *years* he spent with ISIS. A speculative possibility about something that may or may not happen in the future simply is not the type of imminent, and immediate threat required by the elements of the defense, even if it is made by people with a reputation for violence.

The *Campbell* case is instructive on this point. There, the defendants, who were members of a prison gang called "the Wolverines," were indicted for armed bank robbery. 675 F.2d at 816–17. The defendants filed a pre-trial motion seeking permission to call several witnesses, most of whom were fellow gang members. *Id*. at 817. The defendants proffered that these witnesses would testify in support of what the Sixth Circuit dubbed "the Wolverine defense," namely that the defendants had to rob the bank or be killed by fellow gang members. *Id*. The defendants proffered that the witnesses would testify about "the consequences in disobeying an order from the President of the Wolverines" and that the defendants "acted under fear of death." *Id*. at 817–18. The district court refused to permit the

14

defendants to call these witnesses because the court held that the defendants were not entitled to the duress defense as a matter of law. *Id*. On appeal after conviction, the Sixth Circuit affirmed the district court's ruling. The court of appeals stated that "even if he asserts that he has acted under the orders of that organization in fear of his life," the defendants were still not entitled to the duress defense because the threat of death was not "immediately and imminently present at the time of the commission of the crime." *Id*. at 820.

So too with Musaibli. There is no evidence on the record that Musaibli suffered physical harm or a threat of physical harm, and certainly nothing that would rise to the level of an *imminent*, well-grounded apprehension of death or serious bodily injury.

Further, Musaibli relying on his statements to the FBI (which are hearsay), without testifying under oath, is too thin to meet his evidentiary requirement. When speaking with the FBI in 2018, Musaibli said for the first time that he was imprisoned and tortured by ISIS. But by 2018, ISIS was nearly defeated and Musaibli was looking for a way out—perhaps not surprisingly, these statements are the opposite of the pro-ISIS statements he made in real time in 2016 when ISIS was near its peak strength. There are two main problems with these statements as the basis of a duress or coercion defense. First, they are the defendant's self-serving statements, and there is no corroborating evidence that the government is

15

aware of. His statements, not taken under oath or subject to cross examination, are insufficient to show that he faced an imminent threat of death or serious bodily injury. Thus, where, as here, "the evidence is simply too thin to substantiate the claim, then the district court could properly reject a duress defense" based on the first duress factor. *United States v. Hopkins*, 151 F. App'x 448, 455 (6th Cir. 2005). Second, these are Musaibli's statements, and the only way he can introduce this information is to testify at trial himself, a decision that he can make after opening statements and after the government rests its case. The defense should not be permitted to argue the affirmative defense of duress or coercion to the jury in opening statements or to question government witnesses during cross examination before he makes the required evidentiary record.

### c.  Musaibli had a reasonable, legal alternative to violating the law

Nor does Musaibli have any evidence that he "had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm." *Newcomb*, 6 F.3d 1129, 1134 (cleaned up). Musaibli had many reasonable alternatives. He could have stayed in the United States, as he was told to do. Or he could have stayed in Yemen, Saudi Arabia, or Turkey. Instead, he did his own research—reading Dabiq and listening to al-Awlaki lectures—and came to his own conclusion that "the Islamic State 'Isis' are true mujahideen," prompting him to join up. He could have reported his alleged

16

imprisonment and torture to the many, many family members he spoke to over social media and messaging applications in 2016 and 2017 and asked for help. Instead, while ISIS was doing well, Musaibli admitted to fighting with ISIS against American and coalition forces.

He could have fled ISIS territory, deserted, or simply refused to serve ISIS. He could also, at any time, do what he eventually did—contact the FBI. And once Musaibli was directly communicating with the FBI for nearly six weeks, he could have taken the agency up on its repeated offers to help him leave ISIS territory. Instead, Musaibli refused each time, stating that he wanted money to travel back to Yemen, wanted to negotiate a deal with the prosecutors and judge in the United States, or wanted the FBI to arrange for him to be reunited with his Yemeni wife— even requesting that she live with him in his cell.

Whether Musaibli had a reasonable, legal alternative to violating the law requires a moment-by-moment analysis. For example, the Sixth Circuit in *Johnson* rejected the notion that a defendant who shot a security guard, Jones, during a bank robbery had no "reasonable, legal alternative," because in the short time between the defendant entering the bank and pulling the trigger, the defendant "could have warned Jones of the impending robbery, handed over his gun to Jones, or told Jones to lock the door." 416 F.3d at 468–69. As a result, the Sixth Circuit held that the defendant's "failure to proffer any competent evidence that he had 'no

17

reasonable, legal alternative' to shooting Jones and participating in the robbery was fatal to his showing a *prima facie* case and precluded the presentation of the duress defense." *Id.* at 469.

Applying that logic to this case, Musaibli had not seconds, or minutes to choose a different path—he had *years*. He was with ISIS in Iraq and Syria for more than two and a half years, and he was not held hostage in a cell with no access to the outside world. This left him ample opportunity to spend at least some time as he chose to by, among other things, (1) chatting with family and friends; (2) searching the internet for celebrity women; and (3) downloading and watching popular tv shows and movies. The Sixth Circuit has held that "[w]hen criminal conduct endures for 125 days, or a year, or two years, it is logical to conclude that a defendant who is not being held hostage must have ample opportunity to alert the authorities to his predicament." *Newcomb*, 6 F.3d at 1137. Musaibli was with ISIS two and a half years, providing him countless opportunities to avoid the threats and obey the law. Musaibli cannot satisfy the third duress prong either.

### d.  Fighting against coalition forces was not a reasonable alternative

The duress test also requires that a "direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm." *Id*. at 1134 (cleaned up). There is no evidence that Musaibli was ever in prison or tortured, much less imprisoned repeatedly, as he claimed. But

Musaibli has also never stated that ISIS forced him to fight—rather than conduct Ribat, cook, or do some other, less violent work—each time when he was released from prison. So if he choose to fight rather than serve in some other non-combat role, then the fourth prong would not be available to him either.

### e. Musaibli maintained his illegal conduct longer than necessary

For many of the same reasons discussed in section c. above, Musaibli remained with ISIS far longer than was necessary (again assuming that he was not there completely voluntarily the entire time). And assuming for the sake of argument that Musaibli was imprisoned and/or tortured at some point, he spent most of his time in a non-custodial setting with access to the internet and a phone doing everyday type activities: chatting casually with family and friends, watching tv, listening to music, and surfing the internet. Yet, in all of his chats, posts, and calls, Musaibli never asked anyone for help leaving ISIS. In fact, the FBI spent six weeks trying to convince Musaibli to turn himself into the SDF only to be rebuffed time and again because the terms were not to his liking.

The Sixth Circuit has repeatedly held that evidence that a defendant maintained his illegal conduct beyond the minimum time necessary negates the fifth duress element. *See, e.g.*, *Singleton*, 902 F.2d at 473 (in firearm possession case, defendant did not meet the fifth element of duress defense because "he maintained possession of the firearm after he had made his escape" and "should

19

have called the police"); *Grainger*, 239 F. App'x. at 191 (in illegal immigration case, defendant did not meet the fifth element of duress defense because "during the approximately two years he lived illegally in this country he made no effort to apply to the Attorney General for reentry, to return to Canada, or to take any other steps to discontinue his illegal conduct").

### III. Musaibli should be precluded from arguing—or even mentioning—duress or coercion unless and until he's met his burden of production

Allowing Musaibli to raise the affirmative defense of duress or coercion before he has made a *prima facie* showing "that he can produce evidence on each of the elements of the defense," *Johnson*, 416 F.3d at 468, puts the government—and the Court—in an untenable position, because if Musaibli is unable to meet his burden, then argument during opening statements and/or questioning of the government's witnesses in support of coercion or duress would be irrelevant, and should be excluded under Rule 401. And injecting an irrelevant, legally unavailable "defense" would confuse the issues and mislead the jury and should be excluded under Rule 403. Otherwise, the government would be either forced to address this irrelevant, legally unavailable "defense" or leave it to the jury to wonder why the government did not engage. Further, the Court would then have to decide whether to give the coercion/duress jury instruction because the defense raised it during the trial, knowing that the defense is legally unavailable. Finally, allowing Musaibli to raise a legally unavailable duress or coercion "defense" is

unfairly prejudicial because it invites a decision based "on an improper basis."

*United States v. Langhorn*, 473 F. App'x 436, 441 (6th Cir. 2012). It is appropriate

for this court to grant this "motion in limine to preclude [Musaibli] from arguing or

presenting evidence on topics that would lead to jury nullification." *United States*

*v. Walsh*, 654 F. App'x 689, 696–97 (6th Cir. 2016).

## IV.    Conclusion

For these reasons, the government respectfully requests that the Court

preclude Musaibli from arguing the affirmative defense of duress or coercion

unless he is able to make a pretrial, *prima facia* showing that he can meet the

elements of the defense.

Respectfully submitted,

DAWN N. ISON
United States Attorney

s/*Michael C. Martin*
Michael C. Martin
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Michael.C.Martin@usdoj.gov
(313) 226-9100

s/*Hank Moon*
Hank Moon
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Hank.Moon@usdoj.gov
(313) 226-9100

Date:  December 5, 2022

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2022, I electronically filed the

foregoing document with the Clerk of the Court using the ECF system which will

send notification of such filing to defense counsel in this case.

s/*Hank Moon*
Hank Moon
Assistant United States Attorney