United States District Court
Eastern District of Michigan
Southern Division

United States of America,

        Plaintiff,

                                    Case No.  18-20495

v.

                                    Hon. David M. Lawson

Ibraheem Izzy Musaibli,

        Defendant.

_____/

## Government's Opposition to Defendant's Motion *in Limine* to Exclude Government Exhibits under Fed. R. Evid. 401 and 403

The United States of America respectfully files this opposition to Defendant's Motion in Limine to Exclude Government Exhibits under Fed. R. Evid. 401 and 403. (ECF No. 249, PgID.2831). The defendant's motion should be denied because the evidence he seeks to exclude is highly relevant to elements of the offenses, and the prejudice he identifies simply does not exist, is too speculative, or is not substantial enough to offset the evidence's probative value.

## BACKGROUND

Musaibli is charged with three crimes: providing and attempting to provide material support to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Count 1); conspiracy to provide material support to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Count

2); and receipt of military-type training from ISIS, a foreign terrorist organization, in violation of 18 U.S.C. § 2339D(a) (Count 4). (ECF No. 48, PgID.104).

For Counts 1 and 3, the government must prove that ISIS was designated by the Secretary of State as a terrorist organization. For all Counts, the government must also prove that, at the time of the offense, Musaibli had knowledge of one of three things: (1) that ISIS was a designated terrorist organization; (2) that ISIS engaged or engages in terrorist activity as defined in section 212 of the Immigration and Nationality Act; or (3) that ISIS engaged or engages in terrorism as defined by section 140(d)(2) of the Foreign Relations Authorization Act. Musaibli declined the government's offer to stipulate to these elements.

The government must therefore prove beyond a reasonable doubt that Musaibli knew, at the time he committed his offenses, that ISIS had engaged in terrorism at any time in the past, or was presently engaged in terrorism. Musaibli seeks to exclude several pieces of evidence that pertain to these elements and are highly relevant under Federal Rule of Evidence 402. Musaibli argues that these pieces of evidence are unfairly prejudicial under Federal Rule of Evidence 403. But the prejudice Musaibli identifies is either nonexistent, not at all unfair, or so weak that it cannot "substantially" outweigh the probative value of the evidence.

## ARGUMENT

Evidence is relevant if it makes more or less probable the existence of any fact "of consequence in determining the action." Fed. R. Evid. 401. Rule 403 "provides a balancing test for excluding relevant evidence, but only if the evidence's 'probative value is substantially outweighed by a danger of . . . unfair prejudice.'" *United States v. Clark*, 24 F.4th 565, 579 (6th Cir. 2022) (quoting Fed. R. Evid. 403). This balancing test "is strongly weighted toward admission." *United States v. Majeed*, No. 21-5143, 2022 WL 16943238, at *2 (6th Cir. Nov. 15, 2022) (*quoting United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018)).

The term "unfair prejudice" does not mean evidence that is "simply adverse to the opposing party," because "[v]irtually all evidence is prejudicial or it isn't material." *Koloda v. General Motors Parts Div., General Motors Corp.*, 716 F.2d 373, 378 (6th Cir. 1983). Rather, "unfair prejudice," means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (*quoting* Fed. R. Evid. 403, advisory committee note); *see also United States v. Guthrie*, 557 F.3d 243, 250 (6th Cir. 2009) ("Within the context of Rule 403, unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis.").

Terrorism cases present the obvious possibility that emotionally charged evidence will be presented to the jury. Terrorism is, at its core, about acts of violence, often against innocent civilians. Gruesome pictures of dead victims and damaged property are not uncommon in such trials. *United States v. Salameh*, 152 F.3d 88, 120 (2nd Cir. 1998) (affirming admission of admission of photographs of the corpses of six people killed at the scene of the 1993 World Trade Center bombing over objection on Rule 403 grounds despite the photographs being "graphic" and "disturbing"). "But much of this emotional overlay is directly related to the nature of the crimes that the defendant has set out to commit. It should not surprise a defendant that proof of his participation in conspiracies to provide material support to terrorist organizations and to kill Americans here and abroad will engender the presentation of evidence offensive to the sensibilities of civilized people. Terrorism trials are not to be confused with high tea at Buckingham Palace." *United States v. Mehanna*, 735 F.3d 32, 64 (1st Cir. 2013).

Aside from some articles in *Dabiq* magazine discussed further below, which the government does not plan to publish to the jury, the pieces of evidence that Musaibli seeks to exclude under Rule 403 are not pictures of dead bodies or videos of beheadings. In fact, the government has deliberately chosen not to present gruesome pictures or videos to the jury—although such evidence has been admitted in other terrorism trials. *Mehanna*, 735 F.3d at 60 (affirming admission of

evidence of ISIS beheading prisoners over defendant's Rule 403 objection). The evidence at issue here are (1) a video of the defendant admitting to conducting jihad in 2017; (2) photographs of two prominent terrorists that influenced Musaibli directly; (3) photographs of two ISIS prisoners—a journalist and a Jordanian pilot—that Musaibli was aware of; (4) a video of coalition forces blowing up an ISIS money depot (the effects of which Musaibli reported feeling directly in the form of reduced pay from ISIS); and (5) copies of *Dabiq*, an ISIS propaganda magazine that Musaibli read. All of this evidence (save the money depot video) is directly relevant to Musaibli's knowledge that ISIS was engaged in terrorism—an element of the offenses that the government must prove. And this evidence is highly relevant because Musaibli encouraged his family to join him in jihad in the 2017 video, made statements indicating that he knew who the two prominent terrorists were, knew about the journalist and Jordanian pilot, and read the ISIS propaganda magazine. This evidence is therefore especially probative because it helps explain Musaibli's knowledge and intent. True, this evidence is about terrorism and acts of violence. But that is what ISIS was about. It is simply "inescapable" that in a case about supporting terrorism "there would be some evidence about violence and terrorist activity." *United States v. El-Mezain*, 664 F.3d 467, 511 (5th Cir. 2011) (affirming admission of videos of "suicide bombings," "violent images of the aftermath" of suicide bombings, and videos of

children "playing the role of terrorists in school ceremonies" over defendant's 403 objection). In fact, evidence of ISIS's violence is directly relevant because it is precisely that violence which would have put Musaibli on notice that ISIS was engaged in terrorism, which is an element of the offenses the government must prove. Evidence like the graphic depictions of ISIS burning the Jordanian pilot alive published in *Dabiq*, a magazine Musaibli read before joining ISIS. The key question here is whether the evidence is "unfairly" prejudicial to such a degree that the unfair prejudice "substantially" outweighs the probative value of the evidence. Musaibli's motion falls far short of establishing that this highly relevant evidence is unfairly prejudicial.

A.   Musaibli's video to the State Department

The State Department received two tips, one in 2016 and the other in 2017, that claimed that Musaibli was with ISIS. The government does not plan to admit the substance of either tip. However, the second tip included a video that Musaibli filmed of himself thanking his family for helping him "come here for jihad" and encouraging them "to come make hijrah to the land of jihad." In later communications with the FBI, Musaibli admitted to making the video, which the government plans to admit.

The video is relevant for several reasons. First and foremost, the video shows Musaibli, by himself with no gun to his head, admitting that he is

6

conducting jihad.[1] This trial is about whether Musaibli provided material support to ISIS, and in this video Musaibli—who repeatedly said that he was with ISIS in Iraq and Syria—admits that he is conducting jihad there.

Second, the video shows an injury to Musaibli's temple that was not present in photographs of Musaibli dated December 2015. Musaibli said in chats with his family that he was injured with a bullet in Anbar, Iraq, and told a fellow inmate that he was shot in the head while fighting for ISIS against the coalition. This video, which was of course filmed prior to the State Department receiving it in February 2017, is the earliest evidence the government has of Musaibli's injury. Thus, the video sets the outer bound of when Musaibli was shot while fighting the coalition: sometime between December 2015 and February 2017. In conjunction with Musaibli's other statements (that he was in Hit, Anbar, Iraq; that he was fighting the Americans) and the ISIS records that show that he was paid as a fighter for much of 2016, this video makes it "more probable" that Musaibli was injured while providing material support—fighting—to ISIS. Fed. R. Evid. 401.

---

[1] An ISIS expert is going to tell the jury that ISIS defined 'jihad' to mean the duty of all able-bodied Muslims to travel to and support the caliphate. In particular, ISIS called all military aged males to fight for the caliphate, which strived to conquer its enemies. Even relative to other Islamists, jihad in ISIS ideology is violent, genocidal, and expansionist.

Third, this video shows that Musaibli was able to get communications to the United States government in 2017, undercutting his claims that he was coerced into fighting with ISIS and withdrew as soon as he could. If he could film himself and provide the video to his brother-in-law, then certainly he could pass a message saying that he was in trouble; that he was repeatedly imprisoned; that he was a hostage; that he had been tortured; or that he wanted help leaving. Yet, he did not do any of those things; rather, he filmed himself bragging about conducting jihad and encouraging his family to join him. This video is relevant to Musaibli's state of mind at the time he made the video.

Musaibli nonetheless argues that this evidence is cumulative and could prejudice the jury because it might "reinforce the stereotype that because they are an immigrant Muslim family, they are likely supporters of extremist violence." (ECF No. 249, PgID.2839). As to the cumulative nature of the evidence, this is the only video where the defendant admits that he is fighting jihad. Musaibli's own statements—shown in a video straight from his mouth—are strong evidence of his intent: that he knowingly joined the Islamic State. It is also direct evidence that Musaibli was not in jail at the time; that he was not being coerced at the time; that he had not withdrawn at the time. That is very probative evidence.

As to prejudice, Musaibli asks this Court to find that his video admission that he is conducting jihad with ISIS is "unfairly prejudicial" because *his*

8

*statements* might cast his family as "supporters of terrorism." He cites nothing in support of this claim. Further, these are Musaibli's statements, and he is free to explain them to the jury if he chooses to.

B.     Photographs of Abu Bakr al-Baghdadi and Anwar al-Awlaki, two prominent terrorist leaders known to Musaibli

The government plans to introduce the pictures of al-Baghdadi and al-Awlaki shown below.



**Exhibits 1 and 2: Abu Bakr al-Baghdadi and Anwar al-Awlaki**

Abu Bakr al-Baghdadi was the first leader—the self-declared Caliph—of the Islamic State. He announced the establishment of the ISIS caliphate and turned the Islamic State into a terrorist group with global ambitions. Under his leadership, ISIS called for Muslims around the world to travel to and join the Islamic State. And Musaibli knew that al-Baghdadi was ISIS's leader. Musaibli he admitted that he swore allegiance to Baghdadi upon his completion of an ISIS military training camp. Information about al-Baghdadi and Musaibli's knowledge of him is relevant

to the elements the government must prove at trial: that ISIS was a terrorist organization and that Musaibli knew it.

Anwar al-Awlaki was an American of Yemeni descent who became the chief propagandist for aspiring Sunni jihadists. He overtly called for violence against the U.S. and its allies for what he believed was their mistreatment of Muslims and recruited foreigners, particularly English-speaking foreigners, to join Sunni jihadists groups. Groups like ISIS. Musabili admitted that he listended to al-Awlaki's lectures in the United States and Yemen, and that he was motivated to join ISIS because of online propaganda "like awlaki lectures." Musaibli's radicalization—why he traveled halfway around the world to join ISIS—is relevant to the central issue the government must prove at trial: *that* Musaibli did in fact provide material support to the Islamic State.

Musaibli begrudgingly admits that these men "have some relevance to this case," but claims that the pictures are irrelevant—names will suffice, he says—and that any relevance is outweighed by the fact that the pictures show both men in "traditional dress," which will "remind the jury of prejudices . . . that Islam is a foreign religion that gives birth to violent extremism." (ECF No. 249, PgID.2840-41). The Court should reject Musaibli's arguments with respect to these two photographs for three related reasons. First, information about Musaibli's knowledge of al-Baghdadi and al-Awlaki are directly relevant to elements the

government must prove at trial, and the government "is entitled to introduce its own evidence to prove every element of its case." *United States v. Boyd*, 640 F.3d 657, 668 (6th Cir. 2011) (citing *Old Chief*, 519 U.S. at 186–87. Musaibli knew who these men were: he listened to al-Awlaki's lectures, heeded their calls to fight, and served under al-Baghdadi as an ISIS fighter. The government should be permitted to provide this evidence to the jury in order to meet its burden of proof, including by proving Musaibli's knowledge. Nor is the government limited to eliciting both mens' names rather than showing their pictures because, as the Supreme Court has held, "a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it." *Old Chief*, 519 U.S. at 189.

Second, Musaibli cites nothing for the proposition that these pictures are "unfairly prejudicial," claiming without support that seeing them will cause the jury to associate Islam with "violent terrorist[s]." These are not mug shots or pictures of the men committing violent acts. Rather, these pictures are how al-Baghdadi and al-Awlaki choose to dress—how they wanted the world to see them. The picture of al-Baghdadi, for example, was taken during his announcement of the ISIS caliphate. Musaibli sought out al-Awlaki and al-Baghdadi. He choose to listen to these men and to serve under al-Baghdadi in ISIS. The issue is one of fairness, and "a defendant raising a Rule 403 argument must establish 'unfair'

prejudice, not mere prejudice," which Musaibli cannot do. *United States v. Talley*, 164 F.3d 989, 1000 (6th Cir. 1999).

Instead of admitting the above picture of al-Awlaki, Musaibli suggests that the government could admit a picture of a smiling al-Awlaki, with children, taken well before he became a propagandist for one the world's most violent terrorist organizations. That is not the Anwar al-Awlaki that influenced Musaibli to join ISIS and therefore is not relevant as a government exhibit.

Third, any potential prejudice here can be cured by providing a limiting instruction, if appropriate, cautioning "the jury not to use the evidence for an impermissible propensity purpose." *United States v. Emmons*, 8 F.4th 454, 477 (6th Cir. 2021). Limiting instructions like these are regularly used to address potential prejudice, a practice approved by the Sixth Circuit and other circuits. *See, e.g.*, *Talley*, 164 F.3d at 1000; *United States v. Young*, 916 F.3d 368, 379 (4th Cir. 2019) ("Furthermore, any prejudicial effect was blunted by the district court's limiting instructions to the jury."); *United States v. Jayyousi*, 657 F.3d 1085, 1108 (11th Cir. 2011) ("and mitigated the prejudice to the defendants by instructing the jury to consider the video not for its truth, but rather as state of mind evidence against Hassoun and Jayyousi.").

C.     Photograph of James Foley and Muath Safi Yousef al-Kasasbeh

The government also plans to introduce the pictures of James Foley and

Muath Safi Yousef al-Kasasbeh shown below.



**Exhibits 3 and 4: James Foley and Muath Safi Yousef al-Kasasbeh**

James Foley was an American journalist beheaded by the Islamic State in

August 2014. Muath Safi Yousef al-Kasasbeh was a Jordanian pilot burned alive

by ISIS in January 2015. The government intends to present limited evidence of

these crimes to show that ISIS engaged in terrorism and that the defendant *knew*

that ISIS engaged in terrorism, elements the government must prove at trial.

Both pictures are unquestionably relevant: ISIS murdered both men in what

are clearly acts of terrorism. Further, both events happened before Musaibli joined

ISIS—while he was still in the United States. ISIS beheaded Foley in August 2014

and burned al-Kasasbeh alive in January 2015. When talking to the FBI in 2018,

Musaibli acknowledged that he knew that ISIS murdered both men, saying that he

"heard about James Folly [and] the Jordanian pilot," that "james foley wasn't

13

supposed to be killed," and explaining that he would rather remain in ISIS territory than turn himself in because a U.S. judge could (1) be rascist; (2) have had a relative killed in 9/11; or (3) want "to avenge james foley blood on victims like" Musaibli. In addition, the government will elicit expert testimony at trial that both events were well documented and known at the time, with western media covering the murders in detail. Further, expert testimony will show that ISIS acknowledged and even embraced both killings, publicizing the killing of the Jordanian pilot in an article in *Dabiq* just months before Musaibli joined ISIS. This is important because Musaibli stated in February 2015 that he believed that "the Islamic State "Isis" are true mujahiden [jihaidi fighters]," meaning he had done at least some research into ISIS and would almost certainly have come across these killings.

This evidence is directly relevant to Musaibli's intent. The government needs to prove that Musaibli knew that ISIS engaged in terrorism, and that ISIS very publically beheaded a journalist and burned a pilot alive immediately prior to Musaibli researching ISIS is evidence of his knowledge. This is buttressed by the fact that he later admitted to knowing of both murders. These pictures are also relevant to Musaibli's counterclaims of his intent, and "circumstances surrounding an alleged crime become more relevant when the defendant makes his intent a disputed issue." *United States v. Curtin*, 489 F.3d 935, 952 (9th Cir. 2007) (en banc). First, this evidence cuts against Musaibli's later claims that he went to Syria

as a "journalist," because no one would go to Syria as a journalist after doing research on a terrorist organization that beheads journalists. Thus, these pictures are relevant "because they rebutted [Musaibli's] arguments that the purpose of [his] planned travel to the Middle East was not to join the Islamic State, but rather simply for [journalism]." *United States v. Elhuzayel*, 807 F. App'x 621, 622 (9th Cir. 2020) (citing *Curtin*, 489 F.3d at 952). Second, these pictures and evidence of these murders are relevant to Musaibli's claims that he withdrew from ISIS. Evidence shows that he stayed with ISIS after he knew about both murders, which undercuts his claim that he withdrew from the conspiracy.

Musaibli asks the Court to exclude these pictures because he claims that the fact that ISIS beheaded Foley and burned al-Kasasbeh alive are not in dispute, and that showing these pictures "unfairly inflames the emotions of the jury without any evidentiary need." Def. Br. at 12. First, these facts *are* in dispute and there *is* an evidentiary need for their admission. The government offered to stipulate that ISIS was a terrorist organization and that Musaibli knew that ISIS engaged in terrorism, but the defendant declined. Thus, the government now has to prove both elements. That (1) both Foley and al-Kasasbeh's murders happened before Musaibli left the United States; (2) Musaibli researched ISIS in the weeks and months after the murders; (3) ISIS publicized the murder of the Jordanian pilot in an issue of *Dabiq*—a magazine Musaibli admitted he read when he was in Yemen; (4)

Musaibli flew half way around the world and joined ISIS nonetheless; and (5)

Musaibli later acknowledged knowing of both murders, all "makes it more

probable" that Musaibli knew that ISIS engaged in terrorism at some point before

he provided material support to the organization. Fed. R. Evid. 401.

The government acknowledges that "all relevant evidence is prejudicial to

some degree," *United States v. Dumas*, 836 F.2d 551 (6th Cir. 1987)

(unpublished), but Musaibli joined ISIS—a group that bragged about beheading

journalists, boasted about burning a pilot alive, and raping and enslaving women,

so his attempt to exclude all evidence that "remind[s] the jury of the brutality of

ISIS," (ECF No. 249, PgID.2841), rings hollow.

### D.   The video of the bombing of ISIS's cash depot

The government intends to call General Sean MacFarland as a witness in

Musaibli's trial. General MacFarland led the coalition's fight against ISIS in 2015

and 2016, which included the battle of Hit, Iraq, and the preparations for the battle

of Mosul, Iraq. Musaibli admitted to being in both Hit and Mosul during this time.

General MacFarland is going to explain the coalition's campaign to defeat ISIS,

including how the coalition targeted ISIS's funding in an attempt to decrease the

moral of ISIS fighters. During this testimony, the government intends to admit and

play a 30 second, soundless video of a coalition airstrike destroying an ISIS cash

distribution center or bank near Mosul in 2016. The video is taken from the

perspective of an aircraft and does not show the aircraft or any markings. It just shows a building being destroyed and money flying through the air. *See* exhibit 5 for a screenshot from the video. In a call to his parents in March 2017, Musaibli specifically acknowledged this airstrike and the effect that it had on him as an ISIS member. He asked his parents for money for food and said that ISIS was running low on money because "the plane hit it—the bank."



**Exhibit 5: screenshot from video showing airstrike on ISIS money facility**

The video is relevant because it supports the government's theory that Musaibli was paid as a member of ISIS and fighter. First, Musaibli was an ISIS fighter at the time of the airstrike, and part of the government's evidence against Musaibli are ISIS documents that show him being paid as a fighter for several months after the airstrike in 2016. His ISIS pay decreases over several months during that time, and this airstrike explains why.

Second, Musaibli said that he graduated from ISIS training camp in Mosul around December 2015 or January 2016 and stayed in the Mosul area for most of

2016. These statements are consistent with the ISIS records showing that Musaibli was paid as a fighter for most of 2016 (the records stop near the end of 2016). The statements and records are also consistent with the video. That there was a coalition airstrike targeting ISIS's money to decrease fighter moral, that Musaibli was aware of the strike, and that it affected Musaibli, also makes it more probable that Musaibli provided material support to ISIS as a fighter.

In sum, the airstrike video buttresses the ISIS documents in showing that Musaibli was paid as an ISIS fighter and makes a fact at issue in the trial—whether Musaibli provided material support to ISIS—more probable. Fed R. Evid. 401. Musaibli's only claim of "unfair prejudice" is that the video will make "the jury feel as if they are part of the military engagement with ISIS." (ECF No. 249. PgID.2842). But he cites no support for this sweeping claim. The video is dated 2016 and depicts events that clearly happened in the past. The video is in black-and-white, lacks sound, and is akin to similar videos or photos that are shown on the nightly news or printed in newspapers (not to mention movies, television shows, and video games). Nor does the video contain images of victims or graphic violence. There is simply no reason to believe that jurors will be emotionally swayed by this video, and Musaibli's concerns to the contrary are extremely speculative, at best. The probative value of this evidence is not "substantially outweighed" by Musaibli's speculative claims of unfair prejudice.

E.   *Dabiq* magazine is highly relevant because Musaibli admitted that it influenced him to join ISIS

During his conversations with FBI Task Force Officer Kerner, Musaibli admitted in writing and orally that he read *Dabiq* magazine while he was in Yemen. Musaibli traveled to Yemen in 2015, stayed for several months, then left to travel to Syria—via Saudi Arabia and Turkey—and join ISIS. *Dabiq* is an English language magazine published by ISIS from 2014 to 2016. Musaibli told TFO Kerner that he was influenced to travel to Syria, in part, by what he saw in *Dabiq* and he admitted that he downloaded issues of *Dabiq* onto his iPad while in Yemen. However, Musaibli explained that he did not bring his iPad with him to Syria because he was concerned that he might be detained by Saudi Arabian or Turkish security forces if they discovered this material.

During 2015, ISIS published five issues of *Dabiq* magazine prior to Musaibli leaving Yemen for Syria. Each issue contains articles and photographs pertaining to ISIS's ideology, ISIS's military accomplishments, ISIS's attempts to govern its territory, and ISIS's terrorist attacks against civilians. Most of the articles and photographs pertaining to ISIS's military and terrorist activities are not overly graphic in their description of events or in the photographs accompanying the articles. However, a small number of photographs are graphic in nature, including pictures of the Jordanian pilot burning alive.

Musaibli argues that the issues of *Dabiq* "have no evidentiary value" because it is unknown which issues Musaibli read. (ECF No. 249, PgID.2844). But *all* of the issues contain evidence that would put Musaibli on notice that ISIS was engaged in terrorism, therefore it does not matter which particular issue he read. In order to make this point, the government needs to introduce multiple issues of *Dabiq* so that the jury can see that no matter which issues Musaibli read and downloaded, they all establish his knowledge of ISIS's terrorist activities. The issues of *Dabiq* are therefore highly relevant to Musaibli's knowledge and intent. *United States v. Abdi*, 498 F. Supp. 2d 1048, 1071–72 (S.D. Ohio 2007) (admitting pictures regarding al Qaeda over defendant's Rule 403 objection because the images were "highly relevant" to defendant's "intent and motivation").

Musaibli also argues that it is "dangerous" to introduce evidence of his reading material, and cites *United States v. Waters*, 627 F.3d 345, 354 (9th Cir. 2010) for the proposition that reading material will "rarely have a particular significant probative value." But the crime of conviction in *Waters* was arson, which does not contain the same intent elements as material support of terrorism. The arson statute, 18 U.S.C. § 844(i), merely requires proof that the defendant acted knowingly and maliciously. The government does not need to prove that the defendant who committed the arson knew that a particular group was involved in terrorism. And in any event, Musaibli offers no explanation of how *Dabiq* is

unfairly prejudicial, aside from pointing out that articles in *Dabiq* "advocated violence." (ECF No. 249, PgID.2845). But that is precisely what makes *Dabiq* so relevant. The fact that *Dabiq* discusses or shows terrorist activities is why Musaibli would know that ISIS was engaged in terrorism at the time he read the magazine. The use of the magazine for that purpose is entirely fair.

## CONCLUSION

For these reasons, the government respectfully requests that the Court deny the defendant's motion to exclude Government exhibits under Rule 403.

Respectfully submitted,

DAWN N. ISON
United States Attorney

s/*Michael C. Martin*
Michael C. Martin
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Michael.C.Martin@usdoj.gov
(313) 226-9100

*s/Hank Moon*
Hank Moon
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Hank.Moon@usdoj.gov
(313) 226-9100

Date:  December 12, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 12, 2022, I electronically filed the

foregoing document using the ECF system, which will send notification of filing to

the counsel of record.

s/<u><i>Hank Moon</i></u>
Assistant United States Attorney

22