UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                Case Number 18-20495

v.                                        Honorable David M. Lawson

IBRAHEEM IZZY MUSAIBLI,

                Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO EXCLUDE X-RAY SCANS AND MRI AND GRANTING IN PART DEFENDANT'S MOTION TO ADMIT CERTAIN STATEMENTS OF UNAVAILABLE WITNESSES**

Defendant Ibraheem Izzy Musaibli is charged with crimes involving the provision of material support to a terrorist organization and receiving military-type training from a foreign terrorist organization, that organization being the Islamic State of Iraq and al-Sham (ISIS). Before the Court is the defendant's motion to exclude the results of x-ray films that were taken during the defendant's second competency evaluation at FCI Butner, where the x-ray scans allegedly show metal fragments including a bullet-shaped object and pieces of shrapnel embedded in or proximate to the defendant's skull. The defendant also moves to allow admission of hearsay statements made by several witnesses during interviews abroad with government agents, which were memorialized in FBI Form 302 reports, due to the asserted unavailability of the witnesses whose interviews are the subject of the reports. The defendant has not established that the x-ray results are inadmissible under any theory advanced. That motion will be denied. The defendant will be allowed to offer into evidence, once a proper foundation is laid, the reports of statements by unavailable witnesses procured by the FBI in furtherance of his right to present a defense.

I.

The government has accused Musaibli of serving as a soldier for ISIS from April 2015 through June 2018 in Syria. Musaibli, an American citizen born in Dearborn, Michigan, was supposedly radicalized in April 2015 and traveled to Yemen. Six months later, he left Yemen and traveled to Syria (by way of Saudi Arabia and Turkey), where he joined ISIS.

The factual background and lengthy procedural history of the case are familiar to the Court and the parties. The Sixth Circuit remanded the case to this Court on September 13, 2022, after ruling that all of the documents proffered by the government as having been records of ISIS operations will be admissible at trial as non-hearsay statements by co-conspirators under Federal Rule of Evidence 801(d)(2)(E). The Court previously ruled that the defendant's custodial confession and other statements made by him to government agents also will be admitted. The case presently is set for a final pretrial conference on December 21, 2022, with the jury trial scheduled to begin on January 17, 2023.

II.

In his first motion, the defendant seeks an order excluding from evidence the results of the defendant's MRI and x-ray scans conducted at FMC Butner in November 2019.

A.

The defendant was transferred to FCI Butner for a second competency examination after the first examiner failed to carry out the Court's directive to include a neuropsychological assessment in the scope of the competency evaluation. In November 2019, the second examiner directed that the defendant be subjected to an MRI scan for that purpose. The defendant was asked if he had any metal in his body, and he said no. However, when the defendant was positioned for the scan, the MRI machine sounded an alarm indicating the presence of metal in the scan area. An

x-ray scan of the defendant's head then was taken, which revealed "what the examiner believed to be a metal object in Mr. Musaibli's skull." According to the government, the scans show a "bullet shaped object" embedded near the skull, and other metallic fragments which appear to be shrapnel in or around the defendant's skull.

The defendant contends that because the traces of metal in his skull were discovered during an "involuntary court-ordered examination," they should be excluded from evidence at trial. The defendant argues that Federal Rule of Criminal Procedure 12.2(c)(4) prohibits the use of the evidence. However, that rule states, "No *statement* made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the *statement*, and no other fruits of the *statement* may be admitted into evidence against the defendant in any criminal proceeding [except for certain circumstances not pertinent to this case]." (Emphasis added.) The defendant apparently concedes that the x-ray images and MRI scanner alert do not constitute "statements" made by him, but he contends that the "same principles apply" to the use in evidence of information derived from medical scans, which according to him "involve his Fourth Amendment right to be free from unreasonable searches and seizures." The defendant argues that the Supreme Court's holding in *Estelle v. Smith*, 451 U.S. 454 (1981), precludes the use of the evidence, where the Court held that the admission at trial of statements made during the course of a court-ordered psychological evaluation violated the defendant's Fifth Amendment right against self-incrimination.

The government says that it intends to offer the x-ray images and expert testimony by Dr. Andrew Stock, Clinical Director at FMC Butner, who read the x-ray scans and will testify that he observed traces in the images that appear to be embedded metallic objects. The government argues that Rule 12.2(c)(4) is inapplicable because it does not intend to offer any "statement" by the

defendant, but instead it simply will introduce the scans that disclose physical evidence discovered in his body during the competency evaluation, and the defendant consented to the examination when his attorney's asked for the competency evaluation.

B.

In *Estelle v. Smith*, the Supreme Court held that "the admission of [an examiner's] testimony [relating his conversations with the defendant] at the penalty phase [of the defendant's capital trial] violated respondent's Fifth Amendment privilege against compelled self-incrimination because respondent was not advised before the pretrial psychiatric examination that he had a right to remain silent and that any statement he made could be used against him at a sentencing proceeding." 451 U.S. at 461. However, in later decisions, the Supreme Court held that the applicability of the rule announced in *Estelle* was limited to the "distinct circumstances" of that case, where "the trial judge had ordered, *sua sponte*, the psychiatric examination and [the defendant] neither had asserted an insanity defense nor had offered psychiatric evidence at trial." *Buchanan v. Kentucky*, 483 U.S. 402, 422 (1987). The Court explained that "if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested," and "[t]he defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution." *Id.* at 422-23. Following the lead of *Buchanan*, the Sixth Circuit has explained that "even if *Estelle* extended to non-capital sentencing proceedings, it applies only to an involuntary psychiatric examination," and the rule is inapplicable where the defendant "'initiate[d]' the idea of an evaluation [by asking] for a psychiatric evaluation under 18 U.S.C. § 4241, a statute that does not provide for a defense-only report." *United States v. Graham-Wright*, 715 F.3d 598, 603 (6th Cir. 2013).

The government's initial point, that Federal Rule of Criminal Procedure 12.2 is inapplicable to anything that occurs during the course of a defense initiated competency evaluation, is well taken because that rule applies only where a defendant intends either to assert an insanity defense or to raise arguments involving mental condition at the sentencing phase. Here, as in *Buchanan*, the second competency evaluation was ordered by the Court under the authority of 18 U.S.C. § 4241(a), upon a defense motion seeking a more searching evaluation than the first examiner had conducted, which explicitly was meant to include "neuropsychological testing." *See* Order Granting Second Mot. for Competency Evaluation, ECF No. 77. As the government points out, and as the Sixth Circuit and other courts in this district have affirmed, "Federal Rule of Criminal Procedure 12.2 controls mental examinations where the defense intends to introduce evidence of insanity as a defense at the guilt phase or sentencing phase"; it "'does not deal with the issue of mental competency to stand trial.'" *United States v. Wilson*, No. 16-20460, 2020 WL 1429497, at *5 (E.D. Mich. Mar. 24, 2020) (quoting Fed. R. Crim. P. 12.2 Adv. Comm. Note); *United States v. Thompson*, 462 F. App'x 561, 565 (6th Cir. 2012) ("Rule 12.2 does not deal with the issue of mental competency to stand trial"). Therefore, in the case of a defense initiated competency evaluation, "Rule 12.2 has no applicability," and the defendant's "situation is controlled entirely by 18 U.S.C. § 4241." *Thompson*, 462 F. App'x at 565.

Notably, although the Court granted a defense request to review the report separately before disclosure to the government, no objections to its disclosure were presented, and the full report was produced to the government after review by defense counsel. *See United States v. Graham-Wright*, 715 F.3d 598, 603 (6th Cir. 2013) ("[The defendant] asked for a psychiatric evaluation under 18 U.S.C. § 4241, a statute that does not provide for a defense-only report. It is true that, at the hearing on the motion, Graham-Wright's attorney indicated that he wanted what §

4241 does not permit — for a government-paid psychiatrist to perform the examination and to give the report only to the defense. The court denied Graham-Wright's request and ordered a report that would be distributed to both parties and filed with the court."). In such circumstances it is settled that Rule 12.2 simply does not apply.

Moreover, as the decisions following and interpreting *Estelle* confirm, the holding of that case does not establish any Fifth or Sixth Amendment right to withhold any evidence derived from a competency evaluation that the defendant voluntarily initiated and underwent, after he consulted with and was advised by his counsel, and where he was informed before the examination that all information obtained would be disclosed to the government. The defendant argues that he has "analogous" rights under the Fourth Amendment to preclude the use of the x-ray results in evidence, although he has not cited any legal authority so holding. However, even if the Court assumes that such an analogue applies, the case law holds that the Fifth and Sixth Amendments do not preclude the use of any statements made or evidence derived during a voluntary defense-initiated competency evaluation. *See Graham-Wright*, 715 F.3d at 603 ("[N]ot only did Graham-Wright freely submit to the examination but his statements to the psychiatrist were themselves voluntary, a far cry from the kind of compelled testimony prohibited by the Fifth Amendment. No evidence shows the court or anyone else coerced, intimidated or threatened him to speak during the examination. Just the other way: Graham-Wright conferred with his attorney before he agreed to discuss any of the details of his offense, and he was warned that his statements would be given to the court. Those factors distinguish this case from *Estelle*, where it was not clear the defendant's lawyer was informed of, let alone participated in, the psychiatric exam, and from both *Estelle* and *United States v. Chitty*, 760 F.2d 425 (2d Cir. 1985), where the defendants were not told how the exams might be used.") (citations omitted). If the defendant is entitled to "analogous" protection

of his Fourth Amendment rights, then, by extension, the protection afforded by *Estelle* in the circumstances of this case is none, where the defense initiated and the defendant consented to the competency evaluation.

The defendant has not identified any legal authority that precludes the use of the x-ray results at trial. His motion to bar them will be denied.

III.

In the next motion, the defendant seeks to admit FBI Form 302 reports of witness interviews with five persons who were interviewed by FBI agents in Syria between January 2018 and March 2019. Those persons are: Rayan Abid-Alqadir al-Zihrani, Yusif Hassan Musaif, Ayman Muhammad Marwan, Abebe Oboi Ferreira, and Atiba Joel Grant.

A,

All of the prospective witnesses were interviewed by the FBI while they were held in prison in Syria by the Syrian Democratic Forces. Throughout 2019 and 2020, the defense requested assistance locating and interviewing the witnesses, but the government declined to provide any arrangements or facilitation beyond disclosing its knowledge of the prison facilities where the witnesses were held. Two of the men later were deported to Saudi Arabia and Morocco. The other three remain allegedly in the custody of the SDF to the present (or at least as of the date the motion was filed).

In October 2020, after unsuccessful efforts to secure assistance from the government, the defense hired investigator Christopher Chang, an investigator with expertise locating persons in the Middle East. Chang made efforts to locate the men throughout 2020 and into late 2021, and he was unsuccessful largely due to complications caused by the COVID pandemic, but also due to the lack of diplomatic authorization to access persons in SDF custody. The defense hired two

other investigators to locate the men who were removed from Syria, but their efforts to locate the men were unsuccessful due to lack of sufficient information on their whereabouts.

The witnesses made various statements to FBI agents concerning the defendant's activities with ISIS from 2017 through 2018.

Rayan Abid-Alqadir al-Zihrani stated that in January 2018 he encountered Musaibli in the Syrian city of Dayr az Zayr. Musaibli was traveling in the company of a fellow America, Warren Clark, who appeared to be mentally ill. Musaibli appeared to be homeless and usually slept in a mosque.

Yusif Hassan Musaif stated that he last saw Musaibli in Gharanij, Syria, in January 2018. He stated that Musaibli was arrested and detained by ISIS three times on suspicion of being a spy. Musaibli also was seen usually in the company of two other men, one of whom was Warren Clark.

Ayman Muhammad Marwan stated that in March 2018, he knew Musaibli as someone who often was seen "selling sweets" outside an internet café in Susah, Syria.

Abebe Oboi Ferreira stated that he encountered Musaibli in October 2017 when he was "sleeping in a mosque with others." He stated that Musaibli "hated ISIS," "often argued with ISIS members," wanted to "flee Syria," and had been detained at least 20 times by ISIS. Oboi said that he was in Musaibli's company from October 2017 through June 2018, when Musaibli, Oboi, and Clark walked together to Susah. During that time, Oboi said that Musaibli was a civilian, "went weekly to the ISIS charity office to seek money and had an ISIS civilian ID card," and never was seen with a weapon. Oboi further stated that he himself was jailed by ISIS for refusing to perform military service.

Finally, Atiba Joel Grant stated that Musaibli was a civilian when Grant knew him, that Musaibli "argued with ISIS members," and that he "never knew Musaibli to receive money from ISIS."

B.

Citing *Chia v. Cambra*, 360 F.3d 997 (9th Cir. 2004), the defendant argues that exclusion of an exculpatory hearsay statement from his case would violate due process where the statement "bears 'persuasive assurances of trustworthiness' and is critical to the defense," and that in such circumstances the statement may not be excluded by a 'mechanistic' application of [the] hearsay rules." *Id.* at 1006 (9th Cir. 2004) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). The government responds that the statements are hearsay and untrustworthy.

"The right to present a meaningful and complete criminal defense is a well-established and fundamental element of due process." *Vesey v. McQuiggin*, 587 F. App'x 966, 972 (6th Cir. 2014) (citing *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14, 19-20 (1967)). But that right "is not absolute." *Ibid.* The Supreme Court has counselled that a defense presentation "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." *Chambers*, 410 U.S. at 302. That usually means that a defendant "may not offer testimony that is 'otherwise inadmissible under standard rules of evidence.'" *Vesey*, 587 F. App'x at 972 (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)).

However, even within those restrictions, "the Supreme Court has held that 'where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.'" *Ibid.* (quoting *Chambers*, 410 U.S. at 302). "In *Chambers*, the Supreme Court held that the trial court denied the defendant the

right to a fair trial when it did not allow him to present certain exculpatory evidence." *Rogers v. Mays*, 43 F.4th 530, 543 (6th Cir. 2022). The *Chambers* court found that the defendant's due process right to present a defense was violated where "[a]nother witness, McDonald, had given a sworn confession that he had committed the crime," and "[a]lthough Chambers was permitted to call McDonald and introduce the confession, Chambers was neither permitted to re-examine McDonald after McDonald recanted the confession nor allowed to call other witnesses to testify about McDonald's verbal confessions to them." *Ibid.*

It is true that a strict and "mechanistic" application of the hearsay rule, as the government advocates here, would point toward exclusion of the witness summaries. But that approach must be examined in more depth in light of the Supreme Court's criticism of it. In a compelling and well-reasoned dissent in *Gagne v. Booker*, 680 F.3d 493 (6th Cir. 2012), Judge Kethledge examined the rationale of the *Chambers* decision and found that the central considerations for the Court were whether the evidence was "central to the defendant's claim of innocence," and whether there was a "valid justification" advanced by the prosecution for excluding the evidence from the trial. Judge Kethledge wrote that where exclusion of evidence would result in a trial record denuded of exculpatory evidence, the application of the hearsay rule would produce a violation of due process and should not be upheld. *Id.* at 534 ("The only evidence with which Gagne could realistically defend himself — evidence, I might add, that suggests a substantial possibility that he is innocent — was the evidence that the trial court excluded. Even when viewed deferentially, the court's decision to strip that evidence out of the case plainly interfered with Gagne's right to defend against the State's charges. What was left was an empty husk of a trial — at whose conclusion came a prison sentence of up to 45 years.") (Kethledge, J., dissenting) (cleaned up).

The Supreme Court developed its *Chambers* rationale further in *Crane v. Kentucky*, 476 U.S. 683 (1986). The Court explained that two factors warrant consideration: the degree to which the evidence was "central to the defendant's claim of innocence"; and the strength of the "valid state justification" relied upon to exclude the evidence. 476 U.S. at 690. In his *Gagne* dissent, Judge Kethledge emphasized the former, drawing a parallel to Crane's predicament of confronting the crucial evidence against him — his confession — without being allowed to explain the coercive circumstances the led to it because a state evidence rule barred him from looking behind the state court's voluntariness determination. Gagne was forbidden in his state trial from offering relevant evidence that bore on the victim's consent because of the state's rape-shield rule. *Gagne*, 680 F.3d at 536. In both cases, the excluded evidence "was indispensable to the defendant's ability to demonstrate his innocence," and the State's interests in excluding the evidence were minimal. *Ibid*.

Here the same considerations weigh in favor of admissibility. To start, the statements offered are central to the defendant's claim of innocence, which, based on the record so far presented, turns on his assertion that he was an unwilling participant in ISIS operations, was coerced into service, and withdrew from the conspiracy at the first opportunity, early during the alleged timeframe, after he became disillusioned and afraid.

The government parses the testimony down to particulars in an attempt to draw dispositive distinctions with *Chambers*. The government says that the statements are "not essential" to the defense because the declarants' knowledge of the defendant's activities did not cover significant portions of the relevant time frame. However, as Judge Kethledge observed, the evaluation of the importance of the evidence focuses mainly on the nature of the evidence presented by the government. In this case, as in *Crane*, the government will present the most compelling sort of

evidence available in a criminal case, which is the defendant's own confession. The record does not disclose any other countervailing testimony that could provide context or call into question the inculpatory nature of the statements made by the defendant, absent the hearsay statements of the absent declarants, which tend to suggest that when the defendant served ISIS he did so unwillingly. The government highlights aspects of the statements suggesting that the declarants had a limited basis of knowledge for their observations, but those are criticisms that may be explored by the government on cross-examination of the agents who obtained the statements.

The centrality of the evidence to the defendant's case also is apparent where the physical circumstances, movement, and conduct by the defendant largely are not denied, and the underpinnings of the defense concern the defendant's state of mind and whether he willingly engaged in efforts to advance a conspiracy. As the Ninth Circuit observed in *Chia v. Cambra*, 360 F.3d 997 (9th Cir. 2004), evidence of statements made by another person who accompanied the defendant during the relevant time period may be essential to the defense where the declarant's account tends to suggest an alternative conclusion about the defendant's state of mind while engaging in acts that he does not deny committing. *See id.* at 1004 ("The probative value of the Third Statement and its importance to Chia's defense cannot be called into serious question. If believed, Wang's statement exonerates Chia. Chia's whereabouts, movements, and actions before and during the commission of the crime are not in dispute. The only issue is whether his behavior was aimed — as California contends — at facilitating and encouraging the crime, or — as Chia claims — at discouraging the conspiracy and protecting Wang from placing himself in further jeopardy."). Here, the government has charged the defendant with a wide-ranging conspiracy lasting from 2015 through 2018. The statements of the several declarants include significant observations about the defendant's whereabouts, his traveling companions, his state of

homelessness and destitution, his status as a civilian not engaged in active combat, his adversarial relationship with ISIS members, and his incarceration by ISIS on suspicion of disloyalty and spying, all over a period of 1 to 2 years of the charged timeframe. The government, of course, will be permitted to present the extensive and completely unexpurgated record of the defendant's confession and numerous records of the ISIS organization purporting to document his lengthy enlistment in its armed service. The witness accounts offered in rebuttal apparently comprise the defendant's entire rebuttal record tending to suggest that his enlistment may have been less willing than the government intends to argue.

The government also insists that the statements lack "circumstantial guarantees of trustworthiness" because they do not involve admissions directly incriminating the declarants in the same crimes for which the defendant is charged. However, in the due process context, the analogy to the so-called "declaration against interest," *see* Fed. R. Evid. 804(b)(3), is not the only avenue through which sufficient "circumstantial guarantees of trustworthiness" may be determined. Other federal courts have found sufficient "circumstantial guarantees of trustworthiness" by comparison with other hearsay exceptions, including the so-called "residual exception" in Evidence Rule 807.

Federal Rule of Evidence 807(a) establishes the so-called "residual exception" to the rule against hearsay, and "provides that '[u]nder the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804: (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests

of justice.'" *United States v. Wandahsega*, 924 F.3d 868, 881 (6th Cir. 2019) (quoting Fed. R. Evid. 807(a)). In similar circumstances, other federal courts have admitted evidence of statements memorialized in FBI 302 reports where the persons interviewed were exposed to the threat of criminal consequences of their behavior, notwithstanding whether their statements directly implicated their own guilt in the same crimes for which the defendant was charged. *E.g.*, *United States v. Ruzicka*, 105 Fed. R. Evid. Serv. 475, 2018 WL 385422, at *12 (D. Minn. Jan. 11, 2018) ("The Court finds that each of these [Rule 807] elements is met with regard to the 302 interview report. First, the statements have equivalent circumstantial guarantees of trustworthiness: Mørkeberg Nielsen was formally interviewed by two FBI agents with the assistance of counsel during a criminal investigation (ergo under threat of prosecution for false statements), and he had no incentive to lie to protect Taylor — indeed, the key exculpatory statement was arguably against the financial interests of his employer. Second, the statements are material because Mørkeberg Nielsen's indication that he would likely have approved the deal as Taylor's supervisor tends to refute the Government's assertion that the deal was based on Taylor's false claims. Third, the statements are more probative than other evidence because Mørkeberg Nielsen was Taylor's supervisor at the relevant time. And fourth, admission serves the interests of justice because it tends to vindicate Taylor's Sixth Amendment right to put on a defense.").

In this case, similarly, the statements all were taken by FBI agents from persons who already had been arrested, and apparently incarcerated, for various crimes involving their conduct under the ISIS regime. It is not clear whether any had the assistance of counsel during the interviews. However, the statements are material to the defense because they concern the defendant's state of mind while in service to ISIS and the duration of his active involvement with the conspiracy. The statements are more probative than any other available evidence before the

Court, since nothing else so far offered tends to inform the jury about the defendant's desire to escape or resist ISIS, or his desire to flee Syria during 2017 and 2018. Finally, the admission of the statements would serve the interests of justice by allowing the defendant to put before the jury the evidentiary record to support his defenses of duress and lack of intentional participation in ISIS's war campaign.

The defendant will be permitted to subpoena, and the government shall produce, the FBI agents who interviewed the witnesses and generated the Form 302 reports for the statements by the individuals mentioned above.

III.

The defendant has not demonstrated that admission of the medical imaging evidence obtained during his competency evaluation would violate any of his constitutional rights. The defendant has shown that admission of the summaries of witness interviews of the unavailable witnesses are necessary to allow him to present his defense at trial and that exclusion of that evidence would abridge his rights under the Due Process Clause.

Accordingly, it is **ORDERED** that the defendant's motion to exclude the results of the defendant's MRI and x-ray scans conducted at FMC Butner in November 2019 (ECF No. 199) is **DENIED**.

It is further **ORDERED** that the defendant's motion to admit statements of unavailable witnesses (ECF No. 205) is **GRANTED IN PART**. The defendant may subpoena, and the government shall produce at trial, the agents who interviewed the following individuals: Rayan Abid-Alqadir al-Zihrani, Yusif Hassan Musaif, Ayman Muhammad Marwan, Abebe Oboi

Ferreira, and Atiba Joel Grant; for the purpose of establishing a foundation for the admission of the FBI Form 302 summaries of the individuals' statements.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Dated:   December 21, 2022