UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

v.

Case No.  18-20495

Hon. David M. Lawson

Ibraheem Izzy Musaibli,

Defendant.

_____/

**Government's Sentencing Memorandum**

**"As for me I will never give up jihad even if my kids have to beg
on the streets and I have to eat leaves from tree . . ."**
~Ibraheem Musaibli, August 27, 2016

## I.    Introduction

Ibraheem Musaibli is an Islamic State fighter. He was not
arrested *talking* about becoming an ISIS fighter. He was not stopped on
his way to the airport to *become* an ISIS fighter. He did not change his
mind on the Syrian border or decide to come home once he got there, as
his family wished. He even refused the FBI's repeated offers to help
bring him home, back to the United States. No, Musaibli knew what he
wanted, and he saw it through to the end.

Musaibli researched ISIS while in the United States, saw that
ISIS burned a Jordanian pilot alive, and decided that this was the

group for him, calling ISIS the "true mujahideen," or holy warriors. A religious leader in Yemen told him not to join ISIS, but Musaibli walked into Raqqa, Syria (the Islamic State's capital), and joined the terrorist group anyways. He attended ISIS religious and military training camps. He proudly fought with ISIS on the front lines against American and coalition forces, as he explained to family and friends over social media. He shot at the Islamic State's enemies and was injured—shot in the head—fighting for ISIS against the United States and its allies. And he stuck with the Islamic State until the very end, when ISIS's military was in shambles and what was left of the Islamic State had been pushed into a small and shrinking strip of land in Syria. Only then was Musaibli captured and forcibly returned to the United States.

To this day, Musaibli has neither taken responsibility for serving ISIS as a foreign fighter nor shown remorse for his actions. Given the seriousness of Musaibli's conduct, the government recommends a 420-month sentence of imprisonment and a lifetime term of supervised release, with a computer monitoring provision.

2

## II.   Background

Ibraheem Musaibli is an American citizen from here in Dearborn. At some point in his mid-20s, he started watching online lectures given by Anwar al-Awlaki, a recruiter for radical terrorist groups like ISIS. By early 2015, Musaibli—while living in the safety and security of the United States—was researching the Islamic State and engaging in back-and-forth discussions about the group online. For example, in a conversation on February 24, 2015, Musaibli wrote "I believe the Islamic State 'ISIS' are true mujahideen." Mujahideen means holy warrior, and Musaibli expressed his admiration for the group even though it was known, at the time, as the world's most violent terrorist organization. For example, in the eight months leading up to Musaibli's statement, ISIS had:

- Murdered American journalist James Foley (8/9/14)

- Released a video of the beheading of journalist Steven Sotloff (9/2/14), execution of aid worker David Haines (9/13/14), and beheading of Alan Henning (10/3/14)

- Called for attacks on American and French citizens, among others, for supporting the coalition to fight ISIS (9/22/14)

- Seized 17 hostages in a cafe in Sydney, Australia (12/16/14)

- Killed 15 in the Charlie Hebdo attacks in Paris (1/7/15)

3

- Released a video of it burning a Jordanian pilot alive, while locked in a metal cage (2/4/15)

- Released a video showing the beheading of 21 Egyptian Christians (2/15/15)

Everyone knew of ISIS's atrocities—you couldn't miss them— including Musaibli, who asked on February 24, 2015, "why is m 'Muslim' Jordan fighting these Muslims." He wrote this 10 days after ISIS released the video of the Jordanian pilot being burned alive. People told Musaibli that ISIS was a terrorist group, that "[t]hey kill the innocent and tarnish the reputation of Islam with their barbarism which is not related to Islam!" But Musaibli would not listen. Instead, he left the United States and flew to Yemen, where he continued listening to al-Awlaki lectures and started reading issues of DABIQ, ISIS's propaganda magazine.

ISIS propaganda was not subtle. The group was proud of its terror, its violence, and wanted those who shared in its ideology to come join the caliphate. For example, the issue of DABIQ released in February 2015, when Musaibli was researching the group, included pictures of two Japanese men about to be beheaded, a picture of the Jordanian pilot as he is being burned alive and a second of the pilot's charred

4

remains, pictures of the Coptic Christians about to be beheaded, and pictures of alleged homosexuals after being throw off a building and being stoned to death. Musaibli asked his imam in Yemen for advice about going to Iraq and Syria and was told "not to join ISIS."

Musaibli did not take his imam's advice. Instead, he stole his wife's jewelry, left her pregnant with his child (the second time in six months that Musaibli left a pregnant wife behind), and traveled to Syria, where he joined the Islamic State.

Once with ISIS, Musaibli attended religious and military training camps, where he raised his hand and swore his allegiance to ISIS and its leader, Abu Bakr al-Baghdadi. ISIS assigned him to a military fighting battalion, and Musaibli spent at least nine months fighting on the front lines. Musaibli often talked about his military exploits in places like Hit and Mosul, Iraq; how he was "fighting the army with a Kalashnikov," "digging trenches about Mosul in anticipation for an assault by the americans and their allies the rafitha," and—in his most candid statement of all, "fighting Americans and their friends." We know this is true because Musaibli admitted all the way back in 2017, while he was still with ISIS, that he stopped "fighting after I got injured

5

in Iraq Anbar with a bullet." He then told an inmate in the U.S. that he was shot in the head while fighting against U.S. and coalition forces.

Musaibli stayed with the Islamic State until the summer of 2018, near the bitter end. By the time Musaibli tried to leave and head back to Yemen, the coalition had crushed ISIS's military and retaken most of its caliphate. But he did not make it out. Rather, Syrian Democratic Forces captured Musaibli and turned him over to the United States.

## III. Guidelines Calculation

The PSR finds and the government agrees that Musaibli's guideline range is 360–600 months, based on a total offense level of 40 and a criminal history category of VI. PSR ¶ 66. And Musaibli faces a mandatory 10-year sentence on Count 4, receiving military-type training from ISIS. PSR ¶ 67.

The PSR added twelve levels under the Sentencing Guidelines' terrorism enhancement, U.S.S.G. § 3A1.4. PSR ¶ 26. The terrorism enhancement also increased Musaibli's criminal history category from I to VI. PSR ¶¶ 34–35. Musaibli objects, claiming that the terrorism enhancement does not apply here because all of his pro-ISIS actions

6

were done "under duress" and not intended to "coerce or intimidate any government through material support."

Musaibli presented his factual claim, that he acted under duress, to the jury, which rejected it. And "the district court, when sentencing a defendant under the guidelines, cannot rely on a finding that directly conflicts with the jury's verdict." *United States v. Cockett*, 330 F.3d 706, 711 (6th Cir. 2003). There is no merit to his objection.

Legally, the terrorism enhancement applies to Musaibli's conduct: a felony "that 'involved, or was intended to promote, a federal crime of terrorism.'" *United States v. Stafford*, 782 F.3d 786, 792 (6th Cir. 2015) (quoting U.S.S.G. § 3A1.4). The law, 18 U.S.C. § 2332b(g)(5), "sets forth two requirements for an offense to be considered a federal crime of terrorism: first, the offense must be 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' and second, the underlying act must be included within an enumerated list of eligible offenses." *United States v. Wright*, 747 F.3d 399, 407 (6th Cir. 2014).

Taking the second prong first, all of Musaibli's crimes of conviction, attempting and providing material support to ISIS under 18

U.S.C. § 2339B (Count 1), conspiring to provide material support to ISIS under 18 U.S.C. § 2339B (Count 2), and receiving military-type training from ISIS under 18 U.S.C. § 2339D (Count 4) are enumerated offenses. *See* 18 U.S.C. § 2332b(g)(5)(B).

Second, the government must show by a preponderance of the evidence that Musaibli's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id.* (quoting 18 U.S.C. § 2332b(g)(5)(A)). As the Sixth Circuit explained in *Wright*, "A defendant has the requisite intent if he or she acted with the purpose of influencing or affecting government conduct and planned his or her actions with this objective in mind." *Id.*, at 408. And it is not "necessary that influencing the government be the defendant's ultimate or sole aim." *Id.* So even if the jury believed Musaibli's testimony that he went to Syria to help women and children but ended up fighting for ISIS, the terrorism enhancement would still apply. In fact, this was a very similar claim to that made in *Wright*, which the Court rejected, holding that "a defendant who provided material assistance to terrorist organizations, but claimed that his goal was to assist an oppressed group of Muslims, is eligible for the

8

enhancement regardless of his purportedly benign motive." *Id.*, (citing *United States v. Jayyousi*, 657 F.3d 1085, 1114–15 (11th Cir. 2011)).

There was overwhelming testimony presented during his trial that ISIS used violence—and foreign fighters like Musaibli—to spread its ideology, attack U.S. and coalition forces, and take over territory in Iraq and Syria, all to conquer the world. In fact, Hassan Hassan testified at the beginning of trial that ISIS members committed jihad "in the violent sense to conquer the world, take over, to attack other people and not just to defend your homeland or your home, but really to go further and spread your ideology through violence and through military means." (ECF No. 270, PageID.3036–37). There was significant evidence that Musaibli consumed ISIS propaganda—including DABIQ, was aware of ISIS's ideology and goals, and supported these goals. In communications with his father, family, and friends, for example, Musaibli repeatedly reiterated his support for ISIS and its goals: usually, fighting jihad and implementing Islamic law. And, of course, he refused to leave. But Musaibli did more than just talk. General MacFarland, among others, detailed the brutal and deadly fighting between ISIS and U.S., Iraqi, and collation forces, including fighting in

Hit and Mosul. And Musaibli admitted to fighting for ISIS against U.S. and coalition forces in Hit and Mosul.

Courts have applied the terrorism enhancement for giving money so that other people could go fight for ISIS. *United States v. Kasimov*, No. 15-CR-95-4, 2022 WL 1984059, at *5 (E.D.N.Y. June 6, 2022). Courts have also applied the terrorism enhancement to defendants who attempted to travel abroad to ISIS-held territory. *See, e.g.,* Sentencing Memorandum and Opinion, *United States v. Omar*, No. 15-cr-00049-MJD-HB (D. Minn. Dec. 5, 2016), ECF No. 829 (applying terrorism enhancement and sentencing defendant to 420 months). Musaibli himself joined up and fought for ISIS against U.S., Iraqi, and coalition forces, and knew when he did that his conduct—that supporting and fighting for ISIS—would "influence or affect the conduct of government by intimidation or coercion."

Importantly, for the enhancement to apply, a defendant's conduct can influence or affect the conduct of any government—not just the United States government. *See United States v. Assi*, 428 F. App'x 570, 574 (6th Cir. 2011) ("As a preliminary matter, a review of pertinent case law shows that the term 'government' in 18 U.S.C. § 2332b(g)(5)

includes foreign governments and therefore is not limited to acts against the United States."). And so even joining ISIS to fight against the Iraqi or Syrian regimes would warrant the enhancement. In fact, the Court in *Assi* upheld the district court's determination that that military actions by their very nature "are coercive in nature." *Id*. at 576.

And finally, as detailed above, there was overwhelming evidence that Musaibli knew that ISIS used violence to spread its ideology before he joined. Musaibli knowingly and intentionally joined ISIS, one of the world's most brutal foreign terrorist organizations, and fought with ISIS against U.S., Iraqi, and coalition militaries. The terrorism enhancement applies in this case.

## IV.   Sentencing Factors

Congress has provided factors for courts to consider when imposing a sentence in 18 U.S.C. § 3553(a). The most relevant factors for this defendant are addressed below.

### a.   Nature and Circumstances of the Offense and History and Characteristics of the Defendant, 18 U.S.C. § 3553(a)(1)

The government has repeatedly described (and the Court is independently aware of) ISIS's brutality. Its repressive ideology. Its treatment of women, children, homosexuals, Shia, Yazidis, Christians,

11

and pretty much anyone other than committed jihadists looking to rule the world through ruthless, indiscriminate violence. That Musaibli chose to join ISIS, knowing full well what the group believed in and how it used extreme violence to implement its vision; that Musaibli joined ISIS's military; that the defendant, Ibraheem Musaibli, picked up a weapon and fought against American and coalition soldiers is worthy of a significant prison sentence.

But equally troubling and a second reason why a 35-year sentence is warranted here is because Musaibli has *never*, to this day, taken responsibility for his actions, shown remorse for his conduct, or even admitted that what he did was wrong. Not once. He was dedicated to the Islamic State's core beliefs. He told us so, over and over again:

- "Jihad for the sake of God is the utmost sign of Islam."

- "I am really here for jihad not revenge . . . I really come here to help implement the Islamic law here in Iraq."

- "It is a legal obligation . . . To do jihad against Shiites and America . . . in Iraq."

- "Im thankfull to be a mujahid not american."

- "As for me I will never give up jihad even if my kids have to beg on the streets and I have to eat leaves from tree . . ."

12

And he has never abandoned his radical, violent, anti-American beliefs. When talking to a fellow inmate, Musaibli described U.S. and coalition forces as the "enemy"—years after he was captured and brought back to the United States. At trial, Musaibli refused to acknowledge his poor decisions and never said that he had changed his beliefs. Even the statement in the PSR, that the defendant "loves this country and would not want to hurt or damage this country," does not come from Musaibli, but from his father.

There is simply no reason to believe that Musaibli has moderated his views. He still believes that the United States is corrupt, that the Shia are inferior, and that ISIS fighters are the true mujahideen. There is nothing to suggest that Musaibli wouldn't join ISIS again tomorrow if he were released and sent to Yemen, as he asks for. In fact, in a recent recorded jail call, Musaibli's parents encouraged him to tell the Court that "I regret everything I've done and I'm ready to change." But Musaibli responded by saying: "Why would I say that? . . . if the jurors said I'm guilty, that doesn't mean I'm guilty." Musaibli simply will not acknowledge his criminality in a sincere and meaningful way, and he is therefore not on a path towards changing his beliefs or his behaviors.

13

Thirty-five years is appropriate here given Musaibli's conduct and his lack of remorse.

b. Seriousness of the Offense, Just Punishment, and Respect for Law, 18 U.S.C § 3553(a)(2)(A)

The guidelines create a sentencing range so that courts can sentence similarly situated defendants appropriately based upon the severity of their conduct. The guidelines here are high because terrorism offenses are serious. Musaibli fought on behalf of the world's most violent terrorist group and stayed with that group for nearly three years. He wasn't an idle participant. He fought against United States' soldiers and our allies. Tens if not hundreds of thousands of people died in Iraq and Syria because of ISIS, many of them civilians. Ten thousand civilians died in the Battle of Mosul alone[1]—a fight that Musaibli was proud of: "Thank God im in Mosul now," he wrote just months before the battle started.

And Musaibli sought out this violence. Unlike many the Court sees, he had choices. He had options. He had a family who supported

---

[1] CBS NEWS, *AP: Death toll in Mosul 10 times higher than acknowledged*, available at https://www.cbsnews.com/news/ap-mosul-isis-civilian-death-toll-10-times-higher-us-iraq-acknowledge/.

and still supports him. He had all the benefits that being born and raised in the United States offers. But he chose to leave the privilege of the United States and fight against the very freedom that allowed him to watch Anwar al-Awlaki lectures in the first place. Musaibli has a lack of respect for American law, as evidenced by both his criminal conduct and his conduct during this case.

Just punishment and respect for the law compel a sentence as significant as the choice—the decision—to join a foreign terrorist organization and fight against the United States. A 35-year sentence is both significant and just.

    c. <u>Adequate Deterrence and Protecting the Public, 18 U.S.C. § 3553(a)(2)(B) and (C)</u>

Given Musaibli's beliefs, it is unclear what could deter him from continuing to support ISIS. No one, not friends, family, or religious scholars, could convince Musaibli that he was on the wrong path. And if getting shot in the head and being forced to live in increasingly difficult conditions did not cause Musaibli to rethink his life choices, it is unclear what effect a sentence imposed by a government that he does not respect will have, if any. And although ISIS lost its physical territory, the group still exists and is actively conducting attacks in Iraq and

15

Syria, among other places. As Musaibli himself said, "we are fighting Americans and their friends . . . Jihad is advancing and retreating . . . The State will withdraw, but will come back stronger than before."

While this Court's sentence is unlikely to deter Musaibli, others can be deterred. ISIS was successful at recruiting, convincing young people from around the world to travel to the caliphate and fight and die on its behalf. And these foreign fighters formed the core of ISIS's strength. Foreign fighters like Musaibli. The cost of ISIS's rise is incalculable. The need for deterrence is even more important here because of ISIS's devastating brutality, which must be met with full accountability. A significant, 35-year sentence is necessary to deter others from taking up arms against the United States and our allies and fighting for violent, repressive terrorist organizations.

Finally, given Musaibli's unchanged beliefs, our community deserves to be protected from him and his violence, at least for the next 35 years. He was trained by ISIS in how to use an assault rifle and grenades. He fought with ISIS's military on the battlefield. He admitted to using his assault rifle on the battlefield and fought against U.S. and

16

coalition forces. He is certainly capable of using those skills to conduct attacks on civilians in the United States.

ISIS supporters do not even need to be particularly skilled with firearms or competent in the art of war to conduct deadly attacks on civilians. ISIS supporters—those with the same beliefs as Musaibli— have killed and injured Americans simply by conducting knife attacks or driving vehicles into crowds. In 2016, for example, an ISIS supporter drove a car onto the campus of Ohio State University deliberately striking several pedestrians before crashing. The attacker then exited his car and used a butcher knife to stab and slash students; thirteen people were injured in the attack. In 2017, an ISIS supporter drove a rented pickup truck into cyclists and runners in New York City, killing 8 people and injuring 11. Even more casualties have been inflicted by ISIS supporters when armed with firearms—firearms like those that ISIS trained Musaibli to use. For example, a pair of ISIS supporters shot and killed 14 people and seriously injured another 22 in San Bernardino in 2015, and another ISIS supporter shot and killed 49 people and wounded another 53 at an Orlando nightclub in 2016. The Court cannot be confident, given Musaibli's commitment to ISIS's

17

ideology and his ISIS military training and service, that he does not pose a danger to the community.

## V.   Supervised Release

Given Musaibli's crimes and unchanged beliefs, a lifetime term of supervised release is appropriate here. The guidelines specifically allow for a lifetime of supervision in terrorism and related offenses, and courts in this circuit have imposed this lengthy term. *See, e.g.*, *United States v. Hayne*, 835 F. App'x 855, 858 (6th Cir. 2020); *Wright*, 747 F.3d T 416; *United States v. Stafford*, 782 F.3d 786, 791 (6th Cir. 2015); *United States v. Amawi*, 695 F.3d 457, 488 (6th Cir. 2012).

Even with a 35-year sentence, Musaibli will be in his 50s when released—an age not too far removed from the 49-year-old jihadist who stabbed the neck and slashed the throat of a police officer at the Flint Bishop International Airport in 2017. *United States v. Ftouhi*, Case No. 17-20456, ECF No. 104, PgID.1611; ECF No. 106, PgID.1643 (Ftouhi was convicted by a jury of committing an act of terrorism transcending national boundaries, among other crimes, and sentenced to life imprisonment). The probation department will need the ability to

ensure that Musaibli is obeying the law and not engaging in conduct that presents a risk of danger to the public.

The government also recommends that the Court impose a computer monitoring provision during Musaibli's term of supervised release. Musaibli radicalized in large part by spending time on the internet: listening to al-Awlaki lectures, reading issues of DABIQ, and engaging with others online. This is not surprising, as an increasingly large body of scholarly work confirms that "the internet [has] a significant influence in the radicalization process of the violent extremists and terrorists."[2] Courts in this district and others have imposed computer monitoring provisions in terrorism cases like this one. *See, e.g.*, *United States v. Gregerson*, 16-cr-20552 (EDMI), ECF No. 64, PageID.743; *United States v. Amin*, 15-cr-00164 (EDVA), ECF No. 20, PageID.283.

---

[2] Ines von Behr, Anaïs Reding, Charlie Edwards, Luke Gribbon, RAND EUROPE, *Radicalisation in the digital era: The use of the internet in 15 cases of terrorism and extremism*, available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/radicalisation-digital-era-use-internet-15-cases-terrorism-and-0.

Here, given the gravity of Musaibli's crimes and his penchant for internet usage, the government respectfully requests that the Court enter the same special conditions as in the *Gregerson* case, that:

1. The defendant is prohibited from utilizing a computer during the term of supervised release with the exception of and solely for legal research, outside employment, as a specific class assignment in an accredited educational institution or to send or receive typed email messages without attached electronic files or images embedded in the body for a message, or for other uses, as approved in advance by the probation officer.

2. The defendant shall only access the internet through one internet capable device. All other internet capable devices, such as cellular phones and gaming consoles shall not have the internet connected. The defendant is prohibited from accessing any online computer service at any location including, but not limited to public libraries, internet cafes, and places of employment or education without the permission of the probation officer.

3. The defendant shall provide the probation officer with accurate information about all computer systems (hardware/software), all passwords and Internet Service Provider(s), that the defendant has potential access to and abide by all rules of the United States Probation Department's Computer Monitoring Program. The defendant shall only access a computer approved by the probation officer. The defendant shall consent to the probation officer conducting periodic, unannounced examinations of all computer systems, which may include computer monitoring software at the defendant's expense.

4. To ensure compliance with these provisions, the defendant shall submit his/her person, residence, computer and/or vehicle to searches conducted by the United States Probation Department at a reasonable time and manner. You shall inform any other residents that the premises and your computer may be subject to a

20

search pursuant to this condition. The defendant shall provide the probation officer with access to any requested financial information including billing records (telephone, cable, internet, satellite, etc.).

## VI.   Conclusion

The United States recommends that the Court impose a 420-month sentence followed by a lifetime of supervised release with a computer monitoring provision.

Respectfully submitted,

DAWN N. ISON
United States Attorney

_s/ Hank Moon_
Hank Moon
Assistant United States Attorney
Hank.Moon@usdoj.gov

_s/ Michael C. Martin_
Michael C. Martin
Assistant United States Attorney
Michael.C.Martin@usdoj.gov

Date:  June 9, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that I sent a true and accurate copy of the

Government's Sentencing Memorandum to defense counsel by electronic

filing.

*s/ Hank Moon*
Hank Moon
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-0220
Hank.moon@usdoj.gov